**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA,           )<br>                                                              )<br>          Plaintiff,                              )<br>                                                              )<br>          -vs-                                         )          No. CR-20-168-G<br>                                                              )<br>CHRISTOPHER STEVEN LEDBETTER,  )<br>                                                              )<br>          Defendant.                         ) | |

## UNITED STATES' SENTENCING MEMORANDUM

COMES NOW the plaintiff, United States of America, by Timothy J. Downing, United States Attorney for the Western District of Oklahoma, through Matt Dillon and Jessica L. Perry, Assistant United States Attorneys, and presents to the Court this sentencing memorandum for the benefit and use of the court in fashioning a correct and appropriate sentence in this case.

The United States Probation Office (USPO) has computed Mr. Ledbetter's guideline calculation and concluded in the revised final presentence report (PSR) [Doc. 37] that, based on a total offense level of 25 and a criminal history category of I, the guideline imprisonment range is 57 to 71 months. PSR ¶ 111. As set forth below, the United States believes the USPO correctly calculated Mr. Ledbetter's advisory guideline range, and a sentence at the top of the advisory guideline range is sufficient but not greater than necessary to satisfy the Section 3553(a) sentencing factors.

**TOTAL OFFENSE LEVEL**

On June 26, 2020, Mr. Ledbetter pleaded guilty to a one-count Information charging possession of a machinegun in violation of 18 U.S.C. § 922(o)(1). The applicable United States Sentencing Guideline (USSG) is found in Section 2K2.1(a)(5), which applies a base offense level of 18 if the offense involved a firearm described in 26 U.S.C. § 5845(a). USSG § 2K2.1(a)(5). USPO placed Mr. Ledbetter's base offense level at 18 because the definition of "firearm" in 26 U.S.C. § 5845(a) includes "a machinegun." PSR ¶ 42; *see also* 26 U.S.C. § 5845(a). Section 2K2.1(b) details specific offense characteristics.

**§ 2K2.1(b)(1)**

Subsection (b)(1) directs that "[i]f the offense involved three or more firearms, increase as follows…(A) 3–7 firearms, add 2." USSG § 2K2.1(b)(1). The guideline incorporates the definition of "firearm" from 18 U.S.C. § 921(a)(3). *Id.* at Application Note. 1. Firearm means "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3). Destructive device includes "any explosive, incendiary, or poison gas" including a bomb, grenade, or similar device. 18 U.S.C. § 921(a)(4).

Defendant admitted to, and USPO has held him accountable for, possessing a machinegun and manufacturing four destructive devices (two grenades and two incendiary devices (i.e. Molotov cocktails)). [Doc. 26]. The government submits Defendant should

be held accountable for one additional machinegun and one additional destructive device.[1]

On May 3, 2020, Defendant posted a video to Facebook depicting Close Quarters Battle (CQB) training. PSR ¶ 18. *See* Exhibit 1, CQB Video.[2] The CQB video shows Defendant and another individual shooting fully automatic AK-47-style carbines. Defendant later admitted to FBI that he had modified both of the AK-47 style carbines in the video to shoot fully automatic. PSR ¶ 31. Defendant stated that both of the fully automatic AK-47-style carbines were ordered by him, registered to him, that he modified them, and that he provided the second machinegun to his friend. LED_000606. *See* Exhibits 2 (three-part video of Custodial Interview), and 3, FBI 302 of Custodial Interview.

Defendant further admitted that he had made another grenade in addition to the two located at his home, and that he had tested it to ensure that it worked. PSR ¶ 30. These grenades were constructed to be used against law enforcement in the event "they hit me." *Id.* Defendant stated that he did not have time to make more. LED_000602. Defendant exchanged messages with other individuals via Facebook Messenger related to guns and explosives. In these messages, Defendant stated that:

- December 29, 2019–

    o Just working [sad face crying emoji] maybe make up some nades [grenades] when I get off work.

    o Hell yeah. And for sure I wanna try to make up enough to give out some to everybody riding to VA.

---

[1] The government acknowledges that the additional two firearms will not impact the advisory guideline.

[2] Videos are being presented to the Court without objection by Defendant. It was the parties intention that the Court may view the materials prior to the sentencing hearing.

- 

- [When asked if they were smoke grenades or something else, Defendant responded] Kinda like the old style myself [smile emoji] nah legit frag grenades bro. Black powder with ammonium nitrate and aluminum powder.

- I can get the shells for 10 bucks a piece here. Most important just checking your fuze burn times and making sure you get a good 50 50 of black powder in there to accelerate the AN [ammonium nitrate].

- And you have to weld the bottom closed obviouslu [sic].

*See* Exhibit 4, Application for Search Warrant.

- January 1, 2020–Defendant replied to a comment on a post: "[FBU 2] happy new years bro 😃 nah I am but in all seriousness explosives are not forgiving like other mechanical work, so nothing to not test in safe conditions or fuck around with maybes on. Nice to see at least one person on here actually understanding the dangers of incorrect fuzes, you are correct that will kill you. Ah shit look at that my first black market 😊 but yeah be safe man and may the new years have lots of explosions safe for us, not so safe for others 😃`"

- January 1, 2020–Defendant replied to a comment on a post: "[FBU 3] and obviously putting all of the stable ingredients in and no black powder but just using a blasting cap would be a lot more explosive and more stable/less likely to turn you to swiss cheese if you happened to take a rifle round to your grenade pouch. Maybe pure ammonium perchlorate or any other better more stable ingredient that can be bought."

- January 9, 2020–Defendant sent the following Facebook message to Facebook username [FBU 4]: "I imagine those shoot smoother than any rifle. I'm trying to make enough grenades to give all the boys some in VA. Ironically those are actually legal until you put the fuze in them, fucking ATF clowns."

- February 29, 2020–"I'm still man enough to use machineguns and explosives here without a cute uniform, roll out and do your job plz."

- March 3, 2020–Defendant sent the following message to FBU 6: "Oh I tested the grenades the other day. Worked very well."

Defendant made other statements related to making and carrying explosives. PSR ¶ 23.

UPSO responded to the government's request to add the two additional firearms stating that while USPO did not dispute the statements made by defendant to FBI, they do "not believe these statements are enough to support holding the defendant accountable for an additional machinegun and an additional grenade in the offense level calculation." PSR, p. 27. "[T]he government should bear the burden of proof when it seeks to raise the offense level and ... the defendant should bear the burden of proof when the defendant seeks to

lower the offense level." *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990). The burden of proof is preponderance of the evidence. *United States v. Kieffer*, 681 F.3d 1143, 1168 (10th Cir. 2012).

It is important to hold a defendant accountable for his actual conduct. The Court should accept defendant's admissions. Despite this not affecting the advisory guideline range, the Court should absolutely consider the additional machinegun and destructive device when determining an appropriate sentence. There is a reason that these out of court statements are admissible at trial–they are inherently reliable, both as admissions and statements against interest. Fed. R. Evid. 801(d)(2)(A) & 804(b). In fact, Defendant explained to FBI that the grenade viewed in the video was a "sparkler bomb firework," but he then described how he made grenades and that he had tested the grenade and it worked. As for the machinegun, not only did Defendant confess to owning and modifying the second AK-47-style carbine, but he admitted to providing it to his friend. This machinegun can be viewed in the CQB video operating just as Defendant described. Prior to making these statements, Defendant was given his *Miranda* warnings. He was specifically warned that, "[a]nything you say can be used against you in court." *See* Exhibit 5, Advice of Rights. This evidence, in its totality, is more than sufficient to hold Defendant accountable for exactly what he admitted to, videoed, and photographed.

**§ 2K2.1(b)(6)(B)**

Subsection (b)(6)(B) increases the offense level by 4 if the defendant, "used or possessed any firearm or ammunition in connection with another felony offense, or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to

believe that it would be used or possessed in connection with another felony offense." USPO has recommended this four level enhancement due to Defendant pointing the fully automatic AK-47-style carbine at a police officer at the conclusion of a police pursuit on May 19, 2020.  PSR ¶¶ 19, 45.

Defendant has objected to the characterization of the pursuit in PSR ¶ 19.  Defendant denies that he had a broken taillight, forced a vehicle from the roadway, or that he pointed his weapon at the officer.  He also claims that he only went 60 mph on the highway. Additionally, Defendant states that the black rifle was an AR-15, "not an AR-47 [AK-47]." Defendant also states that "no charges were filed."  Defendant has also objected to this enhancement claiming that PSR ¶ 45 "double counts the weapons listed in ¶ 43…constituting an unnecessary increase in levels."

The government also objected to PSR ¶ 45 asserting that Defendant used or possessed the firearm in connection with another felony—eluding an officer—in addition to pointing of a firearm.  *See* Okla. Stat. tit. 21, § 540A(B).  USPO noted that USSG § 2K2.1, Application Note 14 states that subsection (b)(6)(B) applies if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense.  USPO believed, however, that there was not "sufficient evidence to support that the defendant's possession of the firearm facilitated the offense of eluding an officer.  PSR at 27–28.  The government disagrees.

The Court need not resolve the underlying dispute raised by Defendant as to his inoperable taillight.³ An individual has no legal authority to ignore an officer's attempt to stop his or her vehicle. These disputes are to be resolved in a court of law. *A.L.G. v. State*, Okla.Crim.App., 736 P.2d 521 (1987) (holding any alleged defect in arrest warrant on juvenile did not justify his attempt to escape and elude a police officer). Nor does the Court need to decide the precise speed that Defendant was traveling while eluding the officer, but merely consider the speed in relation to the offense itself.

Defendant further denies that he caused a vehicle to exit the roadway during the pursuit. Officer William Hicks with the McLoud Police Department (MPD) was the officer involved in the pursuit of Defendant. Shortly after the incident, Officer Hicks wrote a narrative of the attempted stop and pursuit. *See* Exhibit 6, Incident/Offense Report. In the report, Officer Hicks notes that Defendant failed to yield to his lights and siren, failed to come to a complete stop at two stop signs, and after turning east on County Road 1070, Defendant forced a white sports utility vehicle off the roadway. *Id*. at p. 8. Officer Hicks activated his body camera during the pursuit. *See* Exhibit 7, Body Cam of Pursuit. Unfortunately, due to the position of the camera, it is difficult to see much activity on the roadway.⁴

---

³ Defendant did not object to the factual assertion that he crossed the centerline multiple times.

⁴ Officer Hicks' speedometer is visible through most of the video. There is inexplicably a short lapse in the video at approximately the nine-second mark, after Officer Hicks makes a left turn from McLoud Road onto Broadway westbound. The video resumes after he had made a right turn from Broadway, traveling north on Main Street/Highway 102 just as he approaches the railroad crossing.

Fortunately for the Court, Defendant also recorded the pursuit. *See* Exhibit 8, Def. Pursuit Video. This video begins slightly before Officer Hicks' video, as Defendant is traveling north on McLoud Road. The video shows Officer Hicks in Defendant's rearview mirror attempting to stop the vehicle with lights and siren activated. Defendant can be heard in the video acknowledging that he is not stopping for the officer and that he is violating the law by doing so. Defendant can be seen failing to come to a complete stop at controlled intersections. Defendant is heard chambering a round into his AK-47-style carbine machinegun.[5] *Id*. at 04:44. Defendant is heard telling his mother to get weapons ready for when he arrives. This video also shows a white sport utility vehicle move to the right of the roadway as the pursuit approaches behind him. *Id*. at 03:40.

Finally, at approximately 06:28, Defendant his heard saying, "No. No motherf***ers. Art, get the f***ing weapons." This occurs as Officer Hicks is driving

---

[5] Defendant objected to PSR ¶ 19, stating that he possessed an AR-15 during the pursuit incident and not the AK-47. He also objected to PSR ¶ 22, again stating that he possessed an AR-15 as opposed to the AK-47.

Defendant confessed to FBI that he possessed his illegal AK-47 during the traffic stop as it was "the only gun" he had at the time. He also posted on Facebook on May 20, 2020 at 3:52:50 UTC "Get everyone to my coordinates now! Tried to do a anatch [sic] and grab on me again and ran away when I took the AK out…"

The video described in PSR ¶ 22 is attached as Exhibit 9, Update Liberty or Death. The carbine seen in the video is not only an AK-47-style, but appears to be the exact firearm recovered from Defendant when he was arrested.

Counsel for Defendant was presented with these facts after the government read his objections. Counsel stated that he was withdrawing these two specific objections and asked that Defendant not be held accountable for frivolously contesting relevant conduct as these statements came directly from counsel himself, not the defendant.

towards Defendant's property. Defendant's camera then pans down, showing him readying his weapon as it is slightly raised towards the oncoming police vehicle. Officer Hicks wrote that he saw the weapon pointed at him and backed out of the scene. Defendant screams with elation that, "They're backing off now. Yeah, they're backing off now!"

A person is guilty of endangering another while eluding if: (1) he is the driver of a motor vehicle; (2) he received a red light and siren from a peace officer; (3) the officer's vehicle is an official police vehicle and directed the driver to bring his/her vehicle to a stop; (4) he willfully eluded the officer or attempted to elude the officer by increasing his/her speed, extinguishing his/her lights, or in any manner; and (5) while eluding/attempting to elude the officer; (6) the driver endangered another person. *Oklahoma Uniform Jury Instructions*, OUJI-CR 6-30.

The 10th Circuit has found that this enhancement is appropriate in this exact scenario. In *United States v. Perry*, 727 F. App'x. 539 (10th Cir. 2018) (unpublished), an officer attempted to stop the vehicle driven by the defendant due to the front seat passenger not wearing a seatbelt. *Id*. at 540. The officer activated his lights and siren in an attempted to stop the defendant. The defendant "drove away, speeding upwards of 50 miles per hour." *Id*. The defendant eventually stopped, exited the vehicle, and fled on foot. *Id*. The officer eventually caught up to the defendant and ordered him to put up his hands. *Id*. The defendant raised his left hand, but reached into his waistband with his right. *Id*. The officer again demanded that he raise both hands. *Id*. The defendant complied, but as he did, "a loaded 'Glock pistol fell from his pants.'" *Id*.

The defendant was charged with being a felon in possession of a firearm and ammunition. *Id.* USPO recommended a four-point enhancement for using or possessing a firearm in connection with endangering others while eluding a police officer in violation of Okla. Stat. tit. 21, § 540A(B). *Id*. at 541. The defendant asserted, "under Oklahoma law, an individual can only endanger others while eluding a police officer if he or she is driving a motor vehicle," and that he solely possessed the firearm after he exited the vehicle. *Id.* Therefore, the defendant believed that there was no evidence that the firearm facilitated or had the potential of facilitating the eluding. *Id.* The court applied the enhancement over the defendant's objection. The Tenth Circuit specifically found that there is no requirement that the firearm actually facilitated the other offense. *Id.* The court reasoned that if the defendant possessed the firearm during the pursuit, "then the firearm had the potential to facilitate the felony of endangering others while eluding a police officer." *Id*. at 541–542.

This is exactly what Defendant did and the reaction that he wanted. He had previously told the MPD Chief that if they attempted to pull him over for a seatbelt violation, then he would "spill [his] blood too." PSR ¶ 55. *See also* Exhibit 10 (two-part video), MPD Video. But for Defendant making his threats and possessing his machinegun during the pursuit, officers would not have retreated and Defendant may have been placed under arrest.[6] Defendant admitted that police only retreated once he "took the AK out."

---

[6] While Defendant appears to be correct that no charges have been filed at this time, he was originally arrested on a State warrant for felony eluding, use of a firearm during commission of a felony, and pointing a deadly weapon. PSR, at 29. *See* USSG § 2K2.1, cmt. note 14(C) (defining another felony offense for the purposes of subsection (b)(6)(B)

11

The facilitation of Defendant's attempt to elude officers would only be more apparent had he actually fired the machinegun.

**§ 3C1.2**

USSG § 3C1.2 instructs that, "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels." USPO has recommended this two-point adjustment due to Defendant's conduct during the pursuit. PSR ¶ 48. Defendant objects claiming there must be a nexus between the crime of conviction and the reckless endangerment during flight and that there is no such nexus related to "the defendant's possession of a modified rifle without a proper license.[7]

The government adopts the response of USPO. Defendant's argument is contrary to Tenth Circuit precedent. *See* PSR at 30–31. Additionally, the government submits that there is a nexus. Defendant possessed the same illegal machinegun during the pursuit. This, coupled with the threats made to law enforcement directly and indirectly over the course of at least four months, is sufficient nexus for the adjustment.

---

as "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, *regardless of whether a criminal charge was brought, or a conviction obtained*." (emphasis added). *See also Perry*, 727 F. App'x. at 541.

[7] Defendant has alluded to the argument that he is simply being punished for failing to pay taxes for possessing a machinegun. This argument is misplaced. The Tenth Circuit has ruled that an individual cannot be convicted for failing to register a machinegun pursuant to 26 U.S.C. §§ 5861(d) and (e) because, "the government refuses to accept this required registration due to the ban imposed by [18 U.S.C. § 922(o)]. As a result of Section 922(o), compliance with Section 5861 is impossible." *United States v. Dalton*, 960 F.2d 121, 126 (10th Cir. 1992).

## PUNISHMENT

In determining the appropriate sentence, the Court must consider the factors in 18 U.S.C. § 3553(a). The first factor is the nature and circumstances of the offense and the history and characteristics of the offense. Defendant has repeatedly claimed to be a "peaceful person." The evidence is in sharp contrast. Defendant has repeatedly made threats to use violence against law enforcement if they attempted to enforce laws that he believed went against his "peaceful freedoms." Defendant fails to understand that our system of government is not established in a manner that allows for individuals to selectively decide which laws they believe are just. We are a representative government. He is not a patriot for choosing to use violence against the enforcement of these laws. Defendant attempts to use the very type of threats and acts of aggression that he claims have been directed at him.

As to the seriousness of the offense and the need to promote respect for the law, Defendant has made his intentions very clear. He threatened to spill the blood of the MPD Chief should they attempt to stop him for failing to wear a seatbelt. In the CQB video, Defendant is shooting at targets in which the word "POLICE" and a badge have been drawn on the silhouettes. Defendant admitted to FBI that he converted this first AK-style carbine prior to any problems with the MPD because he wanted his "rights." Exhibits 2 & 3. Defendant did everything he could to provoke a violent altercation with law enforcement that surely would have ended violently.

Defendant has stated his disrespect for the law, his open defiance of the law and law enforcement, and encouraged others to act in conformity. The following are statements of Defendant that he either posted to Facebook or made publicly:

- 01/01/2020–Break the law any way you can, they aren't gonna legalize it by asking them;

- 1/14/2020–The only good cop is a dead one. Including the "good" bad ones not making the other ones good cops. 👌

- 1/16/2020–[Facebook User] we know, we're already felons. Now comes to the time when people who said they weren't gonna follow the law show if they were actually just talking hard.

- 2/20/2020–Defendant gave a speech in front of the Oklahoma State Capital in which he declared his willingness to use illegal weapons to resist the laws he disagreed with, including the killing of others. PSR at 28; *See also* Exhibit 11, Capital Speech.

- 3/14/2020–Shame I love illegal weapons and being a criminal. Liberty or Death.

- 3/14/2020–Defendant refers to himself as the admin for the Oklahoma Chapter of the New Sons of Liberty. He asks for people that are actual "pipehitters" and ends his post with, "The clock is ticking. Sic Semper Evello Mortem Tyrannis [Thus I always bring death to tyrants]."

- 3/14/2020–[Facebook User] cool excuses, still get f***ed. I'll be the one driving without my seatbelt on with a select fire and grenades pussy.

14

- 3/30/2020–Good deal, are you willing to fight law enforcement and the US government and kill or be killed for defending any peaceful freedom?

- 4/30/2020–"As you can see, I got weapons right on me. I got illegal weapons on me. But none of them are going to do anything because I'm a peaceful person. Right?" PSR ¶ 17. *See also* Exhibit 12, Kansas News.

- Defendant told his girlfriend that he wanted to go "pig hunting," referring to police. Detention Hearing Transcript, p. 35, 9–13 (attached hereto as Exhibit 13).

Defendant has consistently stated that he will not follow what he knows to be the law. "Defendant referred to terrorist laws and that the police were the equivalent of terrorists." Exhibit 14, Order on Detention. Defendant has previously argued that his threats should be protected by the First Amendment. Exhibit 13, at 115, 123. As Judge Mitchell stated, however, that the statements are "still threats in no uncertain terms." *Id*. at 132.

There is a clear need to protect the public from Defendant and to afford an adequate deterrence to this criminal conduct, both to Defendant and to his followers–Boogaloo Boys and the New Sons of Liberty.

## CONCLUSION

The government respectfully requests this Court find that Mr. Ledbetter's guideline is as submitted above and impose a sentence at the top of the advisory guideline range, which is sufficient, but not greater than necessary, to achieve the purposes of sentencing, after consideration of the factors set forth above as they relate to 18 U.S.C. § 3553(a) and the Sentencing Guidelines.

Respectfully submitted,

TIMOTHY J. DOWNING
United States Attorney


s/ MATT DILLON
MATT DILLON
OBA No. 19321
Assistant United States Attorney
210 Park Ave., Suite 400
Oklahoma City, OK 73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
Matthew.Dillon@usdoj.gov

s/ JESSICA PERRY
JESSICA PERRY
OBA No. 22681
Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 - Office
(405) 553-8888 - Fax
Jessica.Perry2@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 7, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Michael S. Johnson, attorney for Mr. Ledbetter.

s/MATT DILLON<br>
Assistant U.S. Attorney