Exhibit 13

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4   UNITED STATES OF AMERICA,

 5          Plaintiff,

 6   vs.                          Case No. M-20-255-SM

 7   CHRISTOPHER STEVEN LEDBETTER,

 8          Defendant.

 9   ----------------------------

10

11

12          TRANSCRIPT OF PRELIMINARY/DETENTION HEARING

13            BEFORE THE HONORABLE SUZANNE MITCHELL

14               UNITED STATES MAGISTRATE JUDGE

15                    JUNE 10, 2020

16                      9:00 A.M.

17

18

19                       APPEARANCES

20   FOR THE GOVERNMENT:  Mr. Matthew B. Dillon and Ms. Jessica L.
     Perry, United States Attorney's Office, 210 W. Park Ave., Suite
21   400, Oklahoma City, OK 73102

22   FOR THE DEFENDANT:  Mr. Michael S. Johnson, Attorney at Law,
     1103 N.W. 87th, Suite A, Oklahoma City, OK 73114
23

24
     Proceedings recorded by digital recording; transcript produced
25   by computer-aided transcription.
```

```
 1                        EXAMINATION INDEX

 2

 3   GOVERNMENT WITNESSES:

 4   JOSHUA RICH
          DIRECT BY MR. DILLON                        4
 5        CROSS BY MR. JOHNSON                        38

 6

 7   DEFENDANT'S WITNESSES:

 8   JOANN JOHNSON
          DIRECT BY MR. JOHNSON                      82
 9        CROSS BY MR. DILLON                        92

10   GLENN JOHNSON
          DIRECT BY MR. JOHNSON                     100
11        CROSS BY MR. DILLON                       109

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (PROCEEDINGS HAD ON JUNE 10, 2020.)

2          THE COURT:  Good morning.  We are here for a

3    preliminary hearing in the matter of 20-255, United States vs.

4    Ledbetter.

5      I'll ask counsel to make their appearances.

6          MR. DILLON:  Matt Dillon and Jessica Perry on behalf

7    of the United States.

8          MR. JOHNSON:  Good morning, Your Honor.  Michael

9    Johnson on behalf of Mr. Ledbetter, who is present at counsel

10   table.

11         THE COURT:  Thank you.

12     And I will remind everyone in the gallery and present here

13   that I appreciate that it appears we are maintaining social

14   distancing norms and to please abide by those.

15     Should any counsel or witnesses be speaking, you may

16   remove your mask for a better recording and -- but if you are

17   uncomfortable doing so, feel free to leave that on.  Please be

18   careful to speak up.

19     And as far as witnesses, I understand that there are some

20   Clorox wipes over there and I would ask that the witness

21   departing -- or we can remind them to just wipe the area down

22   so that there is no risk of any transmission.

23     And it looks like we are about to get going, so I will ask

24   the Government if they would like to present any evidence in

25   support of probable cause.

```
 1          MR. DILLON:  Your Honor, the Government calls Agent

 2   Josh Rich.

 3          MR. JOHNSON:  Judge, I do have a question.  Are we

 4   going to combine the preliminary hearing and detention hearing

 5   into one and use the same evidence?

 6          THE COURT:  To the extent that there is an overlap,

 7   that is certainly fine, but I will give both parties ample

 8   opportunity to provide additional arguments and/or evidence.

 9          MR. JOHNSON:  Yes, Your Honor.

10          THE COURT:  Should we get to the detention hearing

11   stage.

12          MR. DILLON:  Your Honor, the Government will go ahead

13   and announce now, we only intend to present one witness, so we

14   will try to separate the issues as we can --

15          THE COURT:  Certainly.

16          MR. DILLON:  -- overlap.

17          THE COURT:  Thank you.

18                         JOSHUA RICH,

19      (WITNESS SWORN.)

20                      DIRECT EXAMINATION

21   BY MR. DILLON:

22   Q.   Sir, would you please state your name.

23   A.   Joshua Rich.

24   Q.   How are you employed?

25   A.   I'm a special agent with the Federal Bureau of
```

1  Investigations.

2  Q.    How long have you been with the FBI?

3  A.    I've been with the FBI for nearly six years.

4  Q.    What do you do as a special agent for the FBI?

5  A.    Currently, my tasks are investigating domestic terrorism

6  and international terrorism cases.

7  Q.    How long have you functioned in that capacity?

8  A.    I've been assigned to the Joint Terrorism Task Force for a

9  little over a year.

10  Q.    Are you one of the case agents on the case of Christopher

11  Ledbetter?

12  A.    That's correct.

13  Q.    Do you see him in the courtroom today?

14  A.    I do.

15  Q.    Can you describe where he's seated and what he is wearing?

16  A.    He's sitting at defense counsel table wearing an orange

17  shirt and a face mask.

18  Q.    In preparation for the hearing this morning, have you

19  reviewed either reports or had conversations with other members

20  of law enforcement?

21  A.    Yes, I have.

22  Q.    Have you also had an opportunity to review the complaint

23  and complaint affidavit that was filed in this case?

24  A.    Yes, I have.

25  Q.    Are you relying in part for your testimony on those

1   conversations and reports of other law enforcement members?

2   A.   That is correct.

3   Q.   Are you also asking the Court to adopt the affidavit

4   complaint as part of your testimony this morning?

5   A.   That is correct.

6   Q.   When you reviewed the complaint affidavit, is there

7   anything in there that you feel at this time you need to

8   correct or change?

9   A.   Not to my knowledge.

10   Q.   At some point in the investigation of Mr. Ledbetter, did

11   you become aware of a video that had been posted on his

12   Facebook account -- "his" being Mr. Ledbetter's -- that was

13   titled "Training"?

14   A.   That's correct.

15   Q.   Can you generally describe what that video depicts?

16   A.   It depicts an individual firing a fully automatic AK-47.

17   Q.   Is there only one individual in the video or more than

18   one?

19   A.   If I remember correctly, there's at least one other person

20   visible in the periphery.

21   Q.   Do you believe if -- that any of those individuals are

22   Mr. Ledbetter?

23   A.   Yeah -- yes, based on his voice, I do believe it to be

24   Mr. Ledbetter.

25          MR. DILLON:  Your Honor, at this time we would ask to

1   admit Government's Exhibit 9.  It's a DVD of a video titled

2   "Training."

3              MR. JOHNSON:  Judge, I have no objection for purposes

4   of this hearing only and reserving objections to future

5   hearings on the admissibility of this video.

6              THE COURT:  Thank you.  That exhibit will be

7   admitted.

8              MR. DILLON:  Will you please play Exhibit 9.

9         (Exhibit 9 played for the Court.)

10  Q.   (BY MR. DILLON)  The video appeared to be filmed from the

11  perspective of one of the two shooters; do you agree with that?

12  A.   Correct.

13  Q.   Whose perspective do you believe that to be?

14  A.   Christopher Ledbetter.

15  Q.   We also saw on that first-person perspective a tattoo on

16  the left wrist of the person shooting.  Have you seen that

17  tattoo before?

18  A.   Yes, I have.

19  Q.   Where have you seen it?

20  A.   On Christopher Ledbetter's left arm.

21  Q.   Through the course of your investigation, were you able to

22  determine where that video had been filmed?

23  A.   Yes, sir.

24  Q.   Where was that?

25  A.   On the property in McLoud, where he -- he had been

1   residing.

2   Q.   How do you know that?

3   A.   Because he told me.

4   Q.   The first target that was shot in that video, did you

5   notice anything about that target that made it unique from some

6   of the other targets?

7   A.   Yes, it said "police" across the front of it and it had a

8   -- looked like a drawing of a police badge over the left

9   breast.

10  Q.   Through your investigation, did you also view a video from

11  a Kansas news station?

12  A.   Yes.

13  Q.   Did you also read a story that had been reported in

14  relation to that video?

15  A.   I'm familiar with the story; I believe I only watched the

16  video.

17  Q.   Okay.  In that video, is there an individual depicted that

18  is being interviewed?

19  A.   Yes.

20  Q.   Who is that?

21  A.   Christopher Ledbetter.

22  Q.   Did Mr. Ledbetter have -- is it the same individual you

23  previously identify as the defendant?

24  A.   Yes.

25  Q.   Did Mr. Ledbetter have any weapons with him in that video?

1    A.    That's correct.

2    Q.    What type of weapon did he have?

3    A.    An AK-style assault rifle.

4    Q.    Okay.  Did he say anything about the AK-style carbine that

5    he had that day?

6    A.    Yes.  He told a reporter that he has weapons on him, he

7    even had illegal weapons on him.

8    Q.    Based on what you know of this investigation, do you know

9    what he was referring to or have a belief as to what he was

10   referring to as an illegal weapon?

11   A.    Yes, the AK-style rifle that had been modified to fire on

12   fully automatic mode.

13   Q.    On May 22nd, was there a video posted to Mr. Ledbetter's

14   YouTube page titled "Update:  Liberty or Death"?

15   A.    That's correct.

16   Q.    Do you know where that was filmed?

17   A.    Outside the McLoud police station; I think across the

18   street, to be exact.

19   Q.    But you recognize the location?

20   A.    Correct.

21   Q.    Did Mr. Ledbetter have any weapons with him in that video?

22   A.    He did.  He had the AK-styled rifle.

23   Q.    A few days ago, was there an arrest of Mr. Ledbetter that

24   took place in the Western District?

25   A.    That's correct.

1  Q.   Do you know approximately the location?

2  A.   508 Southeast 48th Street.

3  Q.   How is that location related to Mr. Ledbetter?

4  A.   It's a construction site that he had been working, I

5  believe, drywall on.

6  Q.   Do you know if Mr. Ledbetter drove to that location?

7  A.   He did.

8  Q.   What vehicle was he driving?

9  A.   His blue Jeep; I think it's a 2017.

10 Q.   When Mr. Ledbetter was taken into custody, was he inside

11 the place where he was working or was he close to the vehicle?

12 A.   He was close to the vehicle.

13 Q.   When -- have you spoke with the agents that took

14 Mr. Ledbetter into custody?

15 A.   I have.

16 Q.   Did they know anything about Mr. Ledbetter's movement that

17 had given them concern when they approached?

18 A.   One of the arresting agents indicated that when they

19 approached him, in identifying themselves, that he had turned,

20 as if to think about fleeing.

21 Q.   Okay.  But he didn't, in fact, flee, though?

22 A.   Did not.  I believe there were more agents coming from his

23 rear.

24 Q.   When he was taken into custody, was Mr. Ledbetter asked

25 anything in relation to the agent's safety at the scene?

1   A.   Correct.  Based on what had been posted by the defendant

2   on social media, they asked questions, you know, are there any

3   -- essentially establishing if there's anything in the vehicle

4   that could be of harm to the agents and he indicated at that

5   time that all that was in there was the select-fire rifle that

6   he said we knew about.

7   Q.   What does the term "select fire" mean to you?

8   A.   It means a rifle that can fire on more than just

9   single-shot mode; it can fire on fully automatic or burst mode.

10  Q.   Was a search warrant obtained for that Jeep?

11  A.   That is correct.

12  Q.   What, if anything, was located in the Jeep related to

13  either firearms or explosives?

14  A.   The AK-47-style rifle was there and some -- looked like

15  attempted modify of a mortar tube and some unknown explosives.

16  Q.   The firearm itself, first, had you -- do you know if ATF

17  had checked any of their databases to see if Mr. Ledbetter, in

18  fact, had a license or any kind of permission to possess a

19  fully automatic weapon?

20  A.   That's correct.  We did check with the ATF and they

21  indicated that he had no license to possess an automatic

22  weapon.

23  Q.   Do you know if ATF also checked the AK-style carbine that

24  was located in Mr. Ledbetter's Jeep?

25  A.   They did.  They function-tested it and it functioned as if

1  it was capable of firing on fully automatic.

2  Q.   And to be more specific, we're talking -- this took place

3  -- this search and arrest of Mr. Ledbetter took place last

4  Thursday, I believe that was June 4th?

5  A.   Yes, that's correct.

6  Q.   And ATF checked it and it was a functioning fully

7  automatic weapon?

8  A.   Correct.

9  Q.   Did the weapon that was taken into custody appear to be

10  the same weapon that we saw in the training video?

11  A.   It did.

12  Q.   At some point on the 4th, did you interview Mr. Ledbetter?

13  A.   Yes, I did.

14  Q.   Where did that interview take place?

15  A.   At the FBI office on Memorial Road.

16  Q.   Had he been advised of his Miranda warnings?

17  A.   Yes.  He was read his rights, he was provided a statement

18  that printed his rights and then he signed the Miranda form.

19  Q.   Did he appear to understand what was going on?

20  A.   Yes.

21  Q.   Did you ask him specifically about the AK-47-style

22  carbine?

23  A.   Yes.

24  Q.   What did he tell you about that weapon?

25  A.   That he had modified it to fire on multiple modes, to

```
 1  include fully automatic.
 2  Q.   Did he indicate to you if he knew it was illegal to
 3  possess a fully automatic weapon?
 4  A.   Yes, several times.
 5  Q.   And what was his indication; what did he tell you?
 6  A.   That he knew it was illegal.
 7  Q.   Okay.  I now want to move into some areas dealing with
 8  statements and actions taken by Mr. Ledbetter that might assist
 9  the Court in determining whether he is either a danger to the
10  community himself or also if there's a risk of non-appearance.
11  A.   Okay.
12  Q.   Are you familiar with an incident that took place at the
13  McLoud Police Department on -- I believe it was -- would be
14  February of 2019?
15  A.   2020.
16  Q.   I'm sorry, 2020.  Thank you.
17  A.   Yes, that was the -- actually what brought Mr. Ledbetter
18  to our attention.
19  Q.   Okay.  Do you know if this incident was in any way
20  recorded?
21  A.   It was recorded by both the McLoud police chief, Wes
22  Elliott, on his body cam, and Mr. Ledbetter on a -- I believe a
23  GoPro-style camera that he then posted on-line.
24  Q.   Okay.  Have you had an opportunity to review both videos?
25  A.   I have.
```

1              MR. DILLON:  Your Honor, at this time, the Government

2    is going to move for admission of Government's 10 and 11; 10

3    being labeled just as Exhibit 10 and 11 is Exhibit 11 McLoud.

4              THE COURT:  Any objection?

5              MR. JOHNSON:  Judge, no objection for purposes of

6    this hearing, but reserving objections for future hearings on

7    this matter.

8              THE COURT:  Thank you.  That will be admitted.

9    Q.   (BY MR. DILLON)  From the body cam of the police chief of

10   McLoud, does that video contain portions of the interactions

11   that did not -- that were not recorded by Mr. Ledbetter?

12   A.   That is correct.  It is indicating the police chief as

13   he's depart -- walking out of his office towards the lobby

14   where he encounters Mr. Ledbetter's mother.

15   Q.   Do you know her name?

16   A.   Joann.

17   Q.   Was Mr. Ledbetter also seen in that video at the

18   beginning?

19   A.   He could be seen through the glass doors of the McLoud

20   police station donning a military-style kit and retrieving his

21   rifle from the back of his Jeep.

22   Q.   Okay.  It's not my intention to play the video in its

23   entirety, only the portions that deal with Mr. Ledbetter

24   directly.

25        Is there a portion of the chief's video that does not show

JOSHUA RICH - DIRECT BY MR. DILLON                    15

1    or where you cannot hear Mr. Ledbetter?

2    A.    Yes.   The initial interaction when he -- when the police

3    chief goes into the lobby is between him and Joann.

4    Q.    Does he also take Mr. Ledbetter's mother back -- does she

5    come back to his office at some point?

6    A.    Yes, that's correct.

7    Q.    Mr. Ledbetter is not present during that portion, is he?

8    A.    Correct.

9    Q.    Does the interaction pick back up where Mr. Ledbetter's

10   video starts?

11   A.    Correct.

12         MR. DILLON:  Your Honor, at this time ask to play

13   Government's Exhibit 10.

14         MR. JOHNSON:  I would object to that part, Judge,

15   under the Doctrine of Completeness.  I think it sets the whole

16   concept of why he acted the way that he did, that the Court

17   watch the entire video.

18         THE COURT:  How long is -- is Exhibit 10 only that

19   portion?

20         MR. DILLON:  The exhibit itself does contain

21   approximately 30-something minutes.  I would submit that it's

22   relevant for the purpose the Government is introducing it.  We

23   are dealing with Mr. Ledbetter's actions only and statements

24   that he specifically makes to the chief about potential

25   violence that would be brought to police officers.

JOSHUA RICH - DIRECT BY MR. DILLON                16

```
 1              THE COURT:  Have you had a chance to review this
 2  video?
 3              MR. JOHNSON:  Judge, I've read reports regarding it.
 4      My issue is, in order to understand his actions and why
 5  he's saying what he is, you need to understand the entire
 6  context of why the people were there, what they were
 7  complaining about.
 8      This is an ongoing dispute between this family and some
 9  actions that a McLoud police officer did.  They were making a
10  complaint.
11      But just to pick and choose what they think are the good
12  parts, without playing the whole part, doesn't put it into
13  context for the Court.
14      And under the Doctrine of Completeness, I believe that I
15  am allowed to request that that be played, although I
16  understand the Rules of Evidence are very lax at a preliminary
17  hearing.
18              THE COURT:  Right, with respect to relevance.  I
19  mean, I -- I think in the interest of completeness, we will
20  play the entire video, even -- and if at some point,
21  Mr. Johnson, you would agree that we could speed through some
22  parts, that would be helpful.
23              MR. JOHNSON:  Yes, Your Honor.
24              THE COURT:  Okay.  Thank you.
25              MR. DILLON:  Your Honor, may I -- due to the length
```

```
 1   of the video, can I sit while it's being played?

 2           THE COURT:  Yes, you may.

 3       (GOVERNMENT'S EXHIBIT 10 PLAYED FOR THE COURT.)

 4       (RECORDING STOPPED.)

 5           UNIDENTIFIED SPEAKER:  Seven more minutes.

 6           MR. DILLON:  Your Honor, I'm not sure why it cut at

 7   that point, I believe there's a bit more, but the conversation

 8   (unintelligible) essentially into that point they go into the

 9   lobby.  I believe Mr. Ledbetter's video would pick up at that

10   point.  So go ahead and play the next exhibit.

11           THE COURT:  Makes sense to me.

12       Mr. Johnson?

13           MR. JOHNSON:  That's fine.  If it cut off, it cut

14   off.

15           THE COURT:  Thank you.

16           MR. DILLON:  Your Honor, again, I'll make a proffer.

17   I don't know what the technical issue is, we'll turn over the

18   full video in discovery, obviously.

19       There is more that continues with a conversation between

20   Mr. Ledbetter and his mother in the parking lot.  It's mostly a

21   rehash of what the Court just saw but, out of fairness, there

22   is more of the video.  I don't know what the technical issue

23   is, but we'll turn that over to Mr. Johnson.

24           THE COURT:  And, Mr. Johnson, have you seen the

25   entirety of either video?
```

1          MR. JOHNSON:  Judge, I'm aware of -- in the first

2    video there was some talk about one of the officers being

3    accused of being a pedophile and the chief talking about that,

4    that's been cut out.

5         And then the mother and Mr. Ledbetter rehash.  He calms

6    down once she explains what was talked about with the chief of

7    police.  That's what I understood the proffer to be.

8          THE COURT:  Is that consistent with your

9    recollection?

10          MR. DILLON:  It's been a while since I watched that

11   portion.  If it's on there, it's on there.  I don't have any

12   reason to disagree with Mr. Johnson's recollection of that.

13          THE COURT:  Thank you.

14        You may proceed.

15   Q.   (BY MR. DILLON)  The officer that was being complained

16   about in the video, Officer Jones, who had done something now

17   on the road that was being discussed, do you know what the

18   disposition of his job was after this incident?

19   A.   He's no longer a McLoud police officer.

20   Q.   Did he quit or was he fired?

21   A.   My understanding is he was fired.

22   Q.   There was also discussion about the weapon in the video

23   being an AR, what do you take that to mean?

24   A.   It's an AR-style rifle, semi 2nm 4 AR-15.

25   Q.   It is different the -- what you've referred to as the AK

1  or an AK-style carbine that we've previously seen?

2  A.    That is correct.

3  Q.    Did you have an opportunity to review a video posted by

4  Mr. Ledbetter of a speech that he gave at the Oklahoma State

5  Capitol?

6  A.    I'm familiar with it.  I think I read the transcript.

7  Q.    Okay.  Do you know -- are you familiar with the end of

8  that speech, where Mr. Ledbetter makes what he calls a personal

9  declaration of freedom?

10  A.    He essentially makes a comment along the lines that if he

11  doesn't believe in a law he won't follow it.

12  Q.    Okay.  He said that he would defend himself against a vast

13  majority of laws; does that sound familiar to you?

14  A.    Yes, sir.

15  Q.    Did he say that he would use weapons to stand against

16  these laws that he doesn't believe in?

17  A.    That's correct.

18  Q.    Did he specifically also say that he would use

19  banned weapons for that purpose?

20  A.    To my understanding, yes.

21  Q.    Are you familiar with an incident that took place on, I

22  believe, May 19th of this year?

23  A.    Correct.

24  Q.    What happened that day involving Mr. Ledbetter?

25  A.    He -- a police officer had attempted to pull him over on a

1  traffic violation and he failed to yield to that.  He eluded

2  the police officer, drove back to his residence on McLoud -- on

3  1066 McLoud Road.

4  Q.   Was a portion of this incident recorded in any way?

5  A.   Yes.  Mr. Ledbetter recorded it.  Again, it appears to be

6  on a helmet camera that he posted on-line publicly.

7  Q.   Okay.  The video labeled Government's Exhibit 12, is this

8  a portion of the video that took place, at least initially,

9  inside of the vehicle during the pursuit?

10 A.   That's correct.

11          MR. DILLON:  Your Honor, I'd move for admission of

12 Exhibit 12 and ask to play that exhibit.

13          THE COURT:  Any objection?

14          MR. JOHNSON:  Same objection as -- well, same

15 statement as previously made regarding the other video

16 evidence.

17          THE COURT:  Thank you.

18          MR. JOHNSON:  That for purposes of this hearing, no

19 objection, but reserving it for future hearings.

20          THE COURT:  That will be admitted and you may

21 proceed.

22      (EXHIBIT 12 PLAYED FOR THE COURT.)

23      (EXHIBIT 12 PAUSED.)

24          THE COURT:  Appears we have some video difficulties.

25          MR. DILLON:  Your Honor, I would proffer to the

 1  Court, again, the video was working this morning when we were

 2  trying them out.  The audio was obviously playing, the video

 3  portion is not.

 4      This is mostly driving down a dark road, you can see the

 5  lights of the police officer behind him.  I don't know that you

 6  can make much else out on the actual visual portion of this

 7  exhibit.

 8          THE COURT:  If you're going to proceed, we need to do

 9  it in the microphone so we can pick that up.

10          MR. DILLON:  Your Honor, the visual portion is mostly

11  from the perspective of Mr. Ledbetter looking out of the

12  windshield of the vehicle.  It is at night so it's very dark.

13      You can see in the rear view the blue and red lights of a

14  police officer behind him.  At some point in the audio, you'll

15  also hear the siren.

16      I will submit, though, that really it's the audio portion

17  is the Government's intention in playing this.  I don't know

18  what happened to the video portion.  Again, I know it works and

19  we will submit that to Mr. Johnson.  I apologize.

20          MR. JOHNSON:  And, Judge, my point of view on the

21  video of this is it shows there's no laws being broken, no

22  traffic violations that are being met or occurring and it's the

23  same ongoing dispute with the McLoud Police Department that he

24  has been having and he feels that it's a form of harassing,

25  it's not a high-speed chase, the video shows that and he's the

1  one that's recording it to make sure that they get busted again

2  and hopefully get fired again for their misconduct.

3           MR. DILLON:  There will be a statement by

4  Mr. Ledbetter in the video stating that he is not speeding.

5  The video does not actually ever show the speedometer.

6       The office -- I believe Mr. Ledbetter later had said that

7  he was not speeding leading up to the initiation of the traffic

8  stop.  I mean, Mr. Ledbetter's words will speak for itself.

9       The officer would have reported that I believe the top

10  speed was 58 in a 35.  It did not go above that.

11           THE COURT:  You may proceed with the audio.

12           MR. DILLON:  For the record, Your Honor, now the

13  video has popped up.

14           THE COURT:  Okay.

15       (EXHIBIT 12 CONTINUED PLAYING.)

16       (VIDEO ENDED.)

17  Q.   (BY MR. DILLON) At the end of the video, you hear somebody

18  say for Art to get the weapons.  Do you know who was speaking?

19  A.   That was Christopher Ledbetter speaking.

20  Q.   Do you know who Art is in relation to Mr. Ledbetter?

21  A.   It's his stepfather, Art Johnson.

22  Q.   Mr. Ledbetter also appeared to be speaking to somebody on

23  the phone, do you know who that person was?

24  A.   I believe to be his mother; she identified herself as

25  Joann in the voice mail that preceded it.

1  Q.   Again, when he says to his mother to tell Art to get the

2  weapons or get the weapons ready, who do you believe he's

3  referring to?

4  A.   To Art Johnson.

5  Q.   At some point, Mr. Ledbetter said that he believed it was

6  the officer who had gotten his job back.  Do you know at that

7  point, was Mr. Jones employed by the McLoud Police Department?

8  A.   No.

9  Q.   Did the officer that was initiating the stop, do you know

10  if he ever indicated when he was attempting to make the stop if

11  he knew who the driver of the vehicle was?

12  A.   In discussions with McLoud police, and Lincoln County

13  later, the officer initially was unaware.  He was driving a

14  truck that was not his normal Jeep that's very distinctive and

15  well-known around McLoud.

16  Q.   Later, did he run the plate to the vehicle either during

17  or at the end of the pursuit?

18  A.   That's correct.

19  Q.   Who did the truck check back to?

20  A.   If I remember correctly, I believe it checked back to

21  Joann.

22  Q.   Did the officer indicate whether or not he was attempting

23  to stop Mr. Ledbetter for speeding?

24  A.   No, initially, my understanding was the driver of the

25  truck, who at that time was unknown to the officer, had drifted

1  from the left center line a couple times, I believe three.

2  Q.   Did he also say something about a taillight or brake

3  light?

4  A.   Yes.

5  Q.   And what was that?

6  A.   One of the lights was out, I cannot recall if it was a

7  taillight or a brake light.

8  Q.   At some point, are you aware Mr. Ledbetter disputes that

9  light being out at that time?

10 A.   Correct.  He posted a video about it.

11 Q.   Did he also acknowledge that he had recently had an issue

12 with his light?

13 A.   Correct.

14 Q.   Did the officer indicate why he did not come all the way

15 to the gate where Mr. Ledbetter had stopped his vehicle?

16 A.   He saw Mr. Ledbetter with a rifle.

17 Q.   Did he say if he believed that -- where the rifle was ever

18 pointed?

19 A.   He believed it was pointed at him.

20 Q.   At approximately the 445 -- 4-minutes-45-second mark of

21 that video, after he gets off the phone with his mother, you

22 hear a voice, somewhat loud in the vehicle, do you know what

23 I'm referring to?

24 A.   Yeah, it sounds like he's chambering a round into the

25 rifle, preparing it to fire.

1   Q.   Do you know if Mr. Ledbetter ever acknowledged whether or

2   not he did have a gun with him?

3   A.   He made a post on Facebook referencing an -- having an AK

4   during that incident.

5   Q.   Do you know -- at some point, did you have an opportunity

6   to become familiar with Mr. Ledbetter's Facebook account

7   through a state search warrant?

8   A.   Correct.

9   Q.   In the Facebook conversations that Mr. Ledbetter had, did

10  he make any references or have conversations concerning

11  explosives?

12  A.   He did.

13  Q.   What -- what was the nature of that conversation?

14  A.   He discusses making his own homemade grenades.

15  Q.   Okay.  There is a reference at one point to just the word

16  "nades," just working at maybe making up some nades when I get

17  off of work.  Do you have a belief of what he was referring to

18  when he says "nades"?

19  A.   Yeah, I believe he was using shorthand for grenades.

20  Q.   Okay.  Is that also your belief based on the evidence that

21  was later located and the totality of this conversation?

22  A.   That's correct.

23  Q.   When he says, "black powder and ammonium nitrate and

24  aluminum powder in connection with frag grenades," do you

25  believe that could be consistent with making homemade hand

1  grenades?

2  A.   Correct.

3  Q.   Did Mr. Ledbetter state in those conversations via

4  Facebook whether he had actually ever attempted to detonate any

5  of those grenades?

6  A.   He mentioned testing one and said that it was about as

7  effective as a World War I grenade or "WWI," I think, is how he

8  typed it.

9  Q.   In your Mirandized interview with the defendant, did you

10 discuss homemade explosives with the defendant?

11 A.   Yes.

12 Q.   What did he tell you about any of these homemade

13 explosives?

14 A.   He essentially described it the way -- or very close to

15 the way he had been talking about it in his private messages,

16 where he would obtain the grenade body from military surplus

17 stores, drill it out, pack it with ammonium night -- or I'm

18 sorry -- with Tannerite and black powder and then put a cap on

19 it.  And he used -- I believe he referred to it as cannon fuse

20 or hobby fuse or something along those lines as the means of

21 detonation.

22 Q.   So he actually admitted to you that he made homemade

23 grenades?

24 A.   Correct.

25 Q.   Did he describe the type of explosion or did he relate it

JOSHUA RICH - DIRECT BY MR. DILLON                    27

1   to another type of device?

2   A.   So I asked him if he had ever tested them and he had

3   tested one.  And I asked him if he had tested it at the same --

4   in the same area of the property that we see in the training

5   videos, the CQB video.  He indicated, no, he did not use it

6   there and made some comment, essentially, that it would have

7   been dangerous or he could have been hurt if he had detonated

8   it there.

9   Q.   You used the term a moment ago "CQB," what does that stand

10  for?

11  A.   Close quarters battle.

12  Q.   That is consistent with the video you were describing of

13  some mocked hallways or rooms?

14  A.   Correct.

15  Q.   Before I continue on with his interview, do you know if a

16  search warrant was conducted at Mr. Ledbetter's residence

17  shortly after his arrest?

18  A.   Yes, it was.

19  Q.   Have you had an opportunity to learn the items that were

20  found or seized as -- pursuant to that warrant and also have

21  you seen photographs of some of that evidence?

22  A.   Yeah, the evidence recovery team did photograph the items

23  they recovered to essentially built-up homemade hand grenades

24  and the empty body -- empty shells of two other grenade bodies

25  and then two Molotov cocktails.

1   Q.   At the time that you were interviewing Mr. Ledbetter, were

2   you aware of the Molotov cocktails?

3   A.   No.

4   Q.   So did you ever ask him about Molotov cocktails?

5   A.   No.

6   Q.   Can you please look at Government's Exhibit 1.  I'm sorry,

7   in the book in front of you, if you would please open that.

8        Tell me if you recognize what that picture is.

9   A.   It is a shipping container that was located on the

10  property at 1066 Road in McLoud.

11  Q.   Do you know what that container was being used for?

12  A.   A -- like a berthing, a barracks.

13  Q.   Do you know who was staying in it?

14  A.   Mr. Ledbetter indicated that he was.

15  Q.   To the best of your knowledge, does that photograph

16  accurately depict how the container looked on the day of the

17  search warrant?

18  A.   Based on the photos I've seen from the evidence recovery

19  team, yes.

20        MR. DILLON:  Your Honor, move for exhibit (sic) and

21  publish of Government's Exhibit 1.

22        MR. JOHNSON:  Objection.  It's for purposes of this

23  hearing only, Judge.

24        THE COURT:  Thank you.  That will be admitted.

25  Q.   (BY MR. DILLON)  At the top of that there appears to be

1  some netting, do you know what that is?

2  A.    Camouflage netting.

3  Q.    In the book, would you please turn to Government's Exhibit

4  2.

5       Do you recognize what that photograph depicts?

6  A.    That is the top of the shipping container.

7  Q.    Is that an accurate depiction?

8  A.    To my knowledge, yes.

9            MR. DILLON:  Move for admission of Government's 2.

10           MR. JOHNSON:  Same announcement, Your Honor.

11           THE COURT:  Thank you.  That will be admitted.

12  Q.    (BY MR. DILLON) What is around the perimeter of that

13  netting?

14  A.    Those are sandbags.

15  Q.    Do you have military experience?

16  A.    I do.

17  Q.    In your opinion, what is this location, what type of setup

18  is this?

19  A.    An elevated firing position.

20  Q.    Did you discuss this with Mr. Ledbetter?

21  A.    We discussed his -- that, and then there was another

22  sandbag bunker -- or like a pit -- like a mortar pit that he

23  built -- or that him and others.

24  Q.    Did he tell you why he had these areas built up with

25  sandbags?

JOSHUA RICH - DIRECT BY MR. DILLON                    30

1   A.   Essentially as protection for -- if the police came for

2   him.

3   Q.   In the book would you please look at Government's Exhibit

4   3.

5        MR. DILLON:   Your Honor, for the purposes of this

6   hearing and to expedite a little bit, can I go ahead and have

7   the witness view 3 through 8 and admit those in bulk, if

8   appropriate?

9        THE COURT:   You may.

10  Q.   (BY MR. DILLON)   If you'll go ahead and review

11  Government's Exhibits 3 through 8, tell me if you recognize

12  them.

13  A.   Three indicates the two grenades that were built up,

14  homemade grenades, that I believe those were the ones that

15  Mr. Ledbetter referred to when we talked to him on June 4th.

16  And then the ones on the ground there would appear to be empty,

17  as the drill hole has not been filled yet.

18       Exhibit 4, again, is just another close-up of the grenades

19  taken by the evidence recovery team showing the dimensions with

20  the tape measure and unknown fire works.   Exhibit -- that was

21  Exhibit 4.

22       Exhibit 5 would appear to be four bottles.   I believe the

23  two on the left there are empty, but the two on the right were

24  built-up Molotov cocktails.

25  Q.   Where was this photograph taken in reference to the

1    property?

2    A.    This is at the entrance into the -- Conex boxes were at

3    the entrance of the property at 1066 McLoud Road.

4    Q.    Is inside the Conex box that we just reviewed?

5    A.    Correct.

6    Q.    Next exhibit.

7    A.    This is a close-up of the Molotov cocktails.  You can see

8    the rag taped to the side; that would be indicative of a

9    Molotov cocktail.

10   Q.    And No. 7?

11   A.    Another close-up of the Molotov cocktails.

12   Q.    They're in some sort of a bottle.  Is there -- there were

13   four originally, correct?

14   A.    Correct.  To my understanding, two had a flammable

15   material inside.  I think the other two were empty.

16   Q.    And Government's Exhibit 8?

17   A.    That would be another picture of those bottles.

18   Q.    To the best of your knowledge, do Exhibits 3 through 8

19   appear to be accurate depictions?

20   A.    Yes.

21          MR. DILLON:  Move for admission of Government's 3

22   through 8.

23          MR. JOHNSON:  Same objection as made before, Judge --

24   or announcement.

25          THE COURT:  Thank you.  Those will be admitted for

1   this hearing.  Thank you.

2   Q.   (BY MR. DILLON) You had described two grenades were filled

3   and two appear to be empty because you could see the open drill

4   hole.  Can you -- now utilizing the photograph, explain what

5   you mean by that.

6   A.   So the two that are inside next to the Xbox, you can see

7   that there's -- the hole has been plugged on the bottom.

8   Obviously the cap is screwed onto the top where the firing pin

9   would normally be.  And then on the bottom of -- or the ones

10  that are on the ground, you can see there's a hole in the

11  bottom of them.

12  Q.   And now in Exhibit 4, you talked about -- you've used the

13  term "drilled out and threaded," can you explain that in

14  relation to Government's Exhibit 4?

15  A.   Yeah.  You can see the caps that are threaded into the top

16  -- that are now the top of the grenade, just based on the

17  orientation of the photo.

18  Q.   Do you also see in that photo any way to ignite this

19  device?

20  A.   Yeah, it would appear that as he described he -- there are

21  cannon fuse or hobby fuse leading into the grenade body.

22  Q.   The way these are constructed, is that consistent with how

23  Mr. Ledbetter described both on Facebook and also to you, FBI,

24  how he constructed homemade grenades?

25  A.   That's correct.

```
 1   Q.   No. 5.
 2        You mentioned that two bottles appeared to be empty and --
 3   but it was reported that two contained a flammable or
 4   combustible liquid, which two are which?
 5   A.   So the two -- there's a placard that says "22" on it,
 6   those two right there with the tape along the side, you can see
 7   the cloth on one of them; those are the two that were filled,
 8   to my knowledge.
 9   Q.   Moving to 6, this is just a close-up of what you've just
10   described?
11   A.   Correct, yeah, the two on the right of the picture here
12   with the duct tape and the "22" sticky note, they appear to be
13   filled, and to my understanding from the evidence recovery
14   team, they are filled.  And then the two on the left are empty.
15   Q.   And skip over 7, go to 8.
16        You described some sort of rag or cloth.  Do you see that
17   in Government's Exhibit 8?
18   A.   Yes.
19   Q.   It appears to be attached somehow to the bottle; is that
20   correct?
21   A.   Yeah, it's taped.
22   Q.   The bottles are capped?
23   A.   Yes.
24   Q.   Do you know of any reason somebody would have a taped rag
25   next -- or attached to a flammable bottle?
```

1  A.   That it would be a means of ignition for a Molotov

2  cocktail:  You light the rag, throw the bottle filled with the

3  flammable or combustible liquid, and when the glass breaks, it

4  hits the flame and --

5  Q.   In your interview with Mr. Ledbetter, did you discuss his

6  ideas of defending himself and what lengths he would go to in

7  defending himself or what he was defending himself against?

8  A.   He would often -- I mean, he makes statements that if

9  police officers try to pull their weapons on him he'll defend

10 himself, that he'll shoot back if he feels threatened or feels

11 he has to defend himself.

12 Q.   Did these statements appear to be related to actual laws

13 or Mr. Ledbetter's understanding or belief of what the laws

14 should be?

15 A.   He makes several statements of, if he doesn't believe the

16 laws are right, he does not believe that he has to submit to

17 them.  Between the videos and the conversation, he's had

18 several statements like that.

19 Q.   Did he make any statement in reference to what would

20 happen if he was made to disarm again?

21 A.   He has made the statement that he doesn't believe he

22 should have to disarm under any circumstances.

23 Q.   Did he ever say what would happen if he was made to

24 disarm?

25 A.   He has told -- we interviewed a woman by the name of Karen

1   Douglas that said that he has often said that if he's ever

2   going to disarm, he'll go out shooting.

3   Q.    Who is this person in relation to Mr. Ledbetter?

4   A.    Someone he was previously romantically involved with.

5   Q.    Did she tell you if Mr. Ledbetter in her view is serious

6   about injuring or hurting law enforcement officers?

7   A.    She believed that to be true, yes.

8   Q.    How did she express that to you?

9   A.    At a recent vacation they took in Arkansas, there was a --

10  she said advertisement for pig hunting and he made several

11  comments about how fun it would be to go pig hunting, and to

12  her understanding, she indicated he said that he meant police

13  when he said that.

14  Q.    Okay.  Does Mr. Ledbetter in his Facebook posts also make

15  jokes about -- let me back up.

16        In some of the conversations Mr. Ledbetter had via

17  Facebook Messenger, were they all typed messages?

18  A.    Some were audio.

19  Q.    Did you have an opportunity to review at least some of

20  those audios?

21  A.    I have listened to some, yes.

22  Q.    In those, did Mr. Ledbetter make reference to going

23  hunting also?

24  A.    Yes.

25  Q.    Did you believe he was talking about lawful hunting for

1   sport?

2   A.    No.

3   Q.    Was Mr. Ledbetter laughing during this?

4   A.    Yes.

5   Q.    Did that appear to be consistent with what his

6   ex-girlfriend told you?

7   A.    Yes.

8   Q.    Did she give you any other concerns about what would

9   happen with Mr. Ledbetter if he was released?

10  A.    She indicated that he would -- that he did not intend to

11  go to jail because he did not want to be in a cage.

12  Q.    In your interview of Mr. Ledbetter, did he indicate to you

13  what would happen if his firearm wasn't returned to him?

14  A.    Yeah, he referred to if we -- even in the event they

15  lawfully took his weapon, he referred to it as stealing, he

16  viewed that as an act of violence, that if we stole his weapon

17  from him -- and it was -- the context of the conversation was

18  we were -- you know, we were asking him what we could do to

19  sort of avoid violence, particularly, you know, as we were

20  transporting him to the courthouse when it comes to his

21  friends, and he said that if we stole his property or if he was

22  not released, that there would be violence.

23  Q.    At the very beginning of the interview, you mention that

24  you and another agent were going to disarm for everybody's

25  safety.  At that point, Mr. Ledbetter makes some reference to a

 1   Kurdish jail; do you recall that?

 2   A.    Yeah, he indicated that he had been imprisoned in Iraq or

 3   Syria where he had traveled to fight with the Kurds.

 4   Q.    Did he tell you whether he stayed in that jail

 5   voluntarily?

 6   A.    He indicated he attempted to break out of the jail.

 7   Q.    And he, in fact, said that he did break out, correct?

 8   A.    Correct.  And I believe, if I remember correctly, he was

 9   caught and was put back in jail.

10   Q.    And at that point he says he was beaten for attempting to

11   escape?

12   A.    Correct.

13          MR. DILLON:  One moment, Your Honor.

14   Q.    (BY MR. DILLON)  Based on the totality of the

15   circumstances, everything you've reviewed in this case,

16   interviews you've conducted, reports of other people, videos,

17   do you have a belief as to whether Mr. Ledbetter would

18   peacefully disarm again?

19   A.    No.

20   Q.    Do you believe that he is a danger to the community in

21   general?

22   A.    Yes.

23          MR. JOHNSON:  Judge, I'm going to object.  That's the

24   ultimate decision that you're to make.

25          THE COURT:  You're asking his opinion, I think?

1          MR. DILLON:  Yes, Your Honor.

2    Q.  (BY MR. DILLON)  And do you believe that he poses a risk

3    of non-appearance?

4    A.   Yes.

5          MR. DILLON:  Pass the witness.

6          THE COURT:  Thank you.

7       Mr. Johnson.

8                          CROSS-EXAMINATION

9    BY MR. JOHNSON:

10   Q.   Agent Rich, good morning, sir.

11   A.   Good morning.  How are you?

12   Q.   You're assigned to the domestic terrorism, is that my

13   understanding?

14   A.   The Joint Terrorism Task Force investigates both domestic

15   and international terrorism.

16   Q.   Is Mr. Ledbetter a member of ANTIFA?

17   A.   Not to my knowledge.

18   Q.   Is that a terrorist group?

19   A.   I'm not sure.  I don't believe it's been designated as

20   such.

21   Q.   Even though the president wrote an executive order making

22   it such?

23   A.   I'm not aware of that.  I don't have an active case

24   against them personally.

25   Q.   Okay.  Is the militia group that Mr. Ledbetter supposedly

1  is a member of, is that a terrorist group designated by the

2  FBI?

3  A.   Not to my knowledge yet.

4  Q.   Yet?  Are you trying to get it designated as a terrorist

5  group?

6  A.   No, we just became aware of this group recently, so we're

7  still obviously investigating.

8  Q.   Okay.  Well, name one active terrorism or one act of

9  violence, I'll start with that, that Mr. Ledbetter has

10 committed.  Just one.

11 A.   I would argue that the encounter with McLoud police

12 officer was -- were threatening.

13 Q.   Did he shoot at him?

14 A.   No.

15 Q.   Did he throw a grenade at him?

16 A.   No.

17 Q.   Did the McLoud police officer even write him a ticket?

18 A.   Not at that time, no.

19 Q.   Okay.  When you say "not at that time," today is June,

20 what, 10th, has he written him a ticket up to today?

21 A.   No.

22 Q.   Is that because the McLoud police officer was not in his

23 jurisdiction again?

24 A.   I'm sorry, which McLoud police officer?  I was referring

25 to Chief Elliott.

```
 1  Q.   Okay.  Let's talk about the -- I'm sorry, my fault.
 2       The slow-speed chase where he's going the speed limit in
 3  his Jeep and is being followed by a McLoud police officer way
 4  outside of the City of McLoud; do you remember that?
 5  A.   Yeah.  My understanding was it was initiated within McLoud
 6  city limits.
 7  Q.   What do you have to rely on that?
 8  A.   The officer's report.
 9  Q.   So what ticket, then, if Mr. Ledbetter was breaking the
10  law, was ever mailed to him, given to him, issued to him or did
11  he receive for that encounter?
12  A.   My understanding is they have a -- they have an arrest
13  warrant out that has not been filed.
14  Q.   Do you have a copy of that arrest warrant?
15  A.   Not with me.
16  Q.   Have you seen it?
17  A.   Correct.
18  Q.   When was it -- what's the arrest for?
19  A.   Eluding; I believe felony pointing of an assault rifle at
20  an officer; and I think there were maybe one or two other
21  charges.
22  Q.   You saw the GoPro video, did you not?
23  A.   Correct.
24  Q.   Not one time did you see him point that weapon in the
25  direction of that officer, did you?
```

1  A.   It was dark; no.

2  Q.   So the answer would be no?

3  A.   Right.  But I'm going off just what the police officer

4  reported that he saw.

5  Q.   And you saw how dark it was, that was what you just said,

6  correct?

7  A.   Correct.

8  Q.   Police officer is about 70 yards away.  If you can't see

9  it from 2 yards away on the video, how is the police officer

10 going to allegedly see that from 70 yards away, Agent Rich?

11 A.   Well, being in his motor vehicle with headlights on, that

12 would have illuminated what he was pointing at.

13 Q.   So did you look at his dash cam?

14 A.   He did not have a dash cam.

15 Q.   Did you look at his body cam?  Because every McLoud

16 officer has a body cam.

17 A.   Yeah, if I remember correctly, because of the way he was

18 sitting, the body cam was obviously just looking at the front

19 of the car and the totality of the dashboard was not in view.

20 Q.   So when he calls in on his MDT, right off the bat he says,

21 "I'm following Chris Ledbetter."  Did you listen to that?

22 A.   My understanding, again, was in the beginning -- until he

23 ran the plate, he was not aware of who he was trying to

24 initiate a traffic stop on.

25 Q.   But you've listened -- because you just said he couldn't

1    see over the steering wheel because of the dash cam or the body

2    cam, you've listened to it and you heard right off the bat on

3    that where he refers to Mr. Ledbetter?

4    A.   I don't personally recall listening to that portion of it,

5    no.

6    Q.   So how much of this have you listened to?

7    A.   I've read the report and the arrest warrant.

8    Q.   So you haven't watched the dash cam -- or the body cam?

9    A.   I can't remember which of the videos -- because there's

10   dozens of videos -- which one I've seen.

11   Q.   Okay.  Well, let's start about with the first video that

12   we watched here.

13   A.   Okay.

14   Q.   The training video.  Do you remember that?

15   A.   Yeah.

16   Q.   You testified that you thought you saw one other person on

17   that video?

18   A.   Correct.

19   Q.   Now that we've seen this video in court, there's seven

20   other people there.

21   A.   So initially we had two videos of him discharging the

22   automatic.  I was initially confused as to which video.

23   Q.   Okay.

24   A.   There's another video where there's an individual on his

25   left and they're in a field and there's smoke and he's

1  discharging that AK.

2  Q.   Who were those other seven individuals?

3  A.   We haven't identified all of them, but the one that he

4  went to the house with, based on the arm tattoo and statements

5  by Mr. Ledbetter, that would be Braden Chesser, that he was

6  conducting CQB training with.

7  Q.   Okay.  And when you say "CBQ," you're talking about close

8  battle quarters or close quarter battle training?

9  A.   Correct.

10 Q.   Kind of a new fad that a lot of people like to do out in

11 the country, is it not?

12 A.   Correct.

13 Q.   Not unusual to see that, is it?

14 A.   No.

15 Q.   And of those six individuals of which you've identified

16 one, actually seven individuals in that video, how many of them

17 had Class 3 licenses?

18 A.   I'm unaware of that.

19 Q.   How many of them had felony convictions?

20 A.   I'm unaware of that.

21 Q.   How many of them were not allowed to have weapons?

22 A.   I'm unaware.

23 Q.   How many of them are prohibited people under federal law?

24 A.   To my knowledge, I'm not aware of that.

25 Q.   And that weapon that is being used, is there something

1  very peculiar about the forestock of it?

2  A.    Of which AK?  Mr. Ledbetter's or --

3  Q.    The one that we watched in the video here in court, Agent

4  Rich.

5  A.    Right.  There are two AK-style rifles, fully -- both fully

6  automatic.

7  Q.    We watched one video, did we not?

8  A.    Correct.

9  Q.    Entitled "Training"?

10  A.    Correct.

11  Q.    That is the video I am talking about.

12  A.    Correct.

13  Q.    Is there something very peculiar about that weapon?

14  A.    Sir, I was referring to -- I was asking -- there are two

15  AK-47-style rifles in that video, both of which are fully

16  automatic, so which particular AK-47 are you asking about?

17  Q.    Is there one that has a black molded plastic stock, a quad

18  stock?

19  A.    Yes, I believe the one Mr. Ledbetter is holding.

20  Q.    The weapon that you recovered had a wooden stock, did it

21  not?

22  A.    Correct.

23  Q.    That is not that weapon, is it?

24  A.    No, it -- in our interview, he indicated that he has --

25  Q.    Listen to my question:  That is not that weapon, is it?

1  A.   I'm not aware, it could be.

2  Q.   Did that weapon belong to one of the other six

3  individuals?

4  A.   The one in the video, that's unknown to me at this time.

5  Q.   Did any of those six individuals have a Class 3 license to

6  have that weapon?

7  A.   That's unknown to me.

8  Q.   So the bottom line is before this Court, when you're

9  implying that weapon belongs to him, that one in the video, it

10  could have been with one of other Class 3 weapon holders, could

11  it not have been?

12  A.   That's possible.

13  Q.   And are Class 3 weapon holders allowed to let other people

14  use their weapons under their supervision?

15  A.   That's -- yeah, that's correct.

16  Q.   Okay.  And like you've testified, close quarter battle

17  training, people like to do that, it's a fad for whatever

18  reason?

19  A.   Yeah.

20  Q.   Not against the law?

21  A.   Correct.

22  Q.   Okay.  You also got to watch the video of his mother and

23  the McLoud chief of police, although part of it got cut off at

24  the very end, when they kind of got to the meat of what they

25  were really there for, there was an ongoing dispute between

1   McLoud police and the Ledbetters, were there not?

2   A.    Outside of the Officer Jones incident, is that what you're

3   referring to?

4   Q.    Starting with -- it all started with the Officer Jones

5   incident, did it not, on February 16, 2020?

6   A.    Correct.

7   Q.    Was that officer and what he did, was it legal?

8   A.    I can't speak to that, their laws.

9   Q.    Okay.  Are police officers allowed to pretend to be

10  somebody that they're not?

11  A.    If that did occur, then, no, that would not be allowed.

12  Q.    Are they allowed to be police officers outside of their

13  jurisdiction?

14  A.    No, unless there is life or serious -- you know, if they

15  witness a crime --

16  Q.    Fleeing Felon Doctrine?

17  A.    Yeah.

18  Q.    Was there any Fleeing Felon Doctrine that night that would

19  have allowed that police officer to pull over his sister on a

20  country road up in Lincoln County way outside of the city

21  limits of McLoud and pretend to be either a sergeant or the

22  chief of police?

23  A.    No, I believe that would be a violation.

24  Q.    Okay.  An internal affairs investigation was started

25  because of it, correct?

```
 1   A.    To my knowledge, yeah.
 2            MR. DILLON:  Objection, Your Honor.
 3            MR. JOHNSON:  It goes towards the motive of why he
 4   was acting --
 5            THE COURT:  I can't --
 6            MR. JOHNSON:  Sorry.
 7            MR. DILLON:  Objection to any discussion of potential
 8   ongoing investigations.
 9            THE COURT:  I think it was mentioned, at least in the
10   video the chief said there's an internal investigation that was
11   started and that -- we can -- that's the extent we can go into
12   as to that.
13            THE WITNESS:  Yeah.
14            MR. JOHNSON:  Well, and I believe Mr. --
15            THE COURT:  Affirmed.
16   Q.   (BY MR. JOHNSON) Well -- and I believe Mr. Dillon asked
17   you the question whether that Jones police officer was still a
18   Jones police officer or whether he was fired as a result of
19   this?
20   A.    That is my understanding.
21   Q.    So he got fired, correct?
22   A.    That's my understanding.
23   Q.    All right.  However, for whatever reason, he wasn't fired
24   when we saw that latest video when he's following him in the
25   truck, correct?  That's the same officer, is it not?
```

```
1   A.   No, not to my knowledge.
2   Q.   Did that officer that is following him in a truck make a
3   phone call to that fired Jones -- or fired McLoud police
4   officer, Mr. Jones, and have him join up with him up in Lincoln
5   County at the Ledbetter residence?
6   A.   Not to my knowledge, no.
7   Q.   Have you discussed this with Officer Jones?
8   A.   No.
9   Q.   Have you looked at the phone records of that police
10  officer to see if he, in fact, did that?
11  A.   No.  He's not under investigation with us.
12  Q.   Agent Rich, I guess what it boils down to, should people
13  be scared of the police?
14  A.   I don't believe so.
15  Q.   You've seen the millions and millions of Americans that
16  are now protesting because of the actions of some of your
17  fellow law enforcement officers, have you not?
18  A.   I have, yeah.
19  Q.   So obviously millions and millions and millions of
20  Americans disagree with you, do they not?
21  A.   That's fair.
22  Q.   Okay.  And it's obvious Mr. Ledbetter has some very strong
23  feelings about police, correct?
24  A.   Yeah.
25  Q.   And I say that because you wanted to emphasize on that
```

1  training video one of the silhouettes that they're shooting at,

2  one of the targets, had "police" written across it, correct?

3  A.   That's correct.

4  Q.   Is that improper?

5  A.   No.

6  Q.   Is that any different than when you go down to the FBI --

7  do you do weapons training?

8  A.   Yes.

9  Q.   Do you shoot at silhouettes?

10  A.   Yeah.

11  Q.   Are they black?  They are?

12  A.   They're -- the ones -- it's a white silhouette, actually.

13          MR. DILLON:  Objection, Your Honor.  Is Mr. Johnson

14  going to testify or ask questions.

15          THE COURT:  I'll allow it, but we get your point,

16  Mr. Johnson.

17  Q.   (BY MR. JOHNSON)  Bottom line is a silhouette doesn't mean

18  that that's necessarily what you're intending to do, correct?

19  A.   I would disagree with that, actually.

20  Q.   So when police officers train shooting black silhouettes,

21  that means something?

22  A.   Our silhouette has a black outline, but it's actually

23  white on the inside.

24  Q.   But you used to train with black ones as well, did you

25  not, before you had sensitivity training?

1    A.    Prior to the joining the FBI, I was in military, we did --

2    and we shot a variety of targets.

3    Q.    Who provided that silhouette that says "police" on it,

4    which one of those seven people on that video?

5    A.    I'm not sure.

6    Q.    Are you implying that Mr. Ledbetter somehow was the one

7    that supplied that silhouette?

8    A.    No, sir, I was just answering prosecution's question.

9    Q.    Okay.  So the Court shouldn't read anything into it that

10   the fact that the silhouette had the word "police" on it based

11   on the type of silhouettes that everybody, including law

12   enforcement, seems to shoot at?

13   A.    That's your opinion, sir.

14   Q.    I'm asking yours.

15   A.    I disagree.

16   Q.    So you think it's important the type of silhouette that

17   somebody shoots at shows their intention?

18   A.    I believe so, yeah.

19   Q.    Okay.  So based on that, nobody should ever shoot at a

20   silhouette that says "police," correct?

21   A.    I didn't say that; I just said it shows an intention.

22   Q.    But based on that and your beliefs that's a law

23   enforcement officer, nobody should ever shoot a silhouette that

24   says "police"?

25   A.    I didn't say whether they should or shouldn't.

1   Q.   And, likewise, they shouldn't shoot at a black silhouette

2   either, should they?

3           THE COURT:   You can move on.   We're getting it,

4   Mr. Johnson.

5   Q.   (BY MR. JOHNSON) You then talked about a Kansas video,

6   which we did not see.   We kind of gave some pointed testimony

7   that there was an AK on it?

8   A.   Correct.

9   Q.   And when you say an "AK," you're talking about not a real

10  Kalashnikov but a knockoff of some type?

11  A.   It's an AK-style rifle.

12  Q.   AK-style?

13  A.   Correct.

14  Q.   Okay.   And when you say "AK," was there something illegal

15  about that weapon that you could tell by looking at it?

16  A.   Negative.

17  Q.   Was he allowed to have it there?

18  A.   If it was a legal firearm, yes.

19  Q.   Was there anything that you could visually look at on that

20  video and tell that it was illegal?

21  A.   Just his words.

22  Q.   Okay.   Was there any way for you to verify what he was

23  saying there?

24  A.   Not at that time, no.

25  Q.   Was he shooting it in the air?

```
 1   A.    No.

 2   Q.    Pointing it at people?

 3   A.    No.

 4   Q.    Threatening people with it?

 5   A.    Not in that video, no.

 6   Q.    Okay.  And, again, you've never seen him, other than with

 7   words, commit any acts of violence?

 8         And let me rephrase that -- let me just emphasize that.

 9         Have you ever known him to commit an act of violence?

10   A.    Not in the United States.

11   Q.    Okay.  Well, you're not going to hold it against him that

12   he was a United States Marine from 2011 to 2015, correct?

13   A.    No.

14   Q.    And do you have any qualms with him joining up with the

15   Kurdish forces and fighting ISIS, who I believe was our enemy?

16   A.    Not at all, no.

17   Q.    In fact, that's pretty patriotic, is it not?

18   A.    I believe so, yeah.

19   Q.    Okay.  And so when you talked about him being in a Kurdish

20   jail and escaping, that was when he was captured by ISIS, was

21   it not?

22   A.    Negative; it was the Kurds themselves put him in jail.

23   Q.    Because he was making allegations about some of the crimes

24   that these Kurds were committing against young girls?

25   A.    That's what he said, yeah.
```

1  Q.   Pretty honorable thing to do, is it not?

2  A.   If it's true, yeah.

3  Q.   Did you attempt to verify the veracity of what happened?

4  A.   He was interviewed by an FBI agent in Erbil and I don't

5  recall -- but I did speak with that agent and he did not

6  mention that, no.

7  Q.   Okay.  And I guess we've kind of blown our relationship

8  with the Kurds now, so no way to verify any more of this, is

9  there?

10 A.   I don't know, sir.  That's beyond me.

11 Q.   All right.  I understand.

12      So on May 22nd, you also talk about when he makes the

13 statement "Liberty or death"?

14 A.   Yes, that was in the video.

15 Q.   Is there something wrong with that statement?

16 A.   No.

17 Q.   In fact, it's taught to us in our history books, is it

18 not?

19 A.   Yeah.

20 Q.   Somebody made that statement on the courthouse steps in

21 Richmond, Virginia:  "Give me liberty or give me death."  Do

22 you remember who that was?

23 A.   Escapes me.  Thomas Payne maybe.

24 Q.   Thomas Payne, good.

25      So there's nothing wrong with that statement?

1  A.    No.

2  Q.    You talked about grenades, do you remember that?

3  A.    Yeah.

4  Q.    Or N-A-D-S (sic)?

5  A.    Yes.

6  Q.    Specifically, is it against the law to make a grenade or

7  is it against the law to make a grenade and transport it off of

8  your property?  I want you to be very specific on this.

9  A.    I am not familiar with which specific statute you're

10  referring to, but possessing illegal explosives is obviously

11  against the law.

12  Q.    Okay.  When you talk about illegal explosives, there's a

13  long list of materials that can be used to make illegal

14  explosives, is there not?

15  A.    Yes.

16  Q.    Is tanzinite (sic) one of them on that list?  Tanonite

17  (sic)?

18  A.    Tannerite?

19  Q.    Tannerite, sorry.

20  A.    No, not in the state of Oklahoma.

21  Q.    Exactly, not in the state of Oklahoma.

22        Is it against the law to own ammonium nitrate?

23  A.    Depends on the -- I think the nitrate concentration in the

24  actual ammonium nitrate.  There's a certain percentage of

25  nitrate that is against the law, to my knowledge.

1   Q.   Okay.  And that's over 62 percent or 62 parts per million,

2   I think is what it is, is it not?

3   A.   I'm not sure.

4   Q.   Bottom line is, you can't -- because of the federal

5   bombing, fertilizer manufacturers no longer make it over sixty-

6   two zero zero, which the zero is the potassium, the other zero

7   is the phosphate, the first one is the nitrate, correct?

8   A.   Correct.

9   Q.   Was the ammonium nitrate that he had illegal?

10  A.   We're unaware.  It's being sent to the FBI laboratory for

11  examination.

12  Q.   So at this point, you don't have an answer to that?

13  A.   Correct.

14  Q.   And we've already said the tanenite (sic) was legal as

15  well?

16  A.   Tannerite, yes.

17  Q.   Tannerite.

18       Next to the picture of those devices were five

19  firecrackers, fireworks?

20  A.   Correct.

21  Q.   Anything illegal about possessing fireworks outside of the

22  Oklahoma City limits?

23  A.   No, sounds like a city law, I'm not sure.

24  Q.   Okay.  So no violation there?

25  A.   Again, we are -- we haven't tested those, either, to make

1  sure that's, in fact, what they are.

2  Q.   Did they look like fireworks to you?

3  A.   It did and I've described them as such.

4  Q.   Any reason to dispute that until the lab comes back that

5  they were fireworks?

6  A.   No.

7  Q.   And, likewise, on what you've described as Molotov

8  cocktails, what kind of liquid was in those bottles?

9  A.   We sent those to the lab, but they field test to be

10  flammable, but those are being sent to the laboratory.

11  Q.   Okay.  There was four bottles there?

12  A.   Correct.

13  Q.   They had a rag taped to the side that was folded in a very

14  -- not a big rag, kind of a small rag -- that was duct-taped to

15  them, correct?

16  A.   Correct.

17  Q.   Was that gun oil?

18  A.   Again, we sent those to the laboratory to be examined.

19  Q.   Do you know whether or not if that was lit that it would

20  actually cause an explosion?

21  A.   I'm relying on the -- speaking to the bomb tech that

22  tested it, but he believed it to be diesel fuel, if I recall

23  correctly.

24  Q.   Okay.  Was it mixed with anything else?

25  A.   I can't testify to that because it's being sent to the

1   laboratory.

2   Q.   And to be very specific, is diesel fuel as explosive as

3   gasoline?

4   A.   I don't know.

5   Q.   Or does it have a higher firing point?

6   A.   I can't speak to that.

7   Q.   Is diesel fuel used to clean weapons?

8   A.   I'm sure it could be.

9   Q.   Okay.  Especially from somebody who has quite a bit of

10  combat experience, as Mr. Ledbetter does, correct?

11  A.   Sure.

12  Q.   It's not like over in fighting ISIS he can go down to the

13  local academy and buy gun oil, is there?

14  A.   I don't know.  I don't know if there's -- Erbil probably

15  does sell gun oil.

16  Q.   Over in northern Iraq?

17  A.   Yeah, it's a pretty well-built-up area.

18  Q.   Fair enough.

19       In fairness to you, Agent Rich, he did admit that the one

20  weapon, the AK-style carbine that you found via the search

21  warrant when he was arrested, that it had been modified to be

22  fired illegally, correct?

23  A.   Correct.

24  Q.   My question to you is:  How was it modified?

25  A.   He described the process, which is on tape.  I'm not a

1  gunsmith so I can't speak to that now, but it is recorded.  But

2  he described how he messed with the mechanism inside so that it

3  could fire fully automatic.

4  Q.   And how many times in your career as an agent have you

5  seen this?

6  A.   This -- on an AK-47?

7  Q.   Yes, sir.

8  A.   This is the first time.

9  Q.   Do you know how common it is for individuals in gun clubs

10 to do this?

11 A.   No.

12 Q.   In order to buy a fully automatic weapon, what kind of

13 license do you have to have?

14 A.   I believe it's a Class 3.

15 Q.   And what is the process for getting a Class 3?

16 A.   I'm not sure because I don't have one.

17 Q.   And if somebody has a Class 3 weapon, are they allowed to

18 let other people use it?

19 A.   Yes.

20 Q.   Okay.  And if somebody else has a Class 3 weapon, are they

21 able to show other people how to modify it?

22 A.   I'm not sure.

23 Q.   Do you know when it was modified?

24 A.   He didn't -- he was not clear on that, but he indicated it

25 was prior to the incident in February with the McLoud police

1  chief.

2  Q.   Okay.  The training video that you saw that we talked --

3  and I hate to jump back to it -- it looked like those were

4  three-round bursts, correct?

5  A.   At the end, it was consuming more than three rounds.

6  Q.   There was three three-round bursts and one seven-round

7  burst, if I counted correctly.

8  A.   Okay.

9  Q.   I think we were both Navy officers, were we not?

10  A.   Correct.

11  Q.   Okay.  Agent Rich, how do you make an AK-47 fire a

12  three-round burst?

13  A.   As I stated before, I'm not familiar, I'm not a gunsmith.

14  Q.   So it would be safe to assume that -- well, obviously,

15  either an ATF agent who was very specialized in this or a

16  gunsmith --

17  A.   Right.

18  Q.   -- who had manufactured this or the manufacturer their

19  selves, but in your training and experience, have you ever seen

20  a three-round selector switch on an AK carbine?

21  A.   I have not, no.

22  Q.   Have you ever even heard of one existing?

23  A.   No, but I'm not very familiar with the AK-style rifle.

24  Q.   In fact, the only weapon that you are familiar with that

25  has a three-round selector switch is what kind of weapon?

1  A.   An M-16 or AR-style, yeah.

2  Q.   The AR styles?

3  A.   Correct.

4  Q.   And I say that because when you initially were asked the

5  question on the video where his mother is talking to the chief

6  of police -- do you remember that you said that he was outside

7  -- and you corrected it later, but he had an AK with him?

8  A.   The police chief incident, he had an AR with him.

9  Q.   And that's correct?

10 A.   I don't --

11 Q.   Anything illegal about that weapon?

12 A.   The AR, not -- unless it's been modified like the AK to

13 fire full auto, it is not illegal.

14 Q.   Where is that weapon?

15 A.   I'm not sure.  We recovered, I believe, around 20 firearms

16 from the property that are being examined to see if they have

17 also been illegally modified, but that examination has not been

18 done at this time.

19 Q.   Did those weapons belong to him or his family members?

20 A.   That's unknown to me, sir; I was not at the scene of the

21 search.

22 Q.   So you're not trying to imply that all 20 weapons that

23 were recovered belonged to Mr. Ledbetter?

24 A.   No, but you asked if -- where the AR was and I was

25 implying that that AR could be one of those and I do not know

1   if that's the case.

2   Q.   Okay.  And just to be clear, the police chief said -- and

3   I'm going to quote -- "that he had taught more concealed carry

4   classes than anybody in the state."

5        Do you remember him saying that statement?

6   A.   Yeah, I believe he did, yeah.

7   Q.   So if he identifies it as an AR, we can -- you would think

8   he would recognize an illegal weapon if he saw one, would you

9   not?

10  A.   I can't speak to that.

11  Q.   Well, he seemed to be very knowledgeable having taught

12  more concealed carry classes than anybody in the state as to

13  what weapons are; would you agree with that?

14  A.   Right.  But the -- to indicate whether an AR is select

15  fire, the mechanism is on the inside and the -- Chris was

16  holding his weapon like this, so his hand would have been

17  covering where the selector switch is.

18  Q.   It's on the upper left side, right above the trigger

19  guard, is it not?

20  A.   Correct.  Which would have been facing in his person and

21  his hand would have been covering -- there's an indicator on

22  the right side as well.

23  Q.   Okay.  Bottom line is, when the police chief says

24  repeatedly that he's not breaking any laws, do you have any

25  reason to disagree with the chief of police there?

1  A.   When he was standing outside, that is an accurate

2  statement.

3  Q.   Okay.  And, again, that dispute, why they're there, goes

4  back to that McLoud police officer, the good ones and the bad

5  ones, kind of the same problem that we're having outside right

6  now with the riots all over this country, is it not?

7  A.   That's your statement, sir.

8  Q.   Well, I mean, you watch TV, surely you're aware of this?

9  A.   Yeah, that incident happened back in February, so -- I

10  wasn't there.

11  Q.   And I understand this incident happened back in February,

12  but other incidents have happened since then that have kind of

13  brought this to the forefront?

14  A.   Right.  And to my knowledge, they did an internal

15  investigation, which it may be ongoing, but that officer is not

16  employed anymore, so...

17  Q.   Okay.  District attorney asked you some very -- not

18  district attorney, I'm sorry, Mr. Dillon -- we go back two

19  decades?

20  A.   He's prior ADA, I'm aware of that.

21  Q.   The Assistant United States Attorney asked you some very

22  pointed questions about whether he would follow a law if he

23  didn't believe in it.  Do you remember that?

24  A.   Yes, sir.

25  Q.   Do you think it's important that if people don't believe

1   in laws that they should follow them?

2   A.   Yes, I believe they should follow them.

3   Q.   Even if they're immoral and wrong?

4   A.   That's not for me to decide.

5   Q.   I understand that, but as an American citizen, do you not

6   think they have a moral obligation to stand up for laws that

7   they believe are unjust or injust?

8   A.   Yeah, but I believe we have a democratic way of changing

9   those laws.

10  Q.   Did he do anything that would be undemocratic to change

11  those laws?

12  A.   In choosing when -- when and when not to follow the law

13  goes against the very foundation of the law itself.  Because if

14  everyone decided what laws they wanted and didn't want to

15  follow, there would be no law.

16  Q.   Well, I'm looking at his criminal history and, again, this

17  is kind of a combined hearing, so bear with me, Agent Rich.

18  A.   Sure.

19  Q.   He had one arrest at age 10, one arrest at age 26 for a

20  misdemeanor reckless driving, and one arrest or a ticket for no

21  state driver's license.

22  A.   Okay.

23  Q.   Sounds to me like he's a pretty law-abiding citizen, is he

24  not?

25  A.   Until recently, yeah.

1  Q.    And, again, the only law that you've accused him of

2  violating is basically carrying or having possession of an

3  automatic weapon, correct?

4  A.    Which is illegal, without a license.

5  Q.    I understand that, but that's the only law you're accusing

6  him of violating?

7  A.    That's why we're here today, yes.

8  Q.    Okay.  Not that he used it in some mass shooting, correct?

9  A.    No.

10 Q.    Nothing that says he was going to do a mass shooting,

11 correct?  And yet they assign this to the domestic terrorism

12 group instead of, you know, the building is being broken down

13 and the windows being smashed in, you were concentrating on

14 this and this one group, were you not?

15 A.    So this case preceded the windows being broken down and

16 the events that you described.  It was based on the threats

17 made in the video.  We also investigate threats.

18 Q.    Okay.  And the threats were basically between the McLoud

19 Police Department and him, correct?

20 A.    Correct.

21 Q.    All right.  He wasn't saying that I'm going to go kill FBI

22 agents or anything like that, correct?

23 A.    Correct.

24 Q.    And, in fact, he peacefully protested when he was on video

25 up there at the Kansas State Capitol, did he not?

1  A.   Yes.

2  Q.   Which is his right as an American, correct?

3  A.   Absolutely.

4  Q.   And after serving in combat in the Marines and

5  volunteering and being a patriot over fighting ISIS -- which I

6  believe our president has deemed a terrorist group, has he not?

7  A.   They've been deemed such, yes.

8  Q.   He's earned that right, has he not?

9  A.   Yes.

10  Q.   Okay.  So when he gets on Facebook and you kind of see

11  some of these -- this agitation that he has with the police

12  department, it always de-escalates, does it not?

13  A.   Yes.

14  Q.   Every incident he has ever had with the police in one form

15  or fashion has been de-escalated the way it should be?

16  A.   Correct.

17  Q.   By both parties, not only law enforcement, but himself?

18  A.   I would disagree with that statement.

19  Q.   Did he carry it to a new level that I'm unaware of and

20  commit a crime that's not in here listed in this --

21  A.   No, I would just characterize the incident where he eluded

22  the law enforcement officers disengaged, he was not

23  disengaging, they backed out.

24  Q.   Okay.  When was that incident again?

25  A.   May 19th.

1    Q.    And it's now June 10th and they still haven't arrested him

2    for the slow speed crossing of a center line?

3    A.    That was initially what he was arrested for on June 4th.

4    Q.    Okay.  So that was the state warrant or the city of --

5    wasn't a state warrant?

6    A.    Lincoln County Sheriff's Office filed the charges -- or

7    they got the warrant, they've yet to file the charges.

8    Q.    I was going to say, there is nothing on OSCN.

9    A.    To my understanding, because we developed probable cause

10   for a federal violation, they held -- withheld from filing

11   pending this situation.

12   Q.    Bottom line, Agent Rich, if this gentleman hadn't voiced

13   his displeasure at law enforcement for some incidents that had

14   happened, he never would have came to your attention, would he?

15   A.    Correct.

16   Q.    And so the McLoud Police Department, for whatever reason,

17   got the domestic terrorism group of the FBI involved against a

18   citizen that one of their officers had basically committed

19   crimes against, correct?

20   A.    That's your characterization, yeah.

21   Q.    Well, let's back up, see if my characterization is

22   correct.

23         Did the McLoud police office give this case to you?

24   A.    They don't give us a case; they file the complaint and

25   then we look into that complaint.

1  Q.   Okay.  And was their complaint based against

2  Mr. Ledbetter?

3  A.   Yes.

4  Q.   And had there been specific threats where he had

5  threatened to blow up the police station or shoot all the

6  McLoud police officers or anything of that nature?

7  A.   Not to my knowledge.

8  Q.   And now that you've got to watch that and -- well, the

9  last part of the video was cut off somehow by the chief of

10  police, but now you're aware that there was, for lack of a

11  better word, a dirty police officer that was doing something he

12  shouldn't have been doing to the Ledbetters and their daughter

13  and he subsequently got fired because of that, correct?

14  A.   To my knowledge, yeah.

15  Q.   And so instead of going after their own, they get the

16  police to go after the citizens that basically were outing this

17  bad officer.  Kind of what it looks like, isn't it?

18  A.   That's your characterization.

19  Q.   And whether it would have been tax evasion, illegal

20  firearm, maybe cockfighting on their property, you had to find

21  something in order to appease the McLoud Police Department and

22  their complaint?

23  A.   It's not my job to appease the McLoud Police Department.

24  Q.   And I understand that.  Your job is domestic terrorism.

25       And I'm wondering why you were putting your resources on a

1   person that is a United States Marine and also went and fought

2   ISIS?

3   A.   Because he was violating a federal statute by possessing a

4   firearm that he is not allowed to have.

5   Q.   Okay.  Well, I want to go down the PSR a little bit more

6   because I think there's more to this story.

7        You also started looking at some of his video --

8   A.   They're posted --

9   Q.   Some of his blogs?

10  A.   They're posted publicly.

11  Q.   Do you have a problem with the New Sons of Liberty Group?

12  A.   No.

13  Q.   Do you have a problem with the -- and you use the term --

14  "boogaloo."

15  A.   I haven't said that term today.

16  Q.   Okay.  Well, it's used in the PSI that you had watched --

17  and when I say "you," you adopted the complaint as your own,

18  even though it was written by Agent Anderson, correct?

19  A.   Correct.

20  Q.   That when somebody says "a boogaloo," that you now seem to

21  think that that's a civil war?

22  A.   That is the accepted definition, yes.

23  Q.   All right.  You're trained in gangs, are you not?

24  A.   I have gang experience, yes.

25  Q.   And you and I have crossed paths before, so I'm sure --

JOSHUA RICH - CROSS BY MR. JOHNSON                69

1   A.   Yes, with gang members, yes.

2   Q.   Absolutely.

3        So "boogaloo" is a term that is associated with the Insane

4   Clown Posse, the ICP, is it not?

5   A.   No, I think you're confusing -- it's -- juggalo is the

6   Insane Clown Posse.

7   Q.   I understand juggalo, but then they do boogaloos?

8   A.   They do blugalo (ph), which is a black juggalo, it's not

9   spelled --

10  Q.   And they do boogaloos, which is a pit mash where they go

11  together and they just slam into each other on some stupid

12  music thing, do they not?

13  A.   I have no knowledge of that, actually.

14  Q.   Well, have you looked up the Urban Dictionary definition

15  for boogaloo?

16  A.   I have.  But I've also looked up the Anti-Defamation

17  League's definition of it as well.

18  Q.   Right.

19       And the Anti-Defamation League, for whatever reason,

20  doesn't define what the FBI does, does it?

21  A.   More so than the Urban Dictionary, I would say.

22  Q.   Are you telling this Court under oath, sir, that the FBI

23  follows what the Anti-Defamation League says?  Because I'm

24  really confused about that.

25  A.   No.  But I just said I would lend more credence to their

1  definition than the Urban Dictionary, sir.

2  Q.   In your interview with Mr. Ledbetter, did he sit there and

3  try to say that he's trying to start a civil war?

4  A.   We didn't ask him that question.

5  Q.   Well, it's sitting here in the PSI -- or not the PSI, the

6  pretrial services report -- you've looked at his YouTube

7  videos, you've looked at his Facebook videos?

8  A.   Yeah.

9  Q.   Do you not think that somebody that's trying to start a

10  civil war would possibly raise the interest of the FBI domestic

11  terrorism group, sir?

12  A.   That's a fair statement, yeah.

13  Q.   It's why I asked it.

14  A.   Yeah.

15  Q.   And you just didn't look him?

16  A.   No, he makes the statement about the book -- in the

17  criminal complaint, if you don't mind me looking, is lifted

18  from his Facebook and I believe he's saying that in a private

19  message to somebody, yes.

20  Q.   It is.  And I'm looking at --

21  A.   So we got those words from the defendant.

22  Q.   I understand that.

23       Did you ask him what he meant by that is my question.

24  A.   No.  We had arrested him on the firearm, we asked him

25  about that.

1  Q.   The presentence report or the presentence report that's

2  prepared for the Court, selective parts of the Facebook, the

3  YouTube, and other videos are given to them by somebody,

4  correct?

5  A.   I'm not familiar with the full process; that's not my job.

6  Q.   Have you looked at all of his Facebook posts?

7  A.   I've looked at a considerable amount.

8  Q.   There is a lot of positive and peaceful posts on those

9  Facebook pages, are there not?

10  A.   Which ones are you referring to?

11  Q.   Well, let's start with last weekend -- or might have been

12  the weekend before -- when he provided security for the NAACP

13  reporters that were covering the riots here in the city.  Was

14  there something wrong with doing that?

15  A.   No, I don't believe that was in the complaint.

16  Q.   Okay.  Well, again, you're accusing him of being some

17  far-right militia member and yet he's out there protecting the

18  NAACP.  The two don't coincide, do they?

19  A.   I can't speak -- I would disagree, actually, with that

20  statement right now.

21  Q.   Well, it's on his Facebook, is it not?

22  A.   No, I'm saying with your statement about whether those two

23  would not coincide, because an anti-police bias, whether it's

24  far right or far left, would coincide with what, as you stated,

25  is happening in the country right now.

1   Q.   Are you telling me that the NAACP, sir, has an anti-police

2   bias?

3   A.   I didn't say that, no.

4   Q.   Okay.  So my question again is, the fact that he is out

5   protecting the NAACP reporters, that's something positive that

6   could have been given to the pretrial services and for whatever

7   reason was not elected to be turned over to them?

8   A.   That's not my job.

9           THE COURT:  I don't think you characterized correctly

10  how pretrial services prepares their reports, so I would stay

11  away from that.

12          MR. JOHNSON:  Fair enough.

13  Q.   (BY MR. JOHNSON) Do you know who turned over all this

14  information, the negative stuff, to pretrial services?

15  A.   I would assume prosecution, but that's not my job.

16  Q.   Okay.  So if there's positive stuff, they don't know where

17  to get it from?

18  A.   Again, I'm not familiar with the process, I'm an FBI

19  agent.

20          THE COURT:  Again --

21          MR. JOHNSON:  I'll move on, Judge.  I can see I've

22  crossed that line.

23  Q.   (BY MR. JOHNSON) I want to go with you over the shipping

24  container, Exhibit No. 1.

25  A.   Okay.

1  Q.   If you can pull this up, please.

2            THE COURT:  Mr. Johnson, I'm not trying to impede

3  your cross --

4            MR. JOHNSON:  Five minutes.

5            THE COURT:  Thank you.  That's what I was asking you

6  for.  Thank you.

7            MR. JOHNSON:  Well, maybe seven, but I'll be quick,

8  Judge.

9            THE COURT:  No, that's -- I appreciate that up -- I'm

10  just rescheduling a few other hearings.

11            MR. JOHNSON:  I understand.

12  Q.   (BY MR. JOHNSON) What is damning about having a shipping

13  container on your property, sir?

14  A.   I don't believe I said it was damning.

15  Q.   Okay.  Why is it prejudicial?

16  A.   I didn't say that.

17  Q.   Within a five-mile radius of this farm, how many other

18  40-foot shipping containers are around?

19  A.   I don't know.

20  Q.   How many other deer stands are around?

21  A.   I don't know.

22  Q.   If a person wants to put sandbags on top of his shipping

23  container so that he can have a clear line of sight to protect

24  his property, is he allowed to do that?

25  A.   Sure.

1  Q.    Breaking any laws by doing that?

2  A.    No.

3  Q.    Okay.  So, really, Exhibit No. 1 has no significance on

4  whether he should be detained or not, correct?

5  A.    Well, just based on the statements he made to us at the

6  interview, I would -- I believe that's why they're there.

7  Q.    Okay.  Are you allowed to protect your property?

8  A.    Yes.

9  Q.    Are you allowed to protect your property against

10 trespassers?

11 A.    Yes.

12 Q.    Of people coming to do harm?

13 A.    Yes.

14 Q.    Even if those people are the police?

15 A.    Not if they have a warrant, no.

16 Q.    Okay.  If they don't have a warrant.

17       Did that McLoud police officer on February 17th have a

18 warrant to pull over that little girl?

19 A.    That did not occur on their property.

20 Q.    Okay.  It came right up to their property line, did it

21 not?

22 A.    I wasn't there, I don't know.

23 Q.    Not even his jurisdiction, was it?

24 A.    And he was fired for that.

25 Q.    And that's what started this whole dispute was the McLoud

1   Police Department basically running to the FBI to get help from

2   -- to protect their own or cover up their own?

3   A.   I can't speak --

4   Q.   You don't see it that way?

5   A.   No.

6   Q.   Doesn't mean that he didn't break any laws, correct?

7   A.   Say again.

8   Q.   Doesn't mean he didn't break any laws by possessing an

9   illegal weapon, correct?

10  A.   It does mean he broke a law by possessing illegal weapon.

11  Q.   Right.  I'm not trying to say that it didn't mean he

12  didn't break the law.

13  A.   All right.  I was misunderstanding what you were trying to

14  ask.

15  Q.   Yeah.

16       But how does any of that make him a flight risk, sir?

17  A.   I don't believe we termed "flight risk."  I think whether

18  he would necessarily come to a hearing if he didn't believe it

19  to be valid, I think, was the question along those lines.

20  Q.   Well, you talked about some comments that he allegedly

21  made in the back of the police car, you're transporting him to

22  -- was it -- where did you transport him to?

23  A.   Those comments were made in the FBI office prior to

24  transporting him to Logan County.

25  Q.   So you have recordings of all that, correct?

```
 1  A.   Correct.
 2  Q.   And he just says if he's not released he's scared there
 3  could be violence?
 4  A.   Yeah, we asked him essentially how his friends will react
 5  and he made comments along those lines, yes.
 6  Q.   That's his friends; that's not him saying that he's going
 7  to commit violence.  Big difference, is there not?
 8  A.   Could be.
 9  Q.   Have you seen any violence here today with the protest of
10  three outside?
11  A.   I did not come in from the front, no.
12  Q.   Okay.  Just because they're three deep outside, I want to
13  make sure there's not going to be any problems with the 42
14  police down there.
15  A.   Right.  I think there's -- a number of them are in here,
16  yeah.
17  Q.   Okay.  And when you make statements -- did you interview
18  Karen Douglas?
19  A.   I did, sir.
20  Q.   And is there pig hunting, razorback hunting in Arkansas?
21  A.   I believe so.
22  Q.   Pretty big industry here in Oklahoma, too, is it not?
23  A.   That's fair, yeah.
24  Q.   Have you done it yet?
25  A.   I have not, no.
```

1  Q.   And did he specifically tell her pigs are police and I

2  would rather be shooting police or words to that statement or

3  she's just implying that that's what she thought he meant?

4  A.   She said he specifically said -- because we asked to

5  clarify how did he say it, how do you mean, and she said he

6  meant police, he said so.

7  Q.   So, again, the fact that he basically has a disdain

8  because of what happened in McLoud for police officers, he's

9  contempt -- or committed the crime of contempt of cop and now

10 has the federal government after him, correct?

11 A.   No, he violated federal firearms law and that's why he's

12 here today.

13 Q.   Is he the only one on any of those videos that you have

14 seen that violated federal firearm laws?

15 A.   No.  The other individual in that video had an automatic

16 weapon, which in interview with myself and Mr. Anderson,

17 Mr. Ledbetter said he also modified illegally and given it to

18 Braden Chesser.

19 Q.   And yet he's not sitting here today, is he?  Has he been

20 arrested?

21 A.   He has not.  We have not located that firearm.

22 Q.   Okay.  But that's because McLoud Police Department didn't

23 make a complaint on him, did they?

24 A.   That has nothing to do with it.

25 Q.   Agent Rich, that's all I have, sir.

1           THE COURT:  Anything further, Mr. Dillon, on direct?

2           MR. DILLON:  No, Your Honor.

3           THE COURT:  Thank you.  You're excused.

4      The Court will take a brief ten-minute recess.  I've got

5  to reschedule a couple of hearings.  I really need to be

6  finished by 1:30.  Do the parties think we'll be able to do

7  that?

8           MR. JOHNSON:  Absolutely, Judge.

9           MR. DILLON:  The Government has no other evidence to

10 present.

11          THE COURT:  As to preliminary.  And I know you might

12 have something as to detention.

13          MR. DILLON:  We're going to ask the Court to

14 incorporate this as to detention.  We have no other evidence.

15          THE COURT:  Thank you.  We'll be in recess until

16 11:20.

17     (RECESS HAD.)

18          THE COURT:  I believe the Government has rested with

19 respect to the preliminary hearing; is that correct?

20          MR. DILLON:  Yes, Your Honor.

21          THE COURT:  With the exception of argument.

22     Would the defendant like to present any evidence with

23 respect to preliminary hearing?

24          MR. JOHNSON:  As respect to preliminary hearing, no,

25 Your Honor.

1          THE COURT:  Thank you.

2      Would the Government like to be heard in argument?

3          MR. DILLON:  Your Honor, despite the discussions

4  concerning Class 3 licenses, who can loan, which gun was which,

5  what we do know is on the day of the defendant's arrest, he

6  acknowledged I've got an AK-47 with a select fire.  ATF

7  test-fired it and it was fully automatic.  That's what's

8  required by the law.  He's violated that.

9      The other instances just show that he had continual

10 possession of an automatic weapon and he himself acknowledged

11 it's illegal to have.

12     I don't think that there's any gray area when it comes to

13 probable cause on this charge.

14         THE COURT:  Thank you.

15     Mr. Johnson.

16         MR. JOHNSON:  Judge, as the Court is aware, the

17 burden is on the Government.  I don't intend to make any

18 argument.  I heard the evidence and will respect the Court's

19 decision as relates to preliminary hearing.  And I am ready to

20 move on to detention when the Court is ready.

21         THE COURT:  Thank you.

22     And so with respect to the preliminary hearing, the Court

23 does find that the alleged incident did take place within the

24 jurisdiction of the Western District of Oklahoma, that the

25 defendant was identified, given the testimony that was heard

1  and -- by Agent Rich and the elements of the offense are not

2  difficult to establish to the extent needed to be for a

3  preliminary hearing, which is only probable cause.

4      Probable cause is not a high burden, and given that the

5  defendant made statements to the effect that he was in

6  possession of one, that he adjusted the gun so that it would be

7  fully automatic, and, again, that such weapon was recovered,

8  the Court does find that there's probable cause for the

9  purposes of preliminary hearing.

10      And so, as such, the defendant will be bound over for

11  trial.

12      We will -- in addition to that, the affidavit was adopted

13  by the testifying agent.

14      We'll move on to detention.

15      And, again, any findings that the Court does make with

16  respect to pretrial detention have no impact upon the

17  defendant's right to the presumption of innocence.

18      Any statements or findings the Court makes at this hearing

19  only go to whether or not the defendant should be detained

20  pending trial in this matter.

21      The Government bears the burden of establishing by clear

22  and convincing evidence that the defendant might pose a danger

23  to the community should he be released.  Similarly, the

24  Government would bear the burden to show by a preponderance of

25  the evidence that the defendant would be a flight risk or some

1   other sort of risk of non-appearance should the defendant be

2   released.

3        Again, the Court can consider a variety of different

4   conditions it might place upon the defendant to do its best to

5   mitigate those concerns.

6        Since the Government does have the burden, the Court will

7   ask if the Government would like to present any evidence with

8   respect to detention.

9            MR. DILLON:  Your Honor, we'd just ask to incorporate

10  the evidence the Court has previously heard or read.

11           THE COURT:  Thank you.

12       The Court will now ask the defendant if it would like to

13  present any evidence via testimony or proffer or both with

14  respect to pretrial detention.

15           MR. JOHNSON:  We would, Your Honor.

16       I first would like to call some witnesses, please.

17           THE COURT:  You may.

18           MR. JOHNSON:  The defense would call Joann Johnson.

19           THE COURT:  I'm just going to take a brief moment.

20       As you walk up, we're going to wipe down the witness

21  stand.

22       Thank you, Andrea.

23       You may proceed.

24       (WITNESS SWORN.)

25           MR. JOHNSON:  Thank you, Your Honor.

```
 1                          JOANN JOHNSON,

 2                        DIRECT EXAMINATION

 3   BY MR. JOHNSON:

 4   Q.   Ma'am, can you state and spell your name for the record

 5   real quick, please.

 6   A.   Joann, J-O-A-N-N, Johnson, J-O-H-N-S-O-N.

 7   Q.   Do you know a person by the name of Christopher Ledbetter?

 8   A.   He is my only son.

 9   Q.   How old is Mr. Ledbetter?

10   A.   He's 29 years old.

11   Q.   And other than his military service, where has he resided

12   his entire life?

13   A.   With me on my property.

14   Q.   And where is your property located?

15   A.   It's 333247 East 1066 Road.

16   Q.   And to the best of your knowledge, is that in the Western

17   District of Oklahoma?

18   A.   It's in Lincoln County is all I know.

19   Q.   Okay.  Was your son ever in the military?

20   A.   Yes, he was.

21   Q.   What branch?

22   A.   He was in the Marines.

23   Q.   And how long was he in the Marines?

24   A.   Four years.

25   Q.   Do you know approximately from when to when?
```

1   A.   I think it was -- I can't remember exactly, but they say

2   it was '11 to '14 maybe -- it was -- he was in there -- I can't

3   remember.  This has been really hard and I can't remember

4   stuff.

5   Q.   I understand, ma'am.

6        Ma'am, I'm going to ask you a couple more basic questions

7   --

8   A.   Okay.

9   Q.   -- and then I'm going to get to some specific ones as it

10  relates to whether the Court believes he's a danger to the

11  community and a flight risk.

12       Is your son employed?

13  A.   Yes, he is.

14  Q.   What does he do for a living?

15  A.   He works for me and he owns part of the company.  We have

16  a drywall company.

17  Q.   And how long has he been doing that?

18  A.   He hasn't worked anywhere else.

19  Q.   So his entire adult life when he wasn't in the Marine

20  Corps?

21  A.   Pretty much, yes, yes.

22  Q.   So how many years would that be, best guess?

23  A.   From the time he was about -- he's worked from the time he

24  was about 16.

25  Q.   Okay.  So minus the Marine Corps, 13 years?

1   A.   Yeah.

2   Q.   At the same job?

3   A.   Yes.

4   Q.   At the same company?

5   A.   Yes.

6   Q.   Does your son have a valid passport right now, or do you

7   know?

8   A.   No, he does not.

9   Q.   Do you know whether or not that was declined by the state

10  department and a hole was punched in it because of his service

11  fighting ISIS when he was in Syria?

12  A.   It was taken out because he went to Syria and he signed a

13  note to them for $4,000.  Until he pays that back, he can't --

14  that was to get out of the prison.  Until he pays that back, he

15  can't have a passport.

16  Q.   Does he have friends that are out of state that he goes

17  and visits and stays with?

18  A.   He does occasionally, yes.

19  Q.   But does he always keep in contact with you?

20  A.   He calls me every day or every two to three days, he

21  always has.

22  Q.   Does he have access to large sums of money which he could

23  secret himself away to Mexico or Canada?

24  A.   No.

25  Q.   Assuming they lift the COVID restrictions?

1   A.   Yeah, no, not really.

2   Q.   Okay.  Going back to -- well, if the Court decides to

3   release him --

4   A.   Yes.

5   Q.   -- there's been some questions about whether you would

6   make him follow the law.

7   A.   He would follow the law.  He's a very honest person, as

8   you know, by the testimony.

9   Q.   Now, you saw starting around February of this year -- for

10  lack of a better expression, his verbal behavior towards law

11  enforcement --

12  A.   Yes.

13  Q.   -- took a turn for the worse?

14  A.   Yes.

15  Q.   And was that related to a Jones police officer basically

16  having an inappropriate relationship with a student at McLoud

17  High School that you were very close to?

18  A.   He was very upset about it, yes.

19  Q.   And that when reports were made to the Jones police -- or

20  to the McLoud police regarding this officer, that they

21  basically did not do anything about it.  And that officer, once

22  he found out that the reports had been made, started harassing

23  your family?

24  A.   That's true.

25  Q.   And that's kind of what led up to that incident that we

```
 1  saw the video with you at the police department?
 2  A.   Yes.
 3  Q.   The video -- and I will let it speak for itself -- you
 4  were very cordial with Chief Elliott, were you not?
 5  A.   Yes, I was.
 6  Q.   But you were recording him as well, were you not?
 7  A.   I was, yes, I was.
 8  Q.   And the video cuts off at a certain point?
 9  A.   Yes, it does.
10  Q.   Are the allegations that were made against the Jones
11  police officer regarding his inappropriate sexual relationship
12  with a minor child who was a student at McLoud High School, is
13  that what's discussed later on that you have the recording of?
14  A.   Yes, it is.
15  Q.   And you would be happy to turn that over to the U.S.
16  Attorneys if they asked for it?
17  A.   Yes, I would.
18  Q.   But for whatever reason, Chief Elliott decided, if he's
19  the one that turned that tape over, that's when he stopped the
20  tape?
21  A.   Exactly.
22  Q.   And that's what your son was mad about.
23            MR. DILLON:  Your Honor, I'm going to object, that's
24  a mischaracterization of what I heard today.
25            THE COURT:  That's not what Mr. Dillon represented
```

 1   earlier.

 2           MR. JOHNSON:  Okay.

 3   Q.  (BY MR. JOHNSON) For whatever reason, that tape cuts off

 4   at -- right when you all get -- start talking about the sexual

 5   allegations?

 6   A.  Just before we talk about that, yes.

 7   Q.  But you have the rest of the tape that you can provide to

 8   the Government if they didn't receive it --

 9   A.  I do.  I have it.

10   Q.  We don't know if they did or didn't?

11   A.  I have it.

12   Q.  Okay.  And was that why your son was so irate outside?

13   A.  Yes, he was.

14   Q.  Okay.  Has your son participated since then in peaceful

15   protests?

16   A.  Yes, he has.

17   Q.  Has he been arrested because of these protests?

18   A.  No, he has not.

19   Q.  You heard that one of the officers said that they did

20   close battle quarters training or things of that nature,

21   correct?

22   A.  Yes.

23   Q.  Your son was a Marine and also fought alongside the

24   Kurdish allies against ISIS, did he not?

25   A.  Yes, he did.

1   Q.   And is that where he learned these skills?

2   A.   Yes, he did.

3   Q.   And were most of the people in this group also fellow

4   veterans that would come do this with him?

5   A.   Yes, they are.

6   Q.   And when I say "veterans," I mean military service

7   members?

8   A.   Yes, sir.

9   Q.   Law-abiding citizens?

10  A.   Yes, sir.

11  Q.   Okay.  When your son makes the statement that he's not

12  going to follow an unjust law if he believes that it's unjust,

13  you would support him on that, would you not?

14  A.   Yes, I would.

15  Q.   However, if the Court orders you to report any violations,

16  would you follow the Court's order even if you believe that it

17  was an unjust law?

18  A.   I would, yes, for my son, I would.

19  Q.   And you understand being a third-party custodian takes --

20  there's a lot of responsibility with that?

21  A.   I don't have a problem with that.

22  Q.   I mean, you've been his mother for 29 years --

23  A.   Twenty-nine years.

24  Q.   -- I understand?

25  A.   He tells the truth.

1  Q.   And you heard that from the agent, he was very forthcoming

2  in this interview?

3  A.   Yes, he was.  He doesn't lie about anything at all.

4  Q.   Are you scared that there's going to be some kind of civil

5  war in this state that your son is supposedly propagating or

6  something?

7  A.   When this started, it was before all this uprising started

8  that's going on now between the Black Lives Matters, this was

9  before that.  This was instigated by the McLoud police and only

10 by the McLoud police.  If there's something like that coming, I

11 have no knowledge of it.

12 Q.   Now, subsequent to this, are there any issues between your

13 family and the McLoud Police Department as you sit here today?

14 A.   Yes, there is.

15 Q.   Still ongoing with the harassment, is it not?

16 A.   Yes, it is.

17 Q.   They fly drones over your house, do they not?

18 A.   Yes, they did.

19 Q.   Okay.

20 A.   Phones taps, too.

21 Q.   Okay.  And you've reported that down to the McLoud, you've

22 tried to have a decent relationship with them, correct?

23 A.   I have tried to talk to Police Chief Wesley.  I talked to

24 that -- him that one time.  After that, I have not talked to

25 him.  But my son has talked to several of the Indian police,

1  any other police in the area since then.

2  Q.   So your son has made other reports to other police

3  departments regarding the McLoud police?

4  A.   Yes, he has.  The Lincoln County police were called out,

5  the Indian police were called out because he trusted them.

6  Q.   And is that because the McLoud Police Department, even

7  though their jurisdiction ends at the McLoud city limits, for

8  whatever reason, keep coming out to your property in Lincoln

9  County?

10  A.   Yes, they do, they have, uh-huh.

11  Q.   Which is way out of their jurisdiction?

12  A.   Yes, it is.

13  Q.   All right.  And that officer that you made the complaint

14  about, he's still not in prison?

15  A.   No, sir, he's not.

16  Q.   And his girlfriend still lives right down the road?

17  A.   He lives there too also, still.

18  Q.   Okay.  And that's an ongoing source of problems, is it

19  not?

20  A.   We don't bother him.  We don't like him, but we don't

21  bother him.  He lives about 40 foot away from our house.

22  Q.   Okay.  If your son is released, will you make sure there's

23  no weapons in that house?

24  A.   Yes, I will.

25  Q.   And you saw some pictures of what the Government are

1   terming as "grenades" or maybe even "Molotov cocktails," even
2   though they haven't got lab reports back as to what those
3   substances are, would you make sure that no devices of that
4   nature are there?
5   A.   Yes, I will.
6   Q.   And if you were assigned a pretrial services officer which
7   you are reporting to, whether weekly, daily, monthly, while
8   pending trial on this matter, would you make sure that occurs?
9   A.   Yes, I would.
10  Q.   Do you have any felony convictions on your record?
11  A.   No, I do not.
12  Q.   Have you ever been in trouble with the law?
13  A.   No, I have not.
14  Q.   Has your husband -- current husband?
15  A.   No, not to my knowledge.
16  Q.   Okay.  Any alcohol or drug issues with your son?
17  A.   Never, ever.
18  Q.   And the language that we saw, and I'm almost embarrassed
19  to say this, that's -- he learned that when he was in military,
20  did he not?
21  A.   As you know, when we talk to each other, when we're not in
22  court and when you're angry, you say things, yes.
23  Q.   I understand.
24       And if the Court orders him not to have any association
25  with any of his friends, even though the agents testify they're

1   not a terrorist group or anything of that nature, and even

2   though they're all military veterans, would you abide by that

3   order as well?

4   A.   Yes, I would.

5   Q.   Ms. Johnson, that's all I have for you.  Thank you, ma'am.

6   A.   Thank you.

7   Q.   The U.S. Attorney might have some questions for you.

8   A.   Okay.

9                    CROSS-EXAMINATION

10  BY MR. DILLON:

11  Q.   Good morning, ma'am.

12  A.   Good morning.

13  Q.   I want to make sure I didn't misunderstand you, and if I

14  misstate something, please feel free to correct me, okay?

15  A.   Okay.

16  Q.   At the beginning of your testimony, did you say that your

17  son has always lived on your property other than when he was

18  overseas?

19  A.   He was overseas; he lived with a roommate for like I think

20  two or three months one time.

21  Q.   Where was that?

22  A.   It was in Midwest City somewhere, I don't remember the

23  address.

24  Q.   Okay.  At some point did he also live over off of, I

25  believe, Martin Luther King Boulevard in Oklahoma City?

```
 1   A.    I've forgotten about that.  Yes, he did.  He lived there
 2   in a duplex with two other guys, they shared it.
 3   Q.    Okay.  Mr. Johnson asked you if he had money to run if he
 4   wanted to; do you recall that?
 5   A.    Yes.
 6   Q.    And you said he didn't?
 7   A.    He has what I pay him and that's all, for his work.
 8   Q.    Okay.  He's purchased guns, even legal guns, correct?
 9   A.    Yes, sir.
10   Q.    Guns aren't necessarily cheap, right?
11   A.    No, they are not.
12   Q.    Rounds of ammunition, there was over 10,000 rounds of
13   ammunition taken from the property?
14   A.    He lives at home and he has no bills except his Jeep
15   payment and I think credit card payment.
16   Q.    Okay.  Are you aware of three GoFundMe pages that are
17   currently to your son's benefit?
18   A.    I was aware of two of them.
19   Q.    Okay.  Those are over $5,000, correct?
20   A.    I have no idea.  They haven't updated me.  Last time I
21   checked there was $3,000 in two of them that I knew of.
22   Q.    Okay.  3,000 in each one?
23   A.    Yes, sir.
24   Q.    Okay.  You also talked to Mr. Johnson about -- that your
25   son would follow the laws if he was told to, right?
```

1   A.   If I tell him to, he will.

2   Q.   Okay.  The fully automatic AK-47, he's actually holding

3   that in pictures with you?

4   A.   Yes, sir, he doesn't lie.  It's my AK, okay.

5   Q.   You know it's illegal, right?

6   A.   I know it's illegal, I told him not to do it because it

7   would give a reason for people to -- like the McLoud Police

8   Department, I said they're after you anyway, if you do that,

9   you'll give them a reason, you know, something to hold against

10  you and I told him not to do it several times.

11       And like I said, it was my gun.  I had got -- he got it

12  for me for my birthday a couple years -- I don't know, it's

13  been a while.  Anyway, I think that's the same gun.

14       Because my husband also had some guns.  I don't keep up

15  with a lot of guns myself.  I have -- I do have a gun, I have a

16  pistol, a 9 mm, and I keep that in my glovebox locked.

17  Q.   And I don't want to go too far into this --

18  A.   Okay.

19  Q.   -- out of fairness to you.

20  A.   Well, it's -- I'm telling you the truth.

21  Q.   Well, no, I know, I'm trying to be very fair to you and

22  not corner you up.

23       You are not making any claim that your son legally

24  possessed that AK-47, are you?

25  A.   No, I did not.  He has the right to use it anytime he

1  wanted.

2  Q.   So I just want to be clear, you're not saying that he

3  somehow had a lawful basis to possess that?

4  A.   Yes, he did.  He had a lawful basis to have that gun.

5  Q.   He had a permit?

6  A.   He purchased it.  He went through and purchased it and

7  went through the background check and gave it to me for my

8  birthday.

9  Q.   But once he modified it to fully automatic, that changes

10  things, correct?

11  A.   It changes how the gun fires, it doesn't make it any

12  more/less lethal.

13  Q.   And I'm not trying to debate the --

14  A.   Right.

15  Q.   -- how lethal it may or may not be.

16       You have even said to the -- it was either a deputy or a

17  police (unintelligible) that you knew it's illegal unless you

18  go through the permit process or something like that?

19  A.   Yes, sir.  Why would I lie?

20  Q.   You're not saying that your son has done that or that you

21  have done that, correct?

22  A.   No, we have not.

23  Q.   And like I said, I'm not trying to trick you, I just want

24  to make sure I'm clear and I understand what you're saying.

25  A.   I'm telling the truth.

1   Q.   When you went to the McLoud Police Department back in

2   February --

3   A.   Yes.

4   Q.   -- your son drove up there in his Jeep?

5   A.   Yes.

6   Q.   He was told -- you were told first, actually, that he

7   couldn't come in, it was against the law for him to come into

8   the lobby?

9   A.   That was not in the video.  Yes, he was told to stay out

10  of the -- but the video cut off, you know.

11  Q.   No, I understand that, I'm just saying -- I'm talking

12  about the very beginning.

13  A.   Yes, he was told not to go in the lobby and I told him not

14  to go in the lobby.

15  Q.   And he did it anyway, didn't he?

16  A.   He went in there and sat down.

17  Q.   Okay.  But with his gun?

18  A.   Yes, sir.

19  Q.   And that's what was -- what the chief is saying is

20  illegal, you can't come in with a gun.  You can come in, but

21  you can't come in with a gun?

22  A.   You don't understand.  It's all these gray areas.  My son

23  believes in right and wrong.  All of these gray areas where you

24  -- it doesn't make any sense to him that police should have so

25  many things -- like, if they shoot somebody, they can get

1   acquitted, they're not prosecuted like pedophiles, are not

2   prosecuted like if somebody did it their self.  He does not

3   believe in that.

4   Q.   Ma'am -- and I appreciate all that information --

5   A.   All men are created equal.

6   Q.   And I understand what you're saying.

7   A.   Yes.

8   Q.   I appreciate that information.

9        My question is:  Your son had been told it was illegal for

10  him to go into the police station with a gun?

11  A.   The police officer did tell him, Wesley, yes.

12  Q.   And he did it anyway?

13  A.   Yes, he did.

14  Q.   You were present during that?

15  A.   Yes, I was.

16  Q.   The video that we saw where he's shooting a -- your son is

17  shooting a fully automatic AK-47, that took place on your

18  property?

19  A.   The video I saw, yes.

20  Q.   You were living there at the time and he was, too?

21  A.   Yes, sir.  He lives in a metal container so that he can't

22  be attacked in the middle of the night.

23  Q.   Okay.  We saw the picture, that's what you referred to?

24  A.   Yes, you did.  And that's all defensive stuff after that

25  happened.

JOANN JOHNSON - CROSS BY MR. DILLON                98

1    Q.   It's not for deer hunting, it's to protect?

2    A.   We deer hunt on our property.  We have deer and they do

3    deer hunt.

4    Q.   From the box?

5    A.   Well, why not, it's --

6    Q.   I'm asking.

7    A.   It's up in the air, yes.

8    Q.   Okay.

9    A.   You can deer hunt from there.

10   Q.   You know you're not supposed to deer hunt from a roadway,

11   right?

12   A.   It's a driveway, it's not a public road, it's our

13   property.

14   Q.   But you just said a moment ago that it was defensive?

15   A.   It is defensive.

16   Q.   He uses it for that also?

17   A.   Yes, it is because they threatened to kill his mother.

18   Q.   Are you aware that he modified another AK-47 and gave it

19   to one of his friends that now shoots fully automatic?

20   A.   No, I am not.

21   Q.   Okay.  Are you aware that your son told FBI that?

22   A.   He won't lie, okay, yes.

23   Q.   So if he told FBI that he did it, you would believe that

24   to be true?

25   A.   Well, I would believe -- well, why wouldn't I?

1   Q.   Okay.  Do you know if this -- if another AK-47 is located

2   at your property?

3   A.   No, not to my knowledge.  We have those Airsoft things.  I

4   did purchase one yesterday.

5   Q.   You purchased what?

6   A.   I purchased it myself.  It will not be kept there, it will

7   be kept at somebody else's house.  Lilly Harris will probably

8   keep it where she lives.  She doesn't live out there anymore.

9   Q.   I'm making sure I'm clear on what you're talking about.

10  A.   Yes.

11  Q.   You mentioned Airsoft.  You purchased what yesterday?

12  A.   We bought an AK yesterday, I did.  At a gun shop in

13  Oklahoma City.  And it's on the record so there's no sense --

14  it would be stupid to lie, I'm not going.

15  Q.   Did Brendon (sic) Chesser bring an AK-47 to your property?

16  A.   I have no idea what gun he had.

17  Q.   Well -- and since your son's arrest, has he brought an

18  AK-47 to your property and left it there?

19  A.   No.

20          MR. DILLON:  Pass the witness.

21          MR. JOHNSON:  Judge, I have nothing further.

22      Can she be excused?

23          THE COURT:  You may be excused.  Thank you.

24      Mr. Johnson, did you want to call another witness?

25          MR. JOHNSON:  I do, Your Honor.  We would call Glenn

 1  Johnson.

 2      (WITNESS SWORN.)

 3          THE COURT:  And, sir, we didn't sanitize the area.

 4  Your wife has just testified there, so I thought you would be

 5  comfortable with it.

 6          THE WITNESS:  We live together, so -- no issues.

 7          THE COURT:  Any reason, there are products there if

 8  you need anything.  Thank you.

 9                          GLENN JOHNSON,

10                       DIRECT EXAMINATION

11  BY MR. JOHNSON:

12  Q.  Mr. Johnson, could you state your name and spell your name

13  for the record, please.

14  A.  Glenn A. Johnson.  It's G-L-E-N-N, Arthur, A-R-T-H-U-R,

15  Johnson, J-O-H-N-S-O-N.

16  Q.  And, Mr. Johnson, do you know an individual by the name of

17  Christopher Ledbetter?

18  A.  Yes, I do.

19  Q.  How are you related to him?

20  A.  I consider him my son.

21  Q.  Are you his stepfather?

22  A.  Stepfather.

23  Q.  How many years have you been his stepfather?

24  A.  About five now.

25  Q.  So you've known him subsequent -- or during and subsequent

1  to his military service?

2  A.    I have known him for pretty much his entire life.

3  Q.    Okay.  But the stepfather relationship developed then?

4  A.    Yes.

5  Q.    I want to ask you a couple questions as relates to his

6  ability to show up to court and whether he's a danger to the

7  community.

8       Does he have a history of drug or alcohol abuse that

9  you're aware of?

10 A.    No, he does not.

11 Q.    Does he associate with any people that use or sell drugs

12 or anything of that nature?

13 A.    Not that I know of and I've not seen any.

14 Q.    Have you ever seen him perform any acts of violence?

15 A.    No, he has not.

16 Q.    Does he have any criminal record that you're aware of?

17 A.    None that I am aware of.

18 Q.    Now, the incident that we're here on today, did this all

19 start up basically when there was an ongoing feud with a

20 certain McLoud police officer?

21 A.    That's when he went to be this -- yes, it was.

22 Q.    And is your son -- I'm going to call him your son.  Is

23 your son very opinionated about that?

24 A.    Yes, he is very opinionated about that.

25 Q.    And was one of the allegations that were made related to

1   inappropriate conduct by a police officer against a young

2   female?

3   A.   Yes, it was.

4   Q.   And that was a friend of the family?

5   A.   Yeah -- yes.

6   Q.   And your son was very irate and very vocal about it that

7   the McLoud Police Department didn't do anything about it?

8   A.   Yes, as am I.

9   Q.   And he went to other law enforcement agencies, the Indian

10  police, Lincoln County Sheriff's Office, but he felt at some

11  point that McLoud police found out that he was the one telling

12  and felt that he was being targeted unfairly by the McLoud

13  Police Department, did he not?

14  A.   Yes.

15  Q.   And based on his military training and experience and his

16  combat duties, he kind of went into a defensive mode, did he

17  not?

18  A.   Yes, he did.

19  Q.   Did he ever receive threats, to your knowledge, from

20  McLoud police officers?

21  A.   Yes, he did.

22  Q.   Did you ever receive threats from McLoud police officers?

23  A.   Yes, I did.

24  Q.   How did that make you feel, sir?

25  A.   Defensive.  I've been trained to, you know, take a person

GLENN JOHNSON - DIRECT BY MR. JOHNSON                103

```
1   at their word.
2   Q.   Were you scared for your life?
3   A.   Yes.
4   Q.   Your son is not a coward, is he?
5   A.   No.
6   Q.   I mean, he served his country very well, did he not?
7   A.   I'm proud of him.
8   Q.   Okay.  That being said, you know it's illegal to have an
9   automatic firearm?
10  A.   Yes.
11  Q.   And you've heard from the agent that he's basically
12  admitted that he had an automatic firearm?
13  A.   Yes, he's very truthful.
14  Q.   If we could have a time clock and go back, do you wish now
15  that he would not have altered that weapon to make it an
16  automatic?
17  A.   Yes.
18  Q.   It works just as well in semi-automatic mode as it does in
19  automatic mode, does it not?
20  A.   Yes, it does.
21  Q.   It's still just as lethal, is it not?
22  A.   Just as lethal, sir.
23  Q.   Prior to that, the February of 2020, did your son have a
24  really good relationship with law enforcement?
25  A.   Yes, he did.
```

1  Q.   Did he hang out, honestly being with some police officers

2  that came over and did close quarter battle training with him

3  at his little place that he set up?

4       Was there a certain person from an Indian tribe that came

5  over, Indian police department?

6  A.   Yeah, there was one guy, I can't remember his name, but he

7  did come over, yes.

8  Q.   Okay.  So he was friends with law enforcement?

9  A.   Yes.

10 Q.   And did that kind of turn when McLoud turned on -- the

11 McLoud Police Department turned on him?

12 A.   Yes.

13 Q.   You saw the video where he was kind of vocal outside the

14 police department, did you not?

15 A.   Oh, yes.

16 Q.   He was stating his opinion?

17 A.   Yes.

18 Q.   You're aware that he protested up in -- at the state

19 capitol of Kansas, correct?

20 A.   Yes.

21 Q.   Didn't break any laws by doing that?

22 A.   No.

23 Q.   Didn't break any laws by protesting outside the police

24 department, did he?

25 A.   No.

GLENN JOHNSON - DIRECT BY MR. JOHNSON          105

1  Q.   You've heard the U.S. Attorney say, well, he came inside

2  with a weapon.  Was he ever prosecuted for that?

3  A.   No.

4  Q.   And when he was asked to leave by the police chief, did he

5  leave, on the video?

6  A.   On the video, yes.

7  Q.   Okay.  Did you ever -- you saw the slow speed chase where

8  allegedly they didn't know where he -- who he was and were

9  pulling him over for the egregious crime of maybe crossing a

10 center lane, outside of their jurisdiction.  You saw that, did

11 you not?

12 A.   Yes.

13 Q.   Did you ever see him on that video, which he has on his

14 head, point a weapon at a police officer?

15 A.   He will not point a weapon at a police officer.

16 Q.   Now, you've heard that if the Court is to consider letting

17 him during the pendency of this action, reside at your house,

18 you had quite a few weapons that were seized when the FBI came

19 in, correct?

20 A.   Yes.

21 Q.   You've heard some talks about grenades and all that stuff,

22 correct?

23 A.   Yes.

24 Q.   In fact, when they came in and arrested him, they used

25 flash-bang grenades and things of that with their tactical

1  team, did they not?

2  A.    That's what I was told.

3  Q.    Okay.  So they're the ones that were using grenades, even

4  though he didn't even have a gun on him?

5  A.    Yes.

6  Q.    At a job site, right?

7  A.    Yes.

8         MR. DILLON:  Objection, Your Honor.

9         THE COURT:  I think you're conflating the two --

10        MR. JOHNSON:  I'll move on, Judge.

11        THE COURT:  We're talking about two different

12  incidents, thank you.

13        MR. JOHNSON:  Sorry, Judge.

14  Q.    (BY MR. JOHNSON) You understand that if he is placed at

15  your house, he'll have to abide by the rules of your home?

16  A.    Yes.

17  Q.    And even though that you all are mad -- let's be honest,

18  you're mad at the McLoud Police Department, are you not?

19  A.    I am.

20  Q.    Are you mad at the FBI for doing their job?

21  A.    That question is a yes and a no, both.

22  Q.    Bottom line is, do you think that they have all the facts

23  right now?

24  A.    No, they don't.

25  Q.    Okay.  And if they knew all the facts, it might have been

1  handled a little bit differently?

2  A.   Yes, and I told them so.

3  Q.   Fair enough.

4       Doesn't make possessing an illegal firearm correct or

5  right?

6  A.   No.

7  Q.   But if that's the only crime he's committed is possessing

8  an illegal firearm, is that something that if he was to live at

9  your house you could remedy real quick?

10 A.   Oh, yes.

11 Q.   You understand that that means you have to get rid of all

12 your firearms while he lives there, that will be a term.  They

13 already took them, didn't they?

14 A.   They already cleaned me completely out.

15 Q.   So the majority of those firearms, those 20 firearms,

16 those were yours, not his?

17 A.   Yes.

18 Q.   And you told them so?

19 A.   Yes.

20 Q.   Okay.

21 A.   I showed them where they were.

22 Q.   All right.  Any concerns that the Court should have with

23 you being able to monitor and control your son, even though I

24 don't think he needs to be controlled during the pendency of

25 this?

1   A.   He will be with me.  I will watch him and speak for him.

2   Q.   One of the things that the Court may order is that he not

3   post anything on social media, such as Facebook, Instagram or

4   on YouTube.  Is that something that you can cut the Internet

5   service and abide by at your house?

6   A.   We don't have Internet service at our house, sir.

7   Q.   So if the Court was to make sure he did not have --

8   A.   But he will not.

9   Q.   -- have a device, such as a cell phone, an Apple phone or

10  something like that, where he could access --

11  A.   He'll only be able to make a call in my presence.

12  Q.   All right.  And whatever the rules the Court decides, if

13  they go this route, you will be willing to abide by?

14  A.   Yes, I will.

15  Q.   Okay.  And to be very clear, your son doesn't have any

16  anti-government views, does he?

17  A.   I haven't heard one yet.

18  Q.   He's just pretty ticked off at the McLoud Police

19  Department?

20  A.   He is.  He's mad.

21  Q.   And that was based on the results or actions of one of

22  their officers?

23  A.   Yes.

24       MR. JOHNSON:  That's all I have.  Thank you,

25  Mr. Johnson.

1           THE COURT:  Thank you.

2      Mr. Dillon.

3                      CROSS-EXAMINATION

4  BY MR. DILLON:

5  Q.   Good morning, Mr. Johnson.

6  A.   Morning.

7  Q.   There were photographs that you've taken with your son in

8  possession of a fully automatic AK-47-style carbine also,

9  correct?

10  A.   My GoPro does not have any of that on it.

11  Q.   I'm not asking about your -- your son posted a picture on

12  his Facebook where you're sitting on the couch with maybe an AR

13  or an M-16-type carbine and he has the AK-47, correct?

14  A.   Yes.  We were there.

15  Q.   There's also a picture of you all gathered at, I believe,

16  the state capitol, some sort of capitol building, and you're

17  there, your wife is there with a pistol, you again have some

18  sort of carbine rifle and your son has the AK-47 again,

19  correct?

20  A.   Yes, I have the M-16.

21  Q.   But he had the AK-47 on him, correct?

22  A.   He had the AK-47 on him.

23  Q.   You heard your son speak at the capitol also?

24  A.   Yes.

25  Q.   So you were there when your son said:  This is my personal

 1  declaration of freedom.  If my feet are standing on it, I am a

 2  free man, I will not allow any laws furthermore against

 3  peaceful freedom -- I will not follow any laws furthermore

 4  against peaceful freedom, if they are using violence on my

 5  peaceful freedom, I will resist in open defiance and I will not

 6  follow them peacefully and I will defend myself.  If violence

 7  is used on me for not following any of those vast majority of

 8  laws, I will defend myself.  If they don't enforce it, great.

 9  If they do enforce it, I will use all of these weapons and all

10  of the banned weapons for their intended purpose of killing

11  terrorists, foreign and domestic, and I will do the same here

12  as the terrorist that I killed.  Foreign, liberty or death.

13      You heard him say all of that?

14  A.   Yes, it was in the heat of the moment.

15  Q.   All right.

16  A.   Yeah, but (unintelligible).

17  Q.   You said to Mr. Johnson earlier that you should take

18  people at their word?

19  A.   Yes.

20  Q.   And that if people make threats, you were referring to the

21  McLoud Police Department?

22  A.   Yes.

23  Q.   But you said if people make threats -- or if threats are

24  made, you should believe it?

25  A.   Yes.

1  Q.   You have heard your son refer to police as terrorists and

2  these laws as terrorist laws, the ones that he doesn't believe

3  in, correct?

4  A.   Repeat that, please, slowly.

5  Q.   Are you aware of your son referring to police as

6  terrorists?

7  A.   Not really.  I have not heard that one.

8  Q.   Are you aware of your son referring to these laws that

9  he's referring to that he believes interferes with his peaceful

10 rights as terrorist laws?

11 A.   He refers to the Constitution of the United States' laws.

12 Q.   Correct.  And those that he believes go against the

13 Constitution, are you aware that he's referred to those as

14 terrorist laws?

15 A.   So has everybody else.

16 Q.   Okay.  But you're aware your son has.  He's the only

17 person I'm asking about.

18 A.   I heard it.

19 Q.   Were you aware that your son had two guns in his Jeep at

20 the time of his arrest?

21 A.   I did not know what he had in his Jeep at his time of

22 arrest.

23 Q.   Were you aware that he had his pistol on his person at the

24 time of his arrest?

25 A.   I did not because I did not see him that morning.

```
 1  Q.  You were also -- you gave an interview with a news station

 2  after your son's arrest, correct?

 3  A.  Yes, I did.

 4  Q.  And on there you said you told him it was illegal to have

 5  that AK-47 unless he would go and get a license for it?

 6  A.  I had said that repeatedly.

 7          MR. DILLON:  Pass the witness.

 8          THE COURT:  Thank you.

 9          MR. JOHNSON:  Judge, I have nothing further.

10          THE COURT:  This witness may be excused.  Thank you.

11      Mr. Johnson, do you have anything further in the way of

12  proffer or testimony?

13          MR. JOHNSON:  I do not.

14      I would ask the Court to adopt the pretrial order -- or

15  the pretrial release.

16          THE COURT:  Pretrial services report?

17          MR. JOHNSON:  Pretrial services report.

18          THE COURT:  Would the Government like to be heard in

19  argument?

20          MR. DILLON:  Your Honor, the Government agrees,

21  obviously, with the recommendation of United States Probation

22  Pretrial Services.

23      We want to be very clear, when we were dealing with

24  probable cause section of this, the defendant -- the Government

25  is not alleging that the defendant has committed some crime
```

1  that he is charged with in any of his exercising of his First

2  Amendment rights to go protest, to speak out against police, to

3  do any of those things.  His crime is possession of an

4  automatic weapon.

5       The reason that we bring up statements in the larger

6  context is because it goes to whether he is a danger and

7  whether he would not appear for court in the future.

8       I mean, first is the obvious, when police attempted to

9  stop him, he wouldn't stop, he ran.  Whether we want to call it

10 a low speed, the Court can decide what 58 miles an hour is on

11 its own, but the point is he didn't stop.

12      The video is also telling that he's incorrect about who

13 was trying to stop him.  He's incorrect about why they were

14 trying to stop him.  And then he tells Mom to tell Stepdad:

15 Get the guns, get the guns ready, as soon as he got home, Art,

16 get the guns.

17      This is exactly what he said at the McLoud police station

18 he would do for as little as a seat belt ticket, that he would

19 defend himself and he would spill their blood, too, about a

20 seat belt.

21      The stakes are obviously much higher now.  He's facing

22 substantial prison time, which he told agents if they tried to

23 lock me up for this, there would be violence.  Yes, he was

24 referring to his friends, but these are the friends he

25 associates with.  If he doesn't get his stolen property back,

1   his fully automatic weapon, that there would be violence.

2       So it can't only be written off as what his friends think

3   because this is things that would be done to him.

4       As much as I appreciate his mother and father testifying,

5   and I believe that they believe that they would be able to

6   control him, the evidence is absolutely to the contrary.

7       Mr. Johnson said it best:  If people make threats, you

8   should believe them, you should take their threats at face

9   value.  That's what he's done.

10      He has said over and over what would happen if police

11  tried to disarm him, if they tried to enforce their laws and if

12  they then have to enforce them by pulling guns, which we know

13  sometimes happens.  That's the job of police, is to control

14  situations where people are breaking the law and arrest them if

15  needed.

16      He has already told the Court what he would do through his

17  videos, through his actions, through his interviews.

18      He broke the law in front of his parents.  I'm not saying

19  they had a duty to stop them -- to stop him, but at the same

20  time, to come in and be able to say we'll make sure he doesn't

21  do it anymore, well, they let it happen to begin with.

22      If they could stop him so easy -- and they said repeatedly

23  they've told him not to do it, he still did anyway.  If you

24  have somebody that says I will not stop for you and I will

25  spill blood, then gets in a police pursuit two months later,

1    three months later, whatever it is, and says on the steps of

2    the capitol that if they try to enforce these laws that he'll

3    die fighting against them, I don't know how else to define a

4    risk or danger to the public and to show the Court that he will

5    not comply with law enforcement and that he will run if we try

6    to lock him up for this, then his own actions, this case is

7    made on his social media and in his statements and interviews.

8         I think that probation said it best, there's no conditions

9    that can adequately prevent the risk of danger to the community

10   and ensure his appearance for the risk that had to be taken to

11   get him here peacefully to begin with.

12        This time he knows who's coming, he knows there's a

13   federal charge against him, he knows what he was afraid of,

14   that he can be locked up for this and that we've taken his

15   guns.

16        I don't believe any combination of conditions, I would

17   submit to the Court, are appropriate in this case.  He is a

18   danger and he is a flight risk.

19             THE COURT:  Mr. Johnson.

20             MR. JOHNSON:  May it please the Court, Counsel,

21   Mr. Ledbetter.  Your Honor, there's only one crime that's been

22   alleged here:  Possession of an illegal firearm.

23        This is a First Amendment case.  This is what got the FBI

24   all riled up.  Mr. Dillon wants to talk up here and say, well,

25   gee, there's certain threats that are being made and we have to

1   take them seriously.  I agree.  But when it's the police that

2   are making the threats, who do you turn to and what do you do?

3   Because that's what we're seeing outside in our country right

4   now.  That's what's been happening.

5        They're going to be held accountable, hopefully, this time

6   for their actions.  What he did, possessing an illegal firearm,

7   absolutely was wrong.  And if he was a convicted felon, if he

8   had a long criminal history, if he used it to commit other

9   crimes, if he pointed it at people, if he threatened to kill

10  people with it, that would be different.  He did none of those

11  things.  He peacefully protested and stated his mind.

12       And it didn't even start occurring until after the

13  incident, which has been sugarcoated here quite a bit, but I

14  think the Court is very aware what happened with the McLoud

15  Police Department.

16       You heard from his parents, they threatened to kill them,

17  to cover up their own crime.  And when you have a small town

18  police force that's coming after you and that's the only law

19  enforcement out there, things are done a little bit

20  differently.

21       McLoud couldn't handle it.  That officer has been fired.

22  I don't know if charges are pending against him yet or not, but

23  you know what, when they threaten him for exposing it and

24  foregoing to other law enforcement agencies with it and then

25  they threaten his family, he had every right to protect

1   himself.

2       Did he go too far in having an illegal weapon?

3   Absolutely.

4       If he wants to have a bunch of combat veterans come out on

5   his land and do some shooting training, you know what, that's a

6   protected right in this state, and quite frankly, it's

7   offensive for them to even think there's something wrong with

8   that.

9       If he has an automatic weapon doing it and one of those

10  people had a Class 3 license, which they can't even tell you

11  whether they did or not, there's nothing illegal about that.

12      The fact that when he gets arrested he is completely

13  forthcoming and admits to law enforcement, yes, I had an

14  illegal weapon, there you go, there's his candidness right

15  there.

16      And then when we get a pretrial services report that,

17  quite frankly, has the lowest PTRA score I have ever seen, it

18  is kind of hard for the Court to look at the 3142 factors and

19  decide which one are we going to say overrides all the rest of

20  them.  Because he hasn't committed an act of violence.

21      You saw the video from his point of view.  Did he ever

22  point that weapon at that police officer?  Absolutely not.  The

23  jury would acquit that in 15 seconds.

24      When Mr. Dillon says that he's looking at significant

25  time, the guideline range is a base level of 18, with a

 1  criminal history of zero on this.  That is not significant

 2  time.  That's 18 to 24 months, assuming he takes a deal or is

 3  found guilty at trial, either way.

 4      Obviously, there could be some relevant conduct

 5  enhancements, but you heard, we don't know yet, we don't know

 6  what the lab reports are, we don't know what's in this, we

 7  don't know if it's illegal, we don't know if it's not legal, we

 8  have no idea.

 9      As for a flight risk, he doesn't have a passport.  He

10  doesn't have the means to travel.  They haven't met that by a

11  preponderance of the evidence.

12      He is from this community.  He's lived in this community,

13  and the only time he wasn't in this community, when he was

14  serving his country.  And we don't punish people for serving

15  their country or at least I would hope we don't hold that

16  against them.

17      As for the danger to the community, this didn't even start

18  until February of this year.  And in wasn't started by

19  Mr. Ledbetter, wasn't started by Ms. Johnson, wasn't started by

20  Mr. Johnson, it was started by the McLoud Police Department.

21      And they subsequently for -- boondoggled, I'll use that

22  word -- the FBI into shutting him up.  And that's fine.  Okay.

23  I'm sure there will be justice in other ways for that officer.

24  But regardless of that, Judge, nothing he said and nothing he

25  did, other than had the illegal weapon, was a crime of

1  violence.

2      None of that -- the fact that you want to rant and rave on

3  YouTube, that's fine.  They made it sound like he was

4  advocating for a civil war; there's been no evidence presented

5  of that.  There was -- they've made it advocate (sic) that he's

6  advocating for violence, when all the testimony you've heard is

7  everything he's done has been peaceful.

8      Was he mouthy to a chief of police?  Sure.

9      Was he mouthy to a police officer?  Absolutely.

10     But those aren't 3142 factors.  Contempt of cop does not

11  mean you get detained.

12     The Bail Reform Act is meant to put our most dangerous and

13  serious offenders behind bars.  There is a presumption that

14  there are conditions that can be met.

15     You heard from his two parents, law-abiding citizens,

16  permanent residents of Oklahoma their entire lives, Judge.

17  They've lived at the same location for 29-plus years, his

18  entire life.

19     You know, the fact that he has a shipping container.  Wow,

20  I live out in the country, I hope they don't arrest me for

21  having a shipping container on my farm land.  You know, if I

22  want to make it into a prepper bunker, hey, that's my right as

23  an American and I shouldn't be punished for it and I shouldn't

24  be considered a danger to it.

25     The fact that some of his other friends might be irate

1  that he's been arrested now, that doesn't relate to him, you

2  know, that's the other friends are making threats.

3      The fact that he has a GoFundMe page that -- he didn't

4  start that, the fact that other people believe in him and

5  believe that what he did, standing up to the McLoud Police

6  Department, was right, we're going to say he's a flight risk

7  and punish him because of that, I don't think that's how that

8  works, Judge.

9      If you look at all the 3142 factors, the seriousness of

10  the offense, I'll start with that.  Judge, this isn't a

11  rebuttable presumption case, this isn't a crime of violence,

12  this isn't a controlled dangerous substance case of over ten

13  years.  It's a possession of an illegal firearm, which quite

14  frankly, up until six years ago you couldn't even move for

15  detention until they added paragraph 5.  Okay.  That was only

16  in the last five years are firearm offenses even allowed for

17  them to consider somebody dangerous.

18      So up until five years ago, we didn't even consider those

19  and weren't allowed to move to detention based on that.

20      Secondly, Judge, if you look at his ties to the community,

21  lack of drug abuse, lack of criminal history, lack of alcohol,

22  lack of anything that would make him a threat, that's fine.  It

23  doesn't exist in this case.

24      If the only concern is that he had a firearm and that he

25  should not have a firearm, this Court can order this.  Pretrial

1   services does a wonderful job of going out and monitoring these

2   individuals that are on this.  If they find a firearm, he goes

3   to jail.

4         You've heard his mother.  You've heard his father.  You

5   get to look at their candor and decide whether they're truthful

6   people and whether they will follow this Court's orders.

7         I understand and I always have the highest respect for

8   pretrial services officers, but unless you understand the

9   entire context, which is why we watched that video, I hope, and

10  why we heard from them on what was really going on behind the

11  scenes, this wasn't somebody that woke up one day and said, you

12  know what, I'm going to hate the Government.  No, this was

13  somebody that had an ongoing dispute with a McLoud police

14  officer where it got really personal and that McLoud police

15  officer stepped over the line and picked on this family and

16  they fought back.  Short, sweet and simple.

17        Now, he had an illegal firearm, that's the only thing out

18  of all the crimes in our United States Code, the only crime

19  they could catch him doing was an illegal firearm.  And what

20  did they do?  They looked through all of his YouTube pages, all

21  of his Facebook posts, all of his Instagram posts and tried to

22  find any type of thing so we can protect the McLoud Police

23  Department.

24        Well, Judge, that's fine.  He broke the law, he didn't lie

25  about it; he admitted it.  He was candid about it.  His mother

1  was candid about it.  His stepfather was candid about it.

2  They've all been candid about it.

3       And, ultimately, he probably will go to prison for a short

4  time because this is not an egregious serious offense.  It does

5  not carry, you know, decades behind bars.  The guideline range,

6  like I said, starts out at a Level 18 and only goes down from

7  there based on mitigation.

8       So I do not think the Government has met the burden of

9  clear and convincing evidence when it -- as a danger to the

10 community.

11      He is allowed free speech.  He has not acted on any of his

12 free speech.  And most importantly, Judge, and I think this is

13 the most important thing to consider, Agent Rich said they had

14 no evidence that he was planning on acting on any of his

15 speeches.

16      Okay.  If he was planning some kind of event where he was

17 going to do violence, that would be different, but there wasn't

18 even any of that.  He is blowing off steam and that's what he

19 did and we don't punish people for doing that, quite frankly.

20      Thank you, Your Honor.

21           THE COURT:  Thank you.

22      Government, you have the last word.

23           MR. DILLON:  People might be free to say many things,

24 but it doesn't mean that it can't be used again them when we're

25 considering things like danger he has done -- he has

1   demonstrated his threats, he has gotten in the pursuit, and

2   let's be mindful, the pursuit ended, as Agent Rich pointed out,

3   not because he was talked down and he decided he should have

4   pulled over, that agents -- or that officers saw him with guns

5   and backed out to de-escalate.  He wasn't taken into custody on

6   it as he should have been because they wanted to de-escalate.

7       It's exactly what he wanted to happen and it did happen,

8   is they couldn't arrest him for the offenses he made.  If he

9   were to be put out on pretrial release, how is the United

10  States Probation Office safely supposed to monitor that?

11      What if we get a report or a video where he has a gun?

12      Who is supposed to go into that compound again after he

13  has made the statements of what he would do and secure him and

14  that firearm in violation of the Court's order?

15      He's not supposed to have guns as a court order, he wasn't

16  supposed to have an illegal, a fully automatic machine gun as a

17  matter of the United States Code, which has been that version

18  around since 1986, longer than the defendant has been around,

19  and it didn't bother him one bit.

20      He thumbed his nose by saying, I have it, I know it's

21  illegal, here it is.  Now he seems surprised that he got called

22  on it.

23      But it doesn't change the fact just because he might have

24  been in an overall First Amendment setting that his words don't

25  have meaning behind them of what his future conduct would be.

1          THE COURT:  Thank you.

2      The Court has considered the arguments of counsel and will

3  review the testimony briefly and we'll take a short recess.

4      (RECESS HAD.)

5          THE COURT:  Good afternoon.

6      The Court has considered the testimony presented and the

7  arguments presented and will review, as it must, the factors

8  under the Bail Reform Act that the Court must take into

9  consideration.

10     To start, it is the nature and circumstances of the

11 offense charged, including whether the offense charged is one

12 that involves a firearm.

13     This is an offense that involves a firearm.  And although

14 there's no suggestion that that was used or pointed at anybody

15 in a way that was dangerous, that still is a factor that the

16 Court considers and that the Court does find that that does

17 weigh against the defendant.

18     The Court looks also to the weight of the evidence against

19 the person.  And this is a rather unique situation because the

20 evidence here, as even defense counsel has suggested, is --

21 does weigh against the evidence very heavily and we have

22 testimony or statements, at least, and testimony with respect

23 to the defendant's having altered that weapon to make it a

24 fully automatic weapon.

25     Again, it remains to be seen with respect to others who

1  may have been licensed to allow that, but that is at least by

2  probable cause, if not more, given the circumstances and the

3  testimony presented in this case.

4      Next, the Court considers the history and characteristics

5  of the person.

6      And the Court has closely reviewed the pretrial services

7  report and does note that the defendant is a long-time resident

8  since he was one year old of Oklahoma, with the exception of

9  his admirable service in military and his reported honorable

10  discharge and other accolades that he may have received there.

11      He also has obtained an emergency medical technician

12  certificate from Oklahoma City Community College recently,

13  about three years, has taken some college courses, and

14  according to his mother, he has worked since -- a significant

15  amount of time at the drywall company that she owns and that he

16  is a part owner of.

17      Other history and characteristics include his financial

18  resources.  The Court has considered those as they are

19  represented in the pretrial services report.  There is nothing

20  alarming about those.  He is living, again, on the -- on his

21  parents' property and has them to rely upon should he need any

22  financial resources.

23      And the Court would also note that he does not have any

24  substantial drug or alcohol abuse that appears would be

25  reported or verified or suggested at all.

1        The Court also notes his criminal history is minimal and

2   he did have a misdemeanor that he has apparently served the

3   probation on related to driving while -- potentially under the

4   influence, but the actual charge was, I believe, reckless

5   driving.  And that was in Florida in about 2017.

6        And the Court does not have any concern with respect to

7   the defendant's record concerning his appearance at any prior

8   court proceedings.

9        The Court does also have to consider, when considering the

10  history and characteristics of the person, his past conduct.

11       And that conduct would include a lot of the events that

12  we've heard testimony and the Court has considered that

13  testimony of today and that conduct does give the Court great

14  concern.

15       The flagrant confrontation that he did have with the chief

16  of police of McLoud, be it because of some very serious

17  allegations with respect to an officer and that was fairly

18  recent in time, it still was very clear to the Court that the

19  defendant did not agree with the rules that he would not be

20  allowed to enter into the McLoud Police Department while he was

21  fully armed.

22       He certainly suggested, if not stated, that it didn't seem

23  right that the chief of police could be fully armed and be

24  present there while he could not.

25       There's no dispute that entering in a police station or

1   any other government office, such as this, the firearm is not

2   something that is allowed and the defendant certainly was, as

3   the video showed, all kitted up and ready to go.

4        The Court does not suggest that he ever pointed that

5   weapon at the chief, but he certainly did not agree with the

6   rule that applied to him and to all members of the public that

7   one could not enter the chief's -- rather, the police

8   department while armed.  That certainly does cause some

9   concern.

10       Other past conduct that the Court considers is the slow

11  elusion or the elusion -- eluding, rather, that the defendant

12  clearly engaged in and that he filmed himself.  That also gives

13  the Court concern.

14       It was -- be it a slow chase or not, whether or not it was

15  a speeding violation or not, whether or not he had a taillight

16  issue or not or if he drifted over the center line, it was

17  still he refused to comply with police who were obviously

18  seeking that he get pulled over.  He did not pull over.  He,

19  instead, decided to videotape and to post that incident.

20       And during that encounter or during that video one is

21  heard -- one might hear or there is testimony as to his

22  preparing a weapon, chamber-loading that.

23       He also made calls to his parents suggesting very strongly

24  that they be prepared, that people go to their coordinates and

25  that the guns needed to be ready.

1        So even though none of these incidents has actually

2   escalated to the point of a -- an interaction that would be

3   very dangerous and that apparently would result most likely if

4   the defendant was getting his weapons ready would result in

5   violence and potential injury to others, certainly it is of

6   some concern to the Court -- it's his past conduct that the

7   Court is considering.

8        The Court would also note that the incidents that involved

9   the McLoud Police Department, those are not before this Court.

10  The Court is only concerned with the one charge that is before

11  it and that is the possession of a machine gun.

12       And the Court understands there might be issues with the

13  neighbors or with that police department, but some of those

14  incidents dated back to February of this year.

15       The incidents that the Court has reviewed in the pretrial

16  services report are as recently as May of this year, May and --

17  late May and as early as June.

18       So we're talking about recent incidents which, to me,

19  suggests that the defendant is certainly becoming even more

20  defensive potentially than he was before.  He is certainly

21  posting more.

22       And the Court did confer with pretrial services with

23  respect to its process as to preparing this report.  And the

24  pretrial services officer independently found all of these

25  references and she also did tell me, that, yes, there are other

1   posts, as Mr. Johnson did point out, that there are posts that

2   are not -- that do not have such language in them, that do not

3   talk about such violent acts occurring and that do not talk

4   about disregard of the laws as they are in this country.

5        However, the ones that she posts -- she included in that

6   report are those that were of concern to her and they are also

7   certainly of concern to the Court.

8        Even if the Court disregards the term "boogaloo," which

9   did apparently come across the screen, and we can debate what

10  the definition of that is, there are other incidents that the

11  Court can look to, including the video that was published from

12  the Guthrie Police Department, where the defendant gave a name

13  that was not his to an officer when inquired, and for no

14  apparent reason would not give his actual name.  That is of

15  some concern.

16       The Oklahoma Capitol speech certainly is of great concern

17  to the Court.  Again, he is allowed to say these things,

18  however, given his other past conduct and some of his -- and

19  some of the statements that his parents made and actually

20  testified to today, the idea that he would actually follow the

21  laws of this country as they stand, it's up to great debate,

22  and certainly of some concern -- great concern to this Court

23  whether or not he would abide by laws with which he does not

24  agree.

25       As everyone knows here, I am part of the judicial branch,

1    I have to enforce the laws as they are written and the concept

2    of ordered liberty would completely be upset if we allowed

3    citizens to simply not follow laws that they disagree with.

4         And that is something that, given the defendant's

5    statements with respect to taking arms, with respect to

6    terrorist laws, with respect to just other laws that the

7    defendant disagrees with, and that his refusal to follow them,

8    and that the potential ramifications of getting the guns ready,

9    certainly gives the Court great, great concern.

10        This is an unusual case and the Court does acknowledge, as

11   it has, that the defendant, apparently, was, again, a very

12   successful and very -- I am very grateful for his military

13   service and he certainly followed rules there; however, it is

14   very abundantly clear that as of late he is unable to admit

15   that the rules and the laws that this country has are those

16   that apply to him as equally as they do to all of us in here

17   and that certainly is of some concern when this Court would set

18   some rather rigorous conditions and did consider many of the

19   conditions that Mr. Johnson alluded to, such as limitations on

20   social media, certainly limitations on any kind of firearm or

21   destructive device, limitations on who he would associate with,

22   even limitations on where he would live.

23        However, the Court does not find -- and this goes into the

24   next factor that the Court would consider, which is the danger

25   -- whether -- the danger to any person or the community that

1   might be posed by the defendant's release.

2       This Court would be asking the pretrial services office

3   and its officers to go ahead and make sure that the defendant

4   did not violate any of these conditions of release and that is

5   a great ask of that office, which it does every day, but in

6   such a case as this, where the defendant has stated in no

7   uncertain terms that he would not follow laws which he does not

8   agree.

9       And I acknowledge that his parents have both said they

10  would make sure he did; however, currently Mrs. Johnson has a

11  firearm in her locked glovebox and purchased one yesterday.

12  Obviously, both of those would have to be -- would not be

13  allowed to be near -- anywhere near the compound or anywhere

14  near the defendant and that could be remedied.

15      However, I don't think it can be remedied that he

16  committed a violation of federal law in their presence and was

17  reminded on multiple times by his stepdad and potentially his

18  mom that that was a problem and that he shouldn't be doing

19  that.

20      The Court does not have a lot of faith that they would be

21  able to make sure that he would not, again, violate any of the

22  strict conditions that the Court could impose or would impose

23  should it feel that it could set some conditions of release

24  that would reasonably assure the safety of the community.

25      Again, because of the concept of ordered liberty and the

1  laws that apply to all in this country, the Court is unable to

2  find any set of conditions that it can come up with that would

3  reasonably assure the safety of the community.

4      The Court will just make additional findings.

5      The Court did note that the defendant's mother did testify

6  that the defendant is a truthful person and does -- also

7  there's testimony from his stepdad as to what threats are.

8      The statements, although they are protected by the First

9  Amendment, to some extent -- or to a great extent, rather,

10 they're still threats in no uncertain terms.  And if one is to

11 believe threats, if it's from the McLoud Police Department, how

12 can we not also believe the threats from a truthful person, as

13 his mother has stated, as the defendant.

14     Although the Court notes that there is no reported mental

15 health history, the recent spiral of events and repeated

16 postings with talking about the laws with which the defendant

17 does not agree and the -- the use of the word "terrorist" and

18 the way that he would, again, react should there be -- should

19 he find that these laws don't apply to him, should he disagree

20 with the application of those laws, that causes great concern

21 to the Court, danger to the community, that would include the

22 pretrial services office and potentially any other officers

23 involved in this case.

24     The Court will also supplement its oral findings with

25 additional written findings as well.

1       So as such, the Court finds that the defendant must be

2   detained and remanded to the custody of the United States

3   Marshal pending trial.

4       Is there anything further from the defendant?

5           MR. JOHNSON:  No, Your Honor.

6           THE COURT:  Anything further from the Government?

7           MR. DILLON:  We would ask to withdraw our exhibits,

8   but nothing further.

9           THE COURT:  Thank you.

10          MR. JOHNSON:  Judge, I'd ask that a copy be made for

11  the record and then they be withdrawn.

12          THE COURT:  Of the exhibits?

13          MR. JOHNSON:  Yes, ma'am.

14          THE COURT:  Any objection?

15          MR. DILLON:  No.

16          THE COURT:  Very well.  That will be done and court

17  is in recess until 1:00.  Thank you.

18      (COURT ADJOURNED.)

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2         I, Tracy Thompson, Federal Official Realtime Court

 3  Reporter, in and for the United States District Court for the

 4  Western District of Oklahoma, do hereby certify that pursuant

 5  to Section 753, Title 28, United States Code that the foregoing

 6  is a true and correct transcript of the digitally recorded

 7  proceedings to the best of my ability to hear and understand

 8  the recording held in the above-entitled matter and that

 9  the transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11                        Dated this 6th day of October 2020.

12

13                        /S/ Tracy Thompson
                          -------------------------------
14                        Tracy Thompson, RDR, CRR
                          Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```