Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,        )
                                 )
                    Plaintiff,   )
                                 )
    vs.                          ) Case No. 20-CR-168-G
                                 )
CHRISTOPHER STEVEN LEDBETTER,    )
                                 )
                    Defendant.   )

TRANSCRIPT OF SENTENCING

DECEMBER 17, 2020, at 10:00 A.M.

BEFORE THE HONORABLE CHARLES B. GOODWIN,

JUDGE PRESIDING

Recorded by mechanical stenography
Transcript produced by computer-aided transcription

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096  *  Cassandra_Kerr@okwd.uscourts.gov

U.S. v. Ledbetter  *  20-CR-168-G                                    2
December 17, 2020

1                        A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3         Mr. Matthew B. Dillon

4         Ms. Jessica L. Perry

5         U.S. Attorney's Office

6         210 West Park Avenue

7         Suite 400

8         Oklahoma City, Oklahoma 73102

9

10   FOR THE DEFENDANT:

11        Mr. Michael S. Johnson

12        Attorney at Law

13        1103 Northwest 87th

14        Suite A

15        Oklahoma City, Oklahoma 73114

16

17

18

19

20

21

22

23

24

25

1     (Call to Order of the Court.)

2          THE COURT:  Good morning, everyone.

3     The Court calls the case of *United States v. Christopher*

4  *Steven Ledbetter*.  It's Case No. CR-20-168.

5     The defendant has previously pled guilty to possession of

6  an illegal machine gun in violation of 18 U.S.C. Sections 922

7  and 924.  Following the submission of a presentence

8  investigation report, we are here for imposition of judgment

9  and sentence.

10     I'll have counsel make their appearances.

11          MR. DILLON:  Matt Dillon and Jessica Perry on behalf

12  of the United States.

13          MR. JOHNSON:  Good morning, Your Honor.  Michael

14  Johnson on behalf of Christopher Ledbetter who is present in

15  the courtroom.

16          THE COURT:  All right.  Thank you.

17     Okay.  Let's go through a few preliminary matters.

18     First, as far as health and safety, it looks like we're

19  fairly well spaced out.  I'd say to the audience:  Anybody

20  who's not in a pod together, as we say, try to space out a

21  little more, if that's appropriate.  I'm going to trust all --

22  everybody's judgment on that.

23     As far as masks, it looks like we're all wearing masks.

24     I would allow Counsel, as you address the Court, or the

25  defendant, to the extent he addresses the Court, to remove your

U.S. v. Ledbetter  *  20-CR-168-G                                    4
December 17, 2020

1   masks, at that time.

2        Generally speaking, I'm going to have everybody at the

3   government's table use the microphones that are there.

4        I'll have counsel for the defendant use the microphone

5   that's in front of you, and the defendant can use the

6   microphone in front of him.

7        At the point in time that we get to any longer statements,

8   I may have you come forward to the podium, but, as a general

9   matter, let's stay at the tables and use the different

10  microphones.

11       Third, as far as materials at issue, in addition to the

12  presentence investigation report and the addendum, I've

13  received the government's sentencing memorandum, which includes

14  various exhibits that I've reviewed as relevant.

15       I've also received an email from United States Probation

16  Officer Alicia Maddocks forwarding a correction that was

17  received from counsel for the government insofar as one of its

18  objections that was reflected in the addendum.

19       Is there any other material that I should have that anyone

20  is aware of?

21            MR. DILLON:  Not at this time, Your Honor.

22            MR. JOHNSON:  Judge, just to be clear, the addendum

23  included my objections, and that's --

24            THE COURT:  Yes, yes.

25            MR. JOHNSON:  And then the agreement that the

1   government and I had regarding the exhibits, even though

2   they're submitted with the government's sentencing memorandum,

3   Mr. Dillon and I had talked and government counsel had talked

4   and agreed that these would be the exhibits.  Basically,

5   they're joint exhibits.  I have no objection to those.

6            THE COURT:  All right.  Very good.

7        All right.  Let's see, then.  I'll state for the benefit

8   of the defendant that there are in general two parts to these

9   proceedings.  The first is the determination of the applicable

10  guideline range under the United States Sentencing Guidelines.

11  That part can get pretty technical for people who are not

12  familiar with it -- lots of detail on the regulations and so

13  forth -- but it's important, so bear with us.

14       The second part of the proceeding is the consideration in

15  full of what is an appropriate consequence under the law for

16  the criminal activity that is at issue in the case, and, at

17  that point, I will allow you to make a statement to the Court,

18  if you wish to, but you're not required to do so.  You can

19  stand on the argument of your attorney, if you prefer.

20       After that, then I will typically take a recess and -- you

21  know, for 30 minutes or so and consider everything that's been

22  presented and all the arguments that have been made and then

23  return to announce my sentence, at that time.

24       Okay.  With that, then, let's begin with the calculation

25  of the guideline range.

U.S. v. Ledbetter  *  20-CR-168-G                                    6
December 17, 2020

1      Has the government had the opportunity to review the

2    presentence investigation report and addendum?

3              MR. DILLON:  Yes, Your Honor.

4              THE COURT:  And does the addendum accurately

5    summarize the objections that the government would make today?

6              MR. DILLON:  Yes, Your Honor.

7              THE COURT:  Okay.  Has the defendant had that

8    opportunity?

9              MR. JOHNSON:  We have, Your Honor.

10             THE COURT:  And does the addendum summarize the --

11   accurately summarize the objections that the defendant would

12   make today?

13             MR. JOHNSON:  It does, Your Honor.

14             THE COURT:  Okay.  All right.  Then, pursuant to

15   Federal Rule of Criminal Procedure 32(i), I will receive any

16   exhibits and hear any testimony that may be needed to resolve

17   the disputed portions of the presentence report.  Let's start,

18   though, with government's counsel and some argument and try to

19   narrow down which of the objections that you've made actually

20   require factual findings by the Court.  So...

21             MR. DILLON:  Your Honor, none of the government's

22   objections actually affect the guideline.  However, two of the

23   objections affect the conduct that the defendant is being held

24   accountable for.  Specifically, that would be the additional

25   machine gun and the additional grenade.  I think that we've

U.S. v. Ledbetter   *   20-CR-168-G                              7
December 17, 2020

1  laid out our argument and the factual basis for that in the

2  sentencing memorandum.

3          THE COURT:  All right.  So, first, we have some

4  objections to paragraphs 16, 28, and 37, and, just to be clear,

5  that's just additional information that the government would

6  provide, and it does not affect the guideline range.

7          MR. DILLON:  Correct, Your Honor.

8          THE COURT:  All right.

9          MR. DILLON:  And I did want to say nothing in our

10  objection -- or our noted objections.  The only additional

11  thing was the inclusion of the firearm in facilitation of

12  another felony.  I didn't know if we wanted to take these one

13  at a time or in bulk.

14          THE COURT:  I -- I want to go through them one at a

15  time, but I appreciated the broader point.  I just wanted to

16  talk about them one at a time so we've got it clear on the

17  record.

18      As to that first set of objections, the Court denies the

19  objections -- or more specifically finds that a ruling is

20  unnecessary because the matters raised are purely additional

21  information and do not affect the sentencing guideline range,

22  and the Court would not consider those matters in determining

23  the proper sentence of the case.

24      All right.  Second, we've got an objection to paragraphs

25  43 and 44, and those involve the matter that you mentioned

1    insofar as an additional machine gun and additional grenade

2    that you think should be attributed to the defendant in

3    considering the sentence in the case.

4            MR. DILLON:  Yes, Your Honor.

5            THE COURT:  All right.  All right.  Then, similarly,

6    as to the -- that matter, the Court finds that a ruling is not

7    necessary because it does not affect the guideline range, and

8    the Court will not consider those additional matters in

9    determining the proper sentence in the case.  The Court does

10   accept it as additional information but does not find that the

11   inclusion of those weapons would change anything about the way

12   that I will go about determining the sentence in the case.

13       Third, we've got an objection to paragraph 45.  Tell me

14   what's going on there.

15           MR. DILLON:  Your Honor, this specifically relates to

16   the four-point enhancement for a firearm that could facilitate

17   or did facilitate another felony.  Probation, I think,

18   rightfully used the pointing of a firearm as an underlying

19   predicate felony for the basis of that enhancement.  The

20   government feels that there is an additional basis for that

21   same enhancement, which is the firearm potentially facilitating

22   the -- the eluding of a police officer.

23       If the Court were to find that the defendant did, in fact,

24   point a firearm and that that facilitated -- that firearm

25   facilitated the underlying felony of pointing, the government

U.S. v. Ledbetter   *   20-CR-168-G                            9
December 17, 2020

1  agrees that it doesn't change the fact that United States

2  Probation has already recommended that four-point adjustment.

3  However, obviously, if the Court found otherwise or found that

4  to be insufficient, it could affect because the Court could use

5  this other basis.  In fact, we believe that the eluding is

6  almost a stronger basis, but the result is the same if the

7  Court adopts either scenario or both.

8            THE COURT:  All right.

9            MR. DILLON:  I'll also say, Your Honor, the -- as the

10  government said, we intend to simply rest on the evidence that

11  we presented in the sentencing memorandum.  However, we do have

12  Officer Hicks with McLoud Police Department here and Joshua

13  Rich with FBI if the Court believes that that would in any way

14  be helpful to further its finding.

15            THE COURT:  All right.  One of the reasons I want to

16  go through the objections first -- both yours and the

17  defendant's objections -- is to at least let everybody know

18  what the factual determinations that I think really matter are,

19  and then you can decide what you want to prove up based on

20  that.

21       All right.  As to that last objection to paragraph 45, I

22  note that the defendant objects to application of the

23  four-point enhancement, I believe.  Certainly objects to the

24  fact that he never pointed -- he said -- contends that he never

25  pointed the firearm.

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096   *   Cassandra_Kerr@okwd.uscourts.gov

U.S. v. Ledbetter  *  20-CR-168-G                                    10
December 17, 2020

1     Mr. Johnson, tell me a little bit more about what's at

2   issue there on your side and from the defendant's perspective.

3             MR. JOHNSON:  And we're specifically talking about --

4   I guess it would be the conduct in paragraph 19 that then --

5             THE COURT:  More specifically, paragraph 45 and the

6   question whether the defendant pointed the weapon in the course

7   of --

8             MR. JOHNSON:  Correct.

9             THE COURT:  -- what I'm generally going to call "the

10  pursuit."

11            MR. JOHNSON:  And -- and, Judge, yes, and -- and so

12  I've read the probable cause affidavit.  Obviously, no charges

13  have ever been filed at the state level, and I've checked that

14  as far as yesterday to make sure that no charges had ever been

15  filed at the state level.

16     One of the agreements that the government and I made --

17  there are two videos of this entire incident:  one from the

18  defendant's point of view from a GoPro that he is wearing on

19  his head, which clearly, I believe, shows this entire

20  interaction; the other, a dash cam -- body cam video -- well, I

21  thought it was a dash cam.  It ended up being a body-worn

22  camera by Officer Hicks, which also, I think, supports the

23  defendant's argument that at no time -- sticking specifically

24  to the pointing of a firearm -- was a firearm ever pointed at

25  this officer.

1     It is enhanced furthermore by the officer's body cam video

2  that, when he finally does stop at the farm in a safe place,

3  that the officer says, Hey, he has an AR-15 or an AR weapon and

4  then backs up.  At no time does the officer say, "Hey, he's

5  pointing a firearm at us," or anything of that nature.

6     It is a factual dispute, but you can see it clearly on the

7  body cam video that the weapon comes -- he clears the weapon,

8  and it comes at about a 45-degree angle to the ground.  That is

9  it.  It doesn't meet the statutory state definition for

10  felonious pointing of a firearm, and it definitely was never

11  pointed with malicious ill or anything else, which is required

12  for this enhancement.  That's the reason I agreed to allow this

13  video jointly so that the Court could review it.

14          THE COURT:  All right.  And I have reviewed the

15  videos.

16     Mr. Dillon, tell me a little bit more about -- well, first

17  off, do you think the videos show that the firearm was pointed?

18          MR. DILLON:  I think it shows that the firearm goes

19  in the direction of the officer.  I think that that's

20  consistent with what the officer would say, which is the

21  firearm was pointed in his direction.

22     When the defendant, in his own video, goes down -- and I

23  think that's important.  Mr. Johnson described it accurately --

24  is to get some perspective of how this firearm was held in

25  relation to the camera view.  His camera is mounted on top of

1  his head.  He's got the rifle slung across his chest.  The

2  government, nor did Officer Hicks, ever contend that he raised

3  a weapon to his shoulder or anything that high.

4       But, as the defendant looks down, you clearly see the

5  weapon pointing out as he turns in the officer's direction.  I

6  think Officer Hicks's video is very clear:  that he immediately

7  says, "He's got a -- he's got an AR.  He's got a rifle,"

8  whatever he says, and immediately backs up and takes a

9  defensive position once he clears face and feels safe.

10       The defendant, in a Facebook post later, even acknowledges

11  what his intent behind that was, which was they -- basically,

12  "They left as soon as I pulled out my AK."

13       I think that, in combination --

14            THE COURT:  I think we need you to take your mask

15  down.  We've got at least a little bit of a muffle.

16            MR. DILLON:  Yes, Your Honor.

17       I think, in combination with that, when you actually look

18  at the state's statute -- and I apologize.  If I can -- I have

19  it pulled up on my phone, if I can.

20            THE COURT:  Yes.

21            MR. DILLON:  I wanted to read it accurately.

22       "Except for an act of self-defense, it shall be unlawful

23  for any person to willfully or without lawful cause point a

24  shotgun, rifle or pistol, or any deadly weapon, whether loaded

25  or not, at any person or purpose -- persons for the purpose of

U.S. v. Ledbetter  *  20-CR-168-G                          13
December 17, 2020

1  threatening or with the intention of discharging the firearm or

2  with any malice or for any purpose of injuring, either through

3  physical or mental or emotional intimidation or for the purpose

4  of whimsy, humor, prank, or in anger or otherwise."

5       It goes on to describe the type of weapons that are being

6  used, but I think that, when you look at the defendant's

7  Facebook posts, what he is saying during the pursuit and once

8  he gets out at the compound, it's very clear what his intention

9  was.

10      You have Officer Hicks who says, "He pointed it in my

11  direction."

12      He would acknowledge, I proffer to you, it was dark out

13  there.  It's hard to see, but he clearly saw a rifle in his

14  direction.  I think it meets that standard for a preponderance

15  to make that finding.

16           THE COURT:  All right.  I'll tell you that I think

17  we've at least got a factual dispute about whether the weapon

18  was actually pointed at the officer, and so I'm going to let

19  you present anything you need to or point me to the exhibits,

20  and, if we need to queue up the relevant portion of the video,

21  I assume we can do that too.

22      Before we do that, though, let's talk about the

23  alternative ground.  So you argue that we get to the same

24  four-point enhancement if the defendant was using the -- I want

25  to make sure that I understand it right.  It's using the

U.S. v. Ledbetter  *  20-CR-168-G                               14
December 17, 2020

1 | firearm to facilitate eluding the police?

2 |      Tell me precisely the ground.

3 |          MR. DILLON:  Sorry, Your Honor.  If I can have just

4 | one moment.

5 |          THE COURT:  Take your time.

6 |          MR. DILLON:  Your Honor, I believe, according to

7 | Application Note 14 of 2K2.1, in referencing Subsection 116,

8 | that it applies if firearm or ammunition facilitated or had the

9 | potential of facilitating another felony offense.

10 |      I think that the case cited by the government is probably

11 | the most analogous and the only thing that we could find on

12 | point, which clearly stated that the Tenth Circuit found it

13 | didn't have to actually facilitate, which is, I think, the

14 | clear reading of that comment.

15 |      And you had a scenario exactly like this where there was a

16 | pursuit reached at times speeds of 50 miles per hour.  Person

17 | got out of the car.  When the officer ordered him to raise his

18 | hands, he raised one hand and then reached for a waistband.

19 | They ordered him again.  When he puts both hands up, a Glock

20 | pistol fell out.

21 |      So, in that scenario versus the defendant's conduct, you

22 | never even have that defendant get the gun out of the waistband

23 | as opposed to this defendant who chambered a round while

24 | driving down the road during the pursuit and then gets out,

25 | aims at least generally in that direction, but he acknowledges

U.S. v. Ledbetter   *   20-CR-168-G                                   15
December 17, 2020

1    later, "They left when I pulled out my AK."

2         He actually was able to accomplish what the defendant in

3    the Tenth Circuit case couldn't, which was get the officers to

4    go away and not arrest him.

5         It was his intention.  He yelled over the phone for his

6    mom to tell the stepdad to get the guns ready when he gets

7    there.  He himself yells at his stepdad to get the guns.  It's

8    clear what his intention is, And the nexus -- and, with all due

9    respect to probation, I don't know if they were aware of that

10   case prior to our citation of it.  I think the nexus to it is

11   very apparent.

12        And, when it says "had the potential to facilitate," I

13   think that that's a lower standard, but I would even argue in

14   this case it did facilitate the eluding.  The officers backed

15   up.  He didn't go to jail that night because he pulled guns.

16   That's exactly the type of conduct that we're fighting to

17   discourage of others, and I think that that's the point of the

18   four-point enhancement -- is, because he pled to a firearm

19   offense, how else did he use that firearm?

20        Did he use it in connection with a crime other than simply

21   possessing it?  It is very clear he did.

22             THE COURT:  All right.  Mr. Johnson, so where we're

23   at now is the potential alternative ground for the four-point

24   enhancement and, specifically, the question of whether the

25   firearm was used to facilitate or had the potential of

U.S. v. Ledbetter  *  20-CR-168-G                              16
December 17, 2020

1   facilitating the offense of eluding an officer.

2        I'll tell you that I'm inclined to agree with the

3   government that, once the defendant pulls out a gun, and -- and

4   the police officer has to back out down the road, then he has

5   used that firearm directly to forestall the police from coming

6   to stop him and arrest him.

7        What do you say?

8            MR. JOHNSON:  Judge, I disagree, and I hope I don't

9   get the term "ludicrous" with my argument, but this is one of

10  the most common cases I see in state court:  aggravated

11  attempting to elude or, in this case, just attempting to elude,

12  and it's been used as a reckless endangerment from flight to

13  keep from getting arrested for the crime that you are

14  committed.

15       In this case, it's possessing a firearm that he basically

16  didn't pay a tax stamp for.  He has -- he's made a select

17  fire weapon legally owned until he put that switch on it and

18  made it into a select fire.  Now -- back then, it was bump

19  stocks.  Could have used a select fire switch.  He didn't go

20  through the proper background check, didn't pay his tax stamp

21  for it.  For that reason, it is a crime.

22       But that is not why -- and if you read through this -- he

23  is attempting to elude these police officers.  They are

24  attempting, if you watch both the videos, to pull him over for

25  no crime.

U.S. v. Ledbetter  *  20-CR-168-G                              17
December 17, 2020

1        You can see clearly on the video that there is no broken

2   brake light.  The brake lights are on.  The taillights are on.

3   They are not broken.  It is on the officer's video, and it's on

4   his video at nine minutes and three seconds into the GoPro

5   video.  Clear as day.  There's nothing wrong with the

6   taillights on that Ford Ranger.

7        This is not a high-speed pursuit.  They are not going 100

8   miles an hour, and this weapon is not being used to facilitate

9   him getting to where he needs to go.

10       Attempting to elude is when you have committed another

11  crime, and you are trying to get away for that crime in order

12  to get this enhancement.  That's what that four-level is.  You

13  are trying to not get caught with the crime that you are

14  committing.

15       That officer's not attempting to arrest him for possession

16  of a firearm.  That officer's attempting -- and there might be

17  some factual disagreement but attempting to arrest him or at

18  least stop him because he has a broken taillight, at the time.

19       Now, the officer also says later on, "Well, he crossed the

20  center line."

21       You have the video.  You can see it.  At no time does that

22  Ford Ranger going 50 miles an hour ever cross a center line

23  illegally.  I mean, it's -- that GoPro is right on point.  You

24  can see the officers' lights in the rearview mirror, and you

25  can see the Ford Ranger, until it, for the last two minutes,

1   pulls onto a driveway that's kind of bumpy, and you can't

2   really see anything, but that's a dirt road, Judge, with no

3   center line.

4        I understand the government's argument saying, "Well,

5   the -- he avoided arrest because he had a firearm."  That

6   wasn't the only firearm he had.  He had a pistol on his hip

7   that he was legally carrying as well.

8        So, for them to say that, "Every time a person carries a

9   gun, and we decide that we don't want to arrest him right

10  then" -- they could have arrested him right then.  They could

11  have called in more officers.  They disengaged.

12       There's -- there's a phone conversation that they have on

13  the phone that's not part of this record where the police

14  officers and him are talking, and they just go away.  They

15  don't say, "Hey, we need you to come out so we can arrest you."

16  "We need you to come here so we can arrest you."

17       They never told him they were going to arrest him.  They

18  never even told him why they were pulling him over.  They just

19  turned on their lights.

20       And, as the Court read in the PSR, this had been an

21  ongoing dispute with the McLoud Police Department -- where an

22  officer from the McLoud Police Department -- and we won't get

23  into the second officer, but one officer had threatened his

24  family, had threatened to kill them, and had been fired over

25  this incident.  This was a rapidly escalating incident between

1  McLoud Police Department and with the Ledbetter family that had

2  been escalating.  That's it.  That's all that was happening

3  here.

4      So, when he drives to a safe place and says, "Hey, now I'm

5  in a safe place where I feel safe, and I'm not getting pulled

6  over by McLoud police officers" -- which, by the -- by the way,

7  Judge, I don't understand, because they're out of their

8  jurisdiction, they're out of their county, when they're even

9  following him, why highway patrol or what other law enforcement

10  has jurisdiction to even pull him over where he's at should

11  have been able to do that, but that's a different argument.

12      As it relates to what my objection is, Judge, there has to

13  be a nexus between the two.  To give a person a four-level

14  enhancement for not having a tax stamp, that -- that's kind of

15  where we're at.  It's not that he's a felon in possession.

16  Completely different standard.

17      This is a -- he has a right to have weapons if he had the

18  right tax stamp for that one weapon.  He definitely had a right

19  to have the other weapon.  So, if he would have jumped out of

20  the car and only had the gun on his hip, and they backed off,

21  would we say, "Well, he had a gun, and, therefore, that's what

22  facilitated it, and we backed off"?

23      It didn't matter what weapon he had.  They were going to

24  back off anyway.  So it didn't facilitate him not being

25  arrested that night for a broken taillight, which he did not

1   have a broken taillight.

2        As for the attempted to elude, Judge, I -- I've put some

3   objections in here, and that's why I wanted you to watch the

4   videos.  There's no cars being run off the road.  This isn't a

5   high-speed chase.  There's no speed limits being broken.  It is

6   all on video.  It's just he doesn't pull over until he reaches

7   his family farm.  And it's about seven minutes, and three of

8   that minute -- or two and a half of that minutes is on the dirt

9   country road in Lincoln County, way outside of McLoud and way

10  outside of Oklahoma County or Pottawatomie County's

11  jurisdiction.

12       So, no, I -- I disagree with the government that that

13  firearm was not the reason he was not arrested that night.

14  There was a bunch of other underlying causes and things that

15  were going on, and, regardless of the firearm that he had, they

16  weren't going to arrest him anyway.

17       So it's not the fact that he had a select fire firearm

18  that caused him not to be arrested.  It was the fact that any

19  firearm or any incident or anything wasn't going to cause him

20  to be arrested that night, because, quite frankly, I'm not

21  really sure what he did wrong other than not pull over for law

22  enforcement, which he was deathly scared of because of the

23  death threats that had been going on with him and the McLoud

24  Police Department and his family, Judge, all of which was

25  documented in the PSR and unobjected to by the government.

U.S. v. Ledbetter  *  20-CR-168-G                              21
December 17, 2020

1          THE COURT:  All right.  First, let me double-check

2     with the court reporter.

3        Are you able to hear Mr. Johnson okay?

4          THE REPORTER:  (Nods head yes.)

5          THE COURT:  All right.  Okay.  We've got a lot there.

6     There's more stuff that we're going to talk about as we go

7     along, but I want to focus in on this enhancement, and the

8     argument -- really, the only argument that I heard that really

9     matters to me, as far as that enhancement, is the question of

10    did the firearm at issue in the enhancement, the one that

11    facilitates eluding the police -- does that have to be the same

12    firearm as the one that is the subject of the charge here?

13         MR. DILLON:  Fortunately, Your Honor, we don't have

14    to wonder.  As stated in the government's memo, the defendant

15    confessed that it was.  He told FBI.  I don't -- I'm not even

16    sure about this pistol, because what the defendant told the FBI

17    was, "Yeah, that was my illegal gun.  In fact, that was the

18    only gun I had, at the time."

19        So I don't think that we have to cross that threshold of

20    deciding whether it had to be the same gun or not.  We know it

21    was.

22         THE COURT:  All right.

23         MR. DILLON:  We know it from the defendant.

24         THE COURT:  All right.  Where's that?

25        I want to make sure that I give that the full

U.S. v. Ledbetter  *  20-CR-168-G                          22
December 17, 2020

1   consideration.

2           MR. JOHNSON:  And, Judge, I do need to make one

3   clarification with the Court's permission.

4           THE COURT:  Yes.

5           MR. JOHNSON:  Judge, on my objection on paragraph 19,

6   when I talked about a factual basis, because this is kind of

7   paramount to what the Court's talking about, I put that the

8   rifle was an AR-15 because there's other videos with him with

9   an AR-15 instead of the AK carbine.  I base that basically on

10  the video of the officer stating that, when he got out, he had

11  an AR.  And there's a big difference, especially with a trained

12  police officer, in noticing the difference between an AR and an

13  AK.

14      But, in talking with my client afterwards and -- and

15  watching the video of his statement that he made to the FBI, he

16  did say that that was an AK -- the AK that he had in his

17  vehicle.

18      So I want to clear that up in my objection so I don't

19  mislead the Court.

20          THE COURT:  All right.  So we are talking about the

21  same select fire weapon that was -- or select auto weapon that

22  is the subject of the charge here?

23          MR. JOHNSON:  Yes, sir, we are.

24          THE COURT:  Okay.  All right.  All right.  Then, as

25  to the objection to paragraph 45 by the government, the Court

U.S. v. Ledbetter  *  20-CR-168-G                                    23
December 17, 2020

1   finds that application of the four-point enhancement pursuant

2   to Section 2K2.1, Subsection (b)(6)(b), Application Note 14 --

3   that that enhancement is supported because the firearm at issue

4   was used to facilitate the felony of eluding an officer,

5   namely, at the point in time that the weapon was shown to the

6   officer.  Whether or not it was pointed directly at him, the

7   officer backed up, and there was at least some continued period

8   prior to -- or some extended period prior to any arrest being

9   made.

10       The Court therefore finds that the application -- the

11   four-point enhancement -- application of that four-point

12   enhancement is supported by that ground facilitating the

13   offense of elusion of a police officer.

14       As a result of that, the Court does not need to determine

15   the factual dispute as to whether any weapon was actually

16   pointed at the police officer.  That said, if, for purposes of

17   appeal or any other reason, either the government or the

18   defendant wants to put evidence on as far as that specific

19   factual question of whether the firearm was pointed at the

20   officer, then I'll let you do that.

21           MR. DILLON:  Your Honor, as part of the plea

22   agreement, there was a appellate waiver as to the issues of

23   the -- how the Court determines the guideline range.  Because

24   of that waiver, the government does not wish to present

25   evidence, at this time.

U.S. v. Ledbetter  *  20-CR-168-G                              24
December 17, 2020

1        MR. JOHNSON:  Judge, I understand the Court's ruling.

2   However, the position that the government has taken now -- that

3   this was attempted -- that this was to keep him from being

4   arrested that night -- is not what was stated in the PSR and

5   was not previously what was stated by the officer.  It -- I

6   didn't object to it because I agreed with what the officer

7   stated in the PSR, and it specifically said, in this part of

8   paragraph 19, "From previous encounters with Ledbetter,

9   officers and deputies knew the property was fortified and

10  Ledbetter and his family were armed with guns.  Therefore, the

11  decision was made to leave the scene and complete a warrant of

12  arrest affidavit," not that, "We didn't arrest him that night

13  because he had a gun."

14       That is a brand-new position that the government took in

15  their sentencing memorandum that, up until this point, had not

16  been raised by the government and was not in the presentence

17  report.

18       So I understand the Court's ruling, but, again, I think,

19  that the government should have at least made that objection in

20  the presentence report.  I think they've waived that argument

21  at this point to try to get their four-level enhancement.

22       I think the only way they can try to get their four-level

23  enhancement is by pointing of a firearm, because this is a new

24  argument that the government has now made that was not

25  supported by evidence in the presentence report that they

U.S. v. Ledbetter  *  20-CR-168-G                          25
December 17, 2020

1    supplied to the Probation Office, and I'm looking at the last

2    sentence -- last two sentences in paragraph 19, Judge.

3          THE COURT:  All right.  Well, I'm looking

4    specifically at the addendum to the presentence report and the

5    objection to paragraph 45 by the government.  That's on pages

6    27, and then the probation officer's response is on page 28.

7          MR. JOHNSON:  Yes, sir.

8          THE COURT:  I read --

9          MR. JOHNSON:  I understand.

10         THE COURT:  -- that as clearly putting it at issue:

11   that the government has raised the -- the argument of eluding a

12   police officer and that that should be reflected and -- and

13   support the enhancement.

14         MR. JOHNSON:  Yes, sir.  I understand.

15         THE COURT:  Okay.  All right.  Then let's move on to

16   the additional information that's requested by the government.

17   This is on page 28 of the presentence investigation report and,

18   specifically, the addendum thereto.

19       So it appears that this is just additional information.

20   It doesn't affect anything insofar as the guidelines; is that

21   correct, Mr. Dillon?

22         MR. DILLON:  That is correct, and it is that

23   additional information that was also referenced earlier, that

24   we had emailed both counsel for the defendant and probation

25   with the correction to the last two lines of that additional

U.S. v. Ledbetter   *   20-CR-168-G                          26
December 17, 2020

1  information.

2          THE COURT:  All right.  So, with the government's

3  acknowledgment that the last two lines there, insofar as the

4  additional information, should be stricken, I believe, does the

5  defendant have any objection to my considering that additional

6  information?

7          MR. JOHNSON:  No, Your Honor.

8          THE COURT:  Okay.  All right.  Then the Court finds

9  that there's no ruling that's required insofar as that

10  provision of additional information as it does not affect the

11  sentencing guidelines.

12      Let's turn, then, to the objections by the defendant, and

13  we'll have covered some of this in the discussion of the

14  pursuit.

15      So, insofar as paragraph 15, Mr. Johnson, tell me:  Is

16  there anything that I need to actually decide as a factual

17  matter?

18          MR. JOHNSON:  Judge, no.

19      I -- I mean, did that happen?  Absolutely.

20      Is that offense conduct?  It is not.  It doesn't affect

21  the Court's decision one way or the other.

22      Why it is included in a presentence report, I do not know.

23  It's no different than me walking up and down the street

24  carrying a firearm.  It's not the same firearm.  It's a

25  different firearm.  It shouldn't be considered, and, that way,

1    from my opinion, it shouldn't be included in the report, but I

2    understand the Court's already said that, for lack of a better

3    legal term, it's going to separate the wheat from the chaff; so

4    I understand.

5              THE COURT:  All right.  The Court does find that a

6    ruling's unnecessary because the additional information is

7    merely -- or the information that's provided in that paragraph

8    15 is purely informational, and it does not affect the

9    sentencing guidelines, and the Court will not consider it in

10   determining the proper sentence in this case.

11       Let's turn, then, to the objection to paragraph 16.  Is

12   that the same situation there?

13             MR. JOHNSON:  A little different, Judge.  It -- yes,

14   for the ultimate ruling, it is.

15       Again, with the events that have happened in this country

16   in the last six or seven months, this is just another name,

17   whether it be Breonna Taylor or George Floyd.  In this case,

18   it's Duncan Lemp.  You know, it's -- it's a call for people to

19   say his name.  People aren't happy with the way he was treated

20   by law enforcement.

21       Obviously, I represent law enforcement a lot, so I know

22   there's two sides to every story, but why that needs to be put

23   into a presentence report -- if the Court's not going to

24   consider it in making its decision, I'm satisfied, Judge.

25             THE COURT:  All right.  The Court does find that a

U.S. v. Ledbetter   *   20-CR-168-G                    28
December 17, 2020

1  ruling's unnecessary because the information that is provided

2  in the subject paragraph does not affect the guideline range,

3  and the specific information objected to by the defendant is

4  not something that the Court considers determinative insofar as

5  the proper sentence to be applied.

6      Okay.  We talked about paragraph 19 to some extent.  Let

7  me say this in general, Mr. Johnson:  Whether the chase was at

8  30 miles per hour or 60 miles per hour doesn't particularly

9  matter to me.

10     Whether the police officer was mistaken about whether an

11 offense had been committed that would allow him to pull over

12 the defendant, again, doesn't particularly matter to me.

13     The important thing for me is that he attempted to pull

14 over the defendant's vehicle, and the defendant did not comply

15 with the law by pulling over, at that time.

16     Understanding that, tell me what's still at issue in your

17 objection to paragraph 19 that we need to take up.

18         MR. JOHNSON:  Judge, paragraph 19 -- you've already

19 made your ruling as it related to paragraph 45.  It also

20 relates to a two-level enhancement under paragraph 48 as to

21 whether that flight was reckless, and one of the factual bases

22 that they use is that two cars were run off the road, and they

23 put that in their PSR.

24     You can clearly see the video:  that, when oncoming

25 motorists or motorists that they're coming upon see the

1    flashing lights, they have pulled off to the side of the road

2    to let the police cars pass.  That's not the defendant running

3    them off the road.

4         So I think there's a big difference when cars have to

5    drive off the road because of the actions -- and, ultimately,

6    it is the action of the defendant not pulling over, but the

7    reason they're pulling over is because they're required to pull

8    over under law when they see flashing lights.  So the motorists

9    did what they're supposed to do.

10        Does that rise to the level of reckless endangerment --

11   somebody having a seven-minute "going from the gas station,"

12   three of which was on his property or the dirt road going to

13   his property -- family property -- that it requires a two-level

14   enhancement?  I don't believe so, Judge.

15        And that was my main objection to that, other than what's

16   already been stated --

17             THE COURT:  All right.

18             MR. JOHNSON:  -- which related to the pointing of the

19   firearm.

20             THE COURT:  And I will say, insofar as the objection

21   to the statement that the firearm was pointed at the officer,

22   that, at this point, what I've concluded is simply that there's

23   not sufficient evidence for me to say one way or the other, but

24   I've allowed the government to point me to what it thinks would

25   support that contention to the extent that it matters.

U.S. v. Ledbetter   *   20-CR-168-G                              30
December 17, 2020

1    Previously, when we're dealing with the government's

2    objection to paragraph 45 and the alternative ground for the

3    application of that four-point enhancement, everyone came to

4    the conclusion that -- that it didn't matter whether the

5    defendant actually pointed the firearm at an officer.

6    Again, I'll give you the chance to prove that if you want.

7    Otherwise, I'm just going to conclude that it can't be stated

8    specifically one way or the other whether the firearm was

9    actually pointed at the officer.

10    MR. DILLON:  Your Honor, first, I -- again, to

11    proffer, I think what the officer would say is that he believed

12    it was pointed in his direction.  I don't think that we're

13    going to hear any testimony -- whether recalled or not -- that

14    he's going to definitively say if it was dead-spot-on at him,

15    or, simply, it's in his direction, I guess -- the best he can

16    say -- in the middle of the country at night.  He did have his

17    lights on, and that's how he was able to see the gun, but he

18    also didn't wait around to see how good an aim Mr. Ledbetter

19    was.

20    This enhancement, though, I think, doesn't rest solely

21    upon the pointing.  It's reckless endangerment during flight.

22    The white SUV that the government directed the Court to is

23    exactly what was in Officer Hicks's report.  Whether you want

24    to say he forced him off the roadway, he pulled over to avoid

25    the pursuit, whatever it might have been, as Mr. Johnson has

U.S. v. Ledbetter  *  20-CR-168-G                                    31
December 17, 2020

1   correctly acknowledged, is all the responsibility of the

2   defendant.  He caused this setting.

3        And, as the Court could have seen in that video, when he

4   first turns east onto that first county road, it's just after

5   that, that he comes upon this white SUV.

6        What's also noted is the right side of the roadway goes

7   up -- upwards into a heavy embankment before it goes down.  So,

8   but for the lucky timing, that vehicle would have had nowhere

9   to go had it just been, you know, not even a quarter mile

10  further west.

11       Luckily, by the time the defendant catches up to him, he's

12  able to pull over to the side to avoid this pursuit on, again,

13  as Mr. Johnson's accurately described, a dirt county road, very

14  narrow, as you can see on the video.

15       It is -- I submit, if you're running from the police as

16  you are loading a machine gun, forcing somebody off the road or

17  to have to get out of your way at night on a narrow county

18  road, is endangerment.  There's no other way to look at it.

19       And the reckless endangerment does not require any injury

20  actually be had.  If so, we'd be dealing with different

21  enhancements of bodily injury.  This is just were they in

22  danger?  Was there a reckless endangerment?  Absolutely.

23       And, as the Court has said, it doesn't matter whether he

24  was going 30 or what, but, on the dirt road, I'd submit that

25  he -- the defendant wasn't going 60, but he was clearly going

U.S. v. Ledbetter   *   20-CR-168-G                              32
December 17, 2020

1  over the speed limit as could be seen in Officer Hicks's body

2  cam where you can see his speedometer.

3      The main purpose of putting that in -- you see in

4  Mr. Ledbetter's rearview mirror how close Officer Hicks is.

5  You can rely on his speedometer because, had Officer Hicks been

6  going faster, he would have overtaken the defendant.  So it is

7  only reasonable to assume that he is at least matching the

8  defendant's speed.

9          THE COURT:  All right.  Tell me more specifically

10  about the factual dispute of running other motorists off the

11  road.

12          MR. DILLON:  Mr. Johnson, if I understand his

13  argument just now, said the motorist simply moved over as you

14  would anytime flashing lights are behind you.

15      Well, if an officer is simply attempting to pull somebody

16  over or is going to a scene, yeah, the law requires that a

17  person move as far right as practical.  That's different than

18  the scenario where there was an active police pursuit going on,

19  and somebody's having to get out of the way of somebody fleeing

20  from law enforcement.

21      I completely understand the argument that, had no

22  pedestrian, no other vehicle, ever been around, the only

23  endangerment we'd really point to is could the officer have

24  been in danger?

25      But, here, you actually have another civilian having to

1  get out of the way, having to move his vehicle off the roadway

2  in the middle of the dark night, to avoid this pursuit.

3       The defendant could have wrecked out.  He doesn't know if

4  there's stop -- stop sticks.  He doesn't know what's going on

5  and what could have happened.

6       The fact that nothing did happen is not the point that

7  this argument turns.  It's whether he endangered, and the

8  answer's clearly yes.

9       As required, you know, essentially, in the underlying

10  felony pursuit, did he endanger somebody?  Yes.

11          THE COURT:  All right.  Tell me about the specific

12  fact that's in the report.  It says, "Two cars were run off the

13  road."

14          MR. DILLON:  I apologize if it's two cars, Your

15  Honor.  I remember them discussing one car at least in the

16  report that's submitted to the Court as an exhibit.

17       The incident report from McLoud Police Department is, as

18  he comes up on this vehicle, the vehicle clearly has to exit

19  the roadway to avoid the pursuit.  It's not like he got to his

20  driveway and simply turned in and went home for the night.  You

21  even see him.  He's even kind of at an angle point -- with

22  his -- the front of the vehicle pointing down.  I think it's at

23  the -- around the three-minute and 40-second mark.  I cited

24  that in our sentencing memo.

25       If somebody's having to avoid a pursuit, even though they

U.S. v. Ledbetter   *   20-CR-168-G                                    34
December 17, 2020

1   don't wreck out, but they have to exit the roadway to avoid

2   it -- he's -- he's going by them as the police are chasing him.

3   I don't know how else to describe that other than endangerment.

4         Again, this isn't a funeral procession where there's

5   flashing lights, and people are safely driving by.  It's a

6   police pursuit.  He's doing everything he can to not be caught

7   by the police, and, as he's doing that, he's passing civilians

8   who have nothing to do with this, have no involvement.

9         You couple that with the nighttime, lack of lighting, the

10  narrow road that's dirt, and that he had just come off of that

11  high embankment and finally got to a point to where he could

12  actually partially get off the road to avoid the defendant

13  fleeing from the police -- you know, but for the grace of God,

14  nothing happened.

15              THE COURT:  All right.  Mr. Johnson?

16              MR. JOHNSON:  Judge, based on your earlier ruling

17  where we've gone from a pointing of a firearm to now a -- he

18  used the firearm to basically facilitate the aggravated -- or

19  the -- in this case, eluding an officer, paragraph 48 is based

20  on that same offense conduct, but there is a difference between

21  reckless endangerment during flight.

22        The way that I read the *U.S. v. Dial* case and the cases

23  regarding this is a person commits a bank robbery.  That is the

24  underlying offense that they have now committed.  They are

25  fleeing that, and they endanger people while going away from

U.S. v. Ledbetter   *   20-CR-168-G                        35
December 17, 2020

1    the crime they have just committed.  So there has to be a nexus

2    between the crime charged for the 48 -- paragraph 48

3    enhancement now and the crime of, in this case, possessing a

4    select fire firearm -- or select firearm without a tax stamp.

5         In paragraph 45, the Court found that, "Okay.  I can see

6    their nexus:  that he -- when the gun came out, the officers

7    didn't arrest him."

8         But the reason that they are pursuing him has absolutely

9    nothing to do with the crime that he has pled guilty and is

10   sitting here today.  It has to do with a alleged broken

11   taillight or an alleged crossing of a center line.  The firearm

12   in no way enhanced that flight.  That's not why he is fleeing.

13   Okay?

14        So there has to be a nexus between the underlying crime --

15   in this case, possession of a firearm -- and the flight in

16   order to get this enhancement, especially when you've just

17   given him a four-level enhancement for the exact same conduct,

18   if I understand the Court's ruling correctly.

19        So, if the government's going to make that argument on

20   paragraph 45, paragraph 48 requires a higher standard.  It does

21   require a nexus, and the statute says "a nexus."  The *U.S. v.*

22   *Dial* case, 524 F.3d 783, that I cited in my brief -- or in my

23   objections requires that nexus, and there is no nexus between

24   that.  This is a broken taillight case, if we are to believe

25   the officer.

1      So I'd ask the Court not to give him another two-level

2   enhancement basically based on the same level -- or the same

3   conduct that the Court already gave him a four-level

4   enhancement now in paragraph 45.

5             THE COURT:  All right.  I understand that legal

6   argument.  I want to make sure that I've got the factual

7   argument sorted out first.

8             MR. JOHNSON:  Yes, sir.

9             THE COURT:  And so Mr. Dillon says they're not going

10   to try to prove up -- or this is my interpretation.  They're

11   not going to try to prove up that two cars were forced off the

12   road.  They do say that one car was forced off the road or had

13   to move off the road in order to avoid being in the course of

14   this pursuit, and that constitutes the reckless endangerment.

15      Tell me what I should know about that.  Do we have a

16   factual dispute there?

17             MR. JOHNSON:  Judge, I -- my factual dispute

18   actually, I think, in -- helps the government.  What I saw on

19   the video is one car pull off to the right and one car that's

20   oncoming pull off to that right.  I saw two vehicles that

21   pulled over during the course of this pursuit, if we're going

22   to call it "a pursuit."  He did not pull over for the police,

23   so I guess we'll call that "a pursuit."

24      I saw two cars pull over.  I didn't see him tailgate them.

25   I didn't see him bump the car.  I didn't get -- see him get

U.S. v. Ledbetter  *  20-CR-168-G                                    37
December 17, 2020

1  right on the bumper where the car had no other opportunity --

2  long before these vehicles even arrived -- because you don't

3  see the car pull over.  What you see is, by the time that this

4  Ford Ranger -- going at 45 miles an hour -- comes up to this

5  car, the car's already pulled over on the side.

6         On the -- later on in the GoPro -- and this is all on my

7  client's GoPro, his own head video -- another car you see has

8  already pulled over to the other side seeing the oncoming

9  police lights.  You don't see why they pulled over.  It's safe

10  to assume -- and I don't think you can assume anything, but

11  they saw the flashing lights.  They pulled over.

12         They don't know it's a high-speed chase.  There's no

13  evidence presented they knew it was a -- or not a high-speed

14  chase -- a pursuit.  There's no evidence that there was any

15  other safe place they couldn't have pulled off.  All you know

16  is the vehicles have pulled off before the police vehicle and

17  the Ford Ranger arrived to where those vehicles are.

18         You know, I -- I -- I cannot sit here and argue and tell

19  you that, if you don't pull over for the police, that there is

20  not some level of danger -- dangerness.  There always is.  If

21  you don't pull over immediately or don't pull over in a safe

22  spot, there's going to be danger.  I mean, to argue

23  otherwise -- there is no other argument.

24         But, in this case, to say that he forced vehicles off the

25  road, I think, is an inaccurate statement.

U.S. v. Ledbetter  *  20-CR-168-G
December 17, 2020                                                      38

1            THE COURT:  All right.  Mr. Dillon?

2            MR. DILLON:  Just briefly.

3            THE COURT:  You can tell me anything you want on the

4     factual dispute and respond to that statement, but then let's

5     get to the legal dispute too.

6            MR. DILLON:  Yes, Your Honor.

7         With all due respect, Mr. Johnson's looking at this in a

8     vacuum.  If it wasn't for the pursuit, would that vehicle have

9     had to exit the roadway?  No.

10        Was he in danger, regardless of it, the point that he

11    recognizes what's speeding down the road at him and moves over?

12        He's -- there's always a reckless endangerment.  The

13    reckless endangerment is acts or actions by the defendant

14    caused towards others.  Just because they are able to respond

15    and avoid an actual collision or something to that effect, the

16    defendant doesn't get the benefit for that.  He's already

17    caused the reckless endangerment.

18        So -- and I don't know if the Court wants to address this

19    nexus argument or not.

20            THE COURT:  I --

21            MR. DILLON:  I'm happy to.

22            THE COURT:  Yeah, please do.

23            MR. DILLON:  I think that probation did a very good

24    job of, one, clarifying what the Tenth Circuit case law is when

25    it relates to a nexus in this adjustment.  There doesn't have

 1    to be one.  I think the government has sufficiently covered in

 2    its sentencing memo, though, we believe that there is a nexus.

 3         Mr. Johnson wants to say they weren't trying to pull him

 4    over for the firearm.  Again, he's looking at it in a vacuum.

 5    Had the defendant pulled over, had he not raised his weapon or

 6    pulled his weapon from the vehicle when the officers got to the

 7    property -- he's alluded.  He would have been arrested.

 8         It's -- only makes sense that they would have discovered

 9    the weapon.  It has a select fire switch on it.  They don't

10    even have to go test it to have PC -- that it's an illegal

11    weapon.

12         It's not the reason that the defendant -- that the officer

13    is stopping him or attempting to arrest him.  It's what's going

14    on with the defendant?

15         He has a select fire, and the only reason the officers

16    didn't know it was a select fire that night is because he

17    pulled it on them and caused them to retreat, which he was

18    proud of.

19         So we believe there is a nexus.  However, there's no nexus

20    required.

21         But, again, to the endangerment, these are the actions

22    caused by the defendant.  It's not whether somebody was able to

23    safely exit the roadway without crashing or if there was

24    actually a collision.  It's was the defendant causing reckless

25    endangerment by the fact that there were other people on that

U.S. v. Ledbetter  *  20-CR-168-G                                40
December 17, 2020

1 | roadway?

2 | This is after he's ran two stop signs in town.

3 | The endangerment is clear.  He had no regard to any

4 | traffic law or to anybody else on the roadway.  He had one

5 | goal:  get to the house and get the guns.

6 | THE COURT:  All right.  Everybody feel free to

7 | stretch your legs for just a minute while I go through my notes

8 | on this one.

9 | (A recess is taken from 11:06 a.m. to 11:23 a.m.)

10 | THE COURT:  All right.  We got a lot going on in this

11 | one.

12 | So, with respect to the defendant's objections to

13 | paragraphs 19 and 48 and the objection to the application,

14 | specifically, of a two-point adjustment for reckless

15 | endangerment during flight, the Court finds the following facts

16 | are supported:

17 | first, the defendant failed to yield when a police officer

18 | attempted to pull him over;

19 | second, the defendant attempted to elude police by driving

20 | away and leading police on a chase;

21 | third, the defendant violated state law not just by

22 | failing to pull over but by exceeding speed limits and failing

23 | to stop at stop signs;

24 | fourth, the defendant -- or pardon me.  Fourth, at least

25 | one vehicle was required to rapidly exit the roadway in order

U.S. v. Ledbetter   *   20-CR-168-G                                    41
December 17, 2020

1  to get out of the path of Defendant's vehicle and the pursuing

2  police officer;

3       and, fifth, when the defendant arrived at his family's

4  property, he exited his vehicle while holding the machine gun

5  that is the subject of the charge at issue today and held that

6  gun in plain view of the police officer as the police officer

7  drove up to the gate at that property.

8       Based on these facts, the Court finds that the defendant

9  recklessly created a substantial risk of death or serious

10  bodily injury to another person in the course of fleeing from a

11  police officer, and the Court finds that there is a connection

12  between the crime of possession of a machine gun and the flight

13  from police and that the defendant had the gun during that

14  flight, and it was in his hand when he exited the vehicle and

15  was in view of the police.

16       Therefore, the Court concludes that the two-point

17  enhancement under Section 3C1.2 of the sentencing guidelines is

18  properly applied in this case.

19       The defendant's objections to paragraphs 19 and 48 are

20  denied to the extent that they disagree with those conclusions

21  and findings of the Court.

22       Insofar as the other factual material that the defendant

23  objects to in those paragraphs, the Court finds that a ruling

24  is unnecessary as it does not affect the sentencing

25  guidelines -- it does not -- and will not be considered by the

U.S. v. Ledbetter   *   20-CR-168-G                        42
December 17, 2020

1   Court in determining its sentence in this case.

2       All right.  What's next?

3       We've got...

4       I think what was stated as an objection to paragraph 22

5   and a dispute about what gun was at issue -- is that objection

6   still at issue?

7           MR. JOHNSON:  Judge, it -- it's still an issue.  It

8   doesn't -- it's not paramount to this.  It doesn't go towards

9   the guidelines.  It was paragraph 19 and which I misstated the

10  weapon.  The weapon in paragraph 22, if this is the video

11  outside of the police station that was played at the detention

12  hearing, was an AR-15 and not an AK carbine, but, regardless,

13  it's not -- it doesn't affect the guideline range one way or

14  the other.

15          THE COURT:  All right.  Anything I need to know about

16  that, Mr. Dillon?

17          MR. DILLON:  Your Honor, only to clarify, and maybe

18  this will clarify Mr. Johnson's response to the Court.  There

19  are two incidents that took place outside of the McLoud Police

20  Department.  There is one in February in which there is a

21  heated exchange from the defendant to the McLoud police chief.

22  In that video, he had an AR.

23      There is a video in, I believe, May of this year where he

24  is standing across the street from the McLoud Police Department

25  with his kit on, and, in that video, he basically says,

U.S. v. Ledbetter   *   20-CR-168-G                                    43
December 17, 2020

1   "They've shut down their Facebook page.  They're hiding.  I'm

2   still here.  We're all going to die but, between now and then,

3   live," something to that effect.

4        He is clearly holding the AK that he was arrested with,

5   and that's the paragraph that, I believe, is being referenced,

6   and that's why we put the footnote in there that he was -- that

7   the objections were wrong in those two instances:  the eluding,

8   and then I think it's called "Liberty or Death" -- is the name

9   of the video that the defendant posted where he has the AK

10  again.

11            MR. JOHNSON:  If that's the video they're referring

12  to, Judge, that is an AK-style carbine.  Obviously, there was

13  three of them.  Whether that's the select fire I don't think is

14  paramount to determining the guidelines.

15            THE COURT:  All right.  The Court will deny the

16  objection, then, as to paragraph 22 and finds that the

17  information presented is accurately stated.  All it states

18  there, insofar as the identity of the gun, is that the

19  defendant was holding an AK-47-style carbine and doesn't

20  specify whether it was the specific select auto gun that's at

21  issue.

22       Let's turn, then, to the next objection.  So that's to

23  paragraph 23, and so I think that there's simply an objection

24  to the way that the facts would be interpreted in the

25  defendant's objection to paragraph 23.  Is there any factual

U.S. v. Ledbetter  *  20-CR-168-G                                    44
December 17, 2020

1    finding that I need to make insofar as that?

2              MR. JOHNSON:  No, Your Honor.  If you're not going to

3    consider that in making a appropriate sentence determination,

4    then, no, sir, there's not.

5              THE COURT:  All right.  The Court finds that a

6    factual ruling is unnecessary on that objection to paragraph 23

7    as the information provided does not affect the guidelines and

8    will not be considered by the Court in determining the sentence

9    in the case.

10         All right.  Next we have an objection to paragraph 37, and

11   this is simply a detail of firearms that were in the Building

12   14 -- what's referred to as "Building 14."  Tell me what I need

13   to consider insofar as this objection.

14             MR. JOHNSON:  Again, Judge, I just object to this

15   even being in the presentence report.  I see no reason for it.

16   Everybody knows those were not his weapons.  They didn't belong

17   to him.  He wasn't in possession of those.  They should not

18   have been included.

19         I think the Court's already made clear what the Court's

20   going to consider and not consider.  I just didn't consider it

21   offense conduct, and therefore, it shouldn't have been put in

22   there.

23             MR. DILLON:  Your Honor, I -- I think, to the extent

24   that it was relevant, like, during the pursuit, when he tells

25   his mother to have Art get the guns, things like that, there

U.S. v. Ledbetter   *   20-CR-168-G                      45
December 17, 2020

1  were obviously a large number of firearms available.  I think

2  it's appropriate to consider.  Obviously, he has some direction

3  or control over them.

4      I don't believe that there's been any official

5  determination made who fire -- what firearms belonged to who,

6  but Mr. Johnson is correct.  Those firearms were not located at

7  least in the small area in which the defendant was sleeping.

8  We have reason to believe that he had access to those other

9  areas, but I don't think that we've asked -- specifically, in

10 the number of firearms under 2K1.2, we've not attempted to

11 attribute those to him in any way.

12     The government did -- would like to ask a question of the

13 Court concerning its ruling at least as to paragraph 23.  I

14 understand that it -- those portions of conversations by the

15 defendant do not affect the guideline that would be determined

16 by the Court.  However, I thought that the Court said that

17 your -- the Court was not going to consider those in

18 determining a sentence either.

19     The government would take issue with that.  We believe

20 they're highly relevant and probative as to the defendant's

21 mind-set, respect for the law, and his intentions of what he

22 would use those firearms for.

23            THE COURT:  All right.

24            MR. DILLON:  We think they're probative to that

25 respect.

Cassy Kerr, CSR, CCR, RPR, CRC, CRR, U.S. Court Reporter
200 Northwest Fourth Street, Oklahoma City, Oklahoma 73102
405-609-5096  *  Cassandra_Kerr@okwd.uscourts.gov

U.S. v. Ledbetter  *  20-CR-168-G                         46
December 17, 2020

1          THE COURT:  Okay.  That's an appropriate point, and

2     so let's circle back to that, but, first, let me deal with the

3     objection to paragraph 37 first.

4          Insofar as that objection, the Court denies it and finds

5     that the information as presented is accurate.  There is no

6     attribution of particular guns to the defendant, and so the

7     objection is denied.

8          Then let's go back to paragraph 23, and I had focused on

9     the actual objection itself.  Tell me a little bit more about

10    why that information is material, even if it doesn't affect the

11    guidelines.

12         MR. DILLON:  Your Honor, again, I think that, when

13    the Court is determining the appropriate sentence for this

14    defendant, there's no limit to the amount of information that

15    the Court can receive in determining that.  I think that we're

16    a little bit unique in this case because we have so many

17    statements made by the defendant either by video or by social

18    media.  It gets into his mind-set and why he possessed those

19    guns.

20         The government submits -- you know, make argument as

21    towards the appropriate sentence that this wasn't simply a

22    dispute with McLoud Police Department.  The defendant's ideas

23    and ideology reached much further than that when he makes

24    references to "boog" -- "I will boog with."  I think that

25    that's relevant.

U.S. v. Ledbetter   *   20-CR-168-G                                    47
December 17, 2020

1        He talks about it's better than waiting to get offed every

2   day.

3        There's just certain things in here that -- you know, his

4   March 14th statement of cool excuses -- the one that begins

5   there -- and he talks about, "I'm still going to be the one

6   driving without my seat belt on and my select fire and my

7   grenades."

8        It's what he's wanting to do with these weapons and the

9   antagonistic nature he took during the offense conduct.  Again,

10  it doesn't affect the guidelines, but it definitely affects the

11  considerations to be given by somebody who simply possessed an

12  illegal item and used it for nothing more than target practice

13  versus somebody who possessed an illegal machine gun and had

14  much worse intentions for it.

15            THE COURT:  All right.  Mr. Johnson?

16            MR. JOHNSON:  Judge, I don't even know where to

17  begin.  This is protected First Amendment speech.  I'm sorry

18  that the government doesn't like his ideology, doesn't like

19  that he's a Trump supporter, maybe.  I don't know.  But he's

20  allowed to speak however he wants to speak.  It's his actions

21  that weigh in on this Court, I would hope.

22        And then to sit there and mischaracterize with FBU, which

23  stands for "Facebook user unknown" -- they don't even know who

24  this individual is -- that basically states, "Hey, this guy I

25  will boog with."

U.S. v. Ledbetter   *   20-CR-168-G                                48
December 17, 2020

1     That's the guy that sent that to him.

2     "Oh, that's how I met you.  You sent that comment to me."

3     Doesn't imply that he is going to do any of those kinds of

4     actions.

5     Yeah, this is an ongoing dispute, and the Court -- the

6     Court is in a very unique position because I agreed to allow

7     the videotaped statement that he made to the FBI to be viewed

8     by this Court so you can see his candidness, his honesty, and

9     how he answers every question very directly with them.  He's

10    not elusive.  He doesn't minimize his role.  He's a Marine.  He

11    says it has a season, and he's very straightforward with that.

12    So, for the government to say that he had some kind of

13    nefarious plan -- there is no nefarious plan.  He was

14    protecting his family from what he believed to be a threat from

15    the McLoud Police Department, which is very well documented in

16    this PSI.  There is nothing else.

17    If they're going to pick and choose all the bad things

18    from Facebook and basically put a page -- there was 26,000

19    pages of this kind of information, almost all of it good.  They

20    didn't put that.  So, you know, I would hope the Court wouldn't

21    consider it.

22    I do agree with the government there is no limit on what

23    the Court can determine for an appropriate sentencing, but, if

24    the Court is going to go down that road, I would at least hope

25    that it would look at his interview with the FBI, take it into

U.S. v. Ledbetter   *   20-CR-168-G                                    49
December 17, 2020

1  context, look at his candidness, his straightforwardness, his

2  lack of minimization, and his acceptance of responsibility

3  right off the bat -- doesn't lie about one thing -- before it

4  determines and takes out-of-context statements and blows them

5  way out of proportion, which I believe that statement does,

6  which is why I've objected to it.

7              THE COURT:  All right.  My ruling on the objection

8  stands insofar as the matters at issue do not affect the

9  guideline range.

10      As far as the relevance of the information that's

11  presented insofar as the Court's determination of the sentence,

12  I'll say this:  I do take the government's point that at least

13  some of this speaks to the defendant's conduct and character,

14  and so I will consider it insofar as any arguments that the

15  government wishes to present in -- in that regard, but I

16  certainly acknowledge that this is a -- an Internet

17  conversation, which I'm inherent -- I believe are inherently

18  suspect.

19      And, B, it is -- we're talking about only a portion of the

20  defendant's communications, and so that -- it does not, by any

21  means, tell me everything that I need to know about

22  Mr. Ledbetter.

23      So I would welcome any information that the defendant

24  wants to present as far as conduct -- or as far as context,

25  and, certainly, you've already done so, as you mentioned, in --

U.S. v. Ledbetter  *  20-CR-168-G                                    50
December 17, 2020

 1  insofar as the video that was presented.

 2      Okay.  With that, let's turn, then, to our next objection.

 3  So we have an objection to paragraph 45.  Is there anything

 4  about that, that we haven't already dealt with?

 5              MR. JOHNSON:  No, Your Honor.  I believe paragraph

 6  45, 48, 49, 53, and paragraph 111, just to cut to the chase,

 7  even though we haven't specifically mentioned the last three,

 8  have already been decided and ruled on by the Court.

 9              THE COURT:  All right.  Mr. Dillon, do you agree?

10              MR. DILLON:  Yes, Your Honor.

11              THE COURT:  Okay.  That should conclude, then, by my

12  count, all of the objections that are listed in the addendum

13  based on -- or let me say first those portions of the report,

14  as to which no objection was made, are adopted as findings of

15  the Court for sentencing purposes.

16      With that information and then the findings specifically

17  made by the Court in considering the various objections, it

18  appears that we remain at a total offense level of 25 and that

19  the defendant's criminal history category is one, and that

20  results in an advisory guideline imprisonment range of 57 to 71

21  months.

22      Does any party disagree with that calculation?

23              MR. DILLON:  No, Your Honor.

24              MR. JOHNSON:  To the calculation, no, Your Honor.

25              THE COURT:  All right.  Is there a motion for

U.S. v. Ledbetter  *  20-CR-168-G                              51
December 17, 2020

1  departure from the guidelines by either the government or the

2  defendant?

3          MR. DILLON:  Not by the government.

4          MR. JOHNSON:  Just by argument only, Judge.

5          THE COURT:  All right.  And I'll say in general there

6  are departures, and there are variances.  To the extent that

7  you're raising common issues, it's always my preference that we

8  take it up in the course of considering a variance rather than

9  a departure, but I don't want to cut you off if there's

10  something that you want to present insofar as departure.

11          MR. JOHNSON:  No, Your Honor.  It'd be -- be a

12  variance.

13          THE COURT:  Okay.  All right.  And then I think we've

14  got it covered, but I want to ask one more time just to be

15  sure.  Does either the government or the defendant have

16  anything further to present on the issues to be considered with

17  respect to the determination of the appropriate guideline

18  range, whether that's the facts or the conclusions in the

19  report or the -- anything insofar as departure or the ultimate

20  calculation of the guidelines?

21          MR. DILLON:  Not by the government.

22          MR. JOHNSON:  No, Your Honor.

23          THE COURT:  Okay.  All right.  The Court concludes,

24  then, that the total offense level is 25, and the defendant's

25  criminal history category is one.  That results in an advisory

U.S. v. Ledbetter  *  20-CR-168-G                                52
December 17, 2020

1   guideline imprisonment range of 57 to 71 months, and the Court

2   so concludes.

3        At this point then, we turn to the question in full of

4   what is the appropriate consequence under the law for the

5   defendant's criminal actions that are at issue here, including

6   any argument for variance?

7        Does either party request to present evidence in that

8   regard?

9               MR. DILLON:  The government does not.

10              MR. JOHNSON:  No, Your Honor.  Just by argument.

11              THE COURT:  Okay.  How are we doing as far as -- it's

12   now 11:45.  My suggestion is that we have the argument; and

13   then I'm going to take a recess; and, at that point, everybody

14   will get a break; but, if there's a request or a need to take a

15   break now, then I'm happy to accommodate you.

16              MR. JOHNSON:  We're ready, Judge.

17              MR. DILLON:  We're ready.

18              THE COURT:  All right.  Seeing none, then let's

19   proceed, and I'll hear argument from the government and then

20   turn to the defendant, and, at that point, Mr. Ledbetter will

21   have the opportunity to address the Court, if he wishes to do

22   so.

23              MR. DILLON:  Your Honor, counsel for the defendant

24   has, on a few occasions, represented today even that this is

25   simply a matter he didn't pay a tax.  That's not true.  I'll

1  direct the Court to government sentencing memo page 12,

2  footnote seven.

3       This is a prohibited item.  That's it.  You can't apply to

4  ATF and pay some -- you know, what's being characterized as --

5  almost as a nominal fee and alleviate what his conduct would

6  have been.  It was a post-1986 firearm.  He can't register it.

7  That's why, in fact, you can't charge him under Title 26,

8  because it's a legal impossibility for him to have a tax

9  violation because he can't pay the tax, and I think that it's

10  either just a simple misunderstanding or it's an attempt to

11  mischaracterize and minimize what his actual conduct was.

12       I think that one of the things that should be viewed is,

13  in fact, what he even admitted to FBI.  His dispute with McLoud

14  starts in, you know, February of this year.  He purchased that

15  first AK-47 and modified it prior to any dispute with McLoud.

16  So to somehow connect these two things is not true.  Even he

17  admitted it under his Miranda.  So it's just -- it doesn't make

18  sense.

19       What we're talking about is this is about his ideology and

20  what the purpose for those weapons are, and, while I understand

21  and I agree Internet conversations can be speculative, they --

22  you know, some people are, you know, referred to as "keyboard

23  warriors."  He's not.

24       How do we know that?  We've got video -- plethora of video

25  showing what he stands for.  He's standing in front of -- not

1  even one -- two state capitols, announcing what he stands for;

2  his unwillingness to follow the law; his willingness to use

3  violence to enforce what he believes his rights are despite

4  what Congress has passed, what the Courts have upheld.

5       And he acknowledges throughout that time that his conduct

6  is wrong, that it's unlawful.  He just refuses to do anything

7  to adhere to the law.  He acts in open defiance, to use his own

8  words.

9       It goes further than that, though.  He encourages others

10 to openly defy the law.  He actually ridicules them, and that's

11 why we put some of the messages in the memo that we did --

12 where he is encouraging people -- he berates them if they won't

13 stand up.  I think he says, "We'll see if they're just talking

14 hard."

15      He requests, as an admin of the Oklahoma chapter of New

16 Sons of Liberty -- that he wants, quote, "pipe hitters."  Very

17 illustrative.  Granted, he didn't say "shooters."

18      But he also asked another individual, when they're talking

19 about wanting to join New Sons of Liberty, "Are you willing to

20 fight, kill, and be killed by the government?  Are you willing

21 to kill the government?"

22      He says later that, despite his time in the military -- I

23 don't know how else to paraphrase this.  He says, "Fuck the

24 military."  That's his quote.  He has no respect for them.

25      He has no respect for law enforcement.  This isn't about

U.S. v. Ledbetter   *   20-CR-168-G                              55
December 17, 2020

 1   McLoud no matter how much they want to turn it on its head and

 2   point to one little thing.

 3       He says that his family was threatened.  By what?  Seat

 4   belts, because, on more than one occasion, that's what he says.

 5   "If you pull -- I'm going to drive off without my seat belt."

 6   He says this in person to the McLoud police chief.  He also

 7   reiterates it on Facebook in another conversation.  "I'm going

 8   to be the one driving around without my seat belt and with

 9   select fire and grenades."

10       He's willing to spill his blood.  He told the chief of

11   police, if they pulled him over for the seat belt and tried to

12   enforce it, he would spill their blood.  In his words, "I am

13   one of many."

14       He knows he has an audience.  He knows that what he is

15   doing is not simply protected speech.  He wants to act like

16   there's a shield of, "I can say anything, and the First

17   Amendment says it should never be brought up or used against

18   me."

19       I think Judge Mitchell called it out precisely for what it

20   should be.  These are threats.  They are threats to law

21   enforcement.  "You do your job, and I will shoot you.  I will

22   spill your blood."

23       We don't have to get into his head, and we don't have to

24   simply look at his Internet commentary.  I don't know why he

25   chose to film all the things that he did, but, again, we're not

U.S. v. Ledbetter  *  20-CR-168-G                                    56
December 17, 2020

1  talking about somebody who is smoking marijuana and finally

2  realizes, you know, "Is it really worth smoking marijuana,

3  because it can land me in federal prison."

4      While this is a possession offense, what we are talking

5  about is his ideology.  You saw firsthand how deeply embedded

6  this ideology is to him, the lengths that he will go to, to get

7  his message out; the lengths that he will go to, to defy law

8  enforcement.

9      Mr. Johnson said earlier, "Well, they could have still

10 arrested him."

11     I don't know how many times lately we hear in the news

12 about deescalation, and Mr. Johnson actually suggests that, for

13 an individual who, before he even stopped, chambered a round

14 into a machine gun; called ahead to a residence we know has

15 numerous, numerous other firearms; tells them to get them

16 ready -- as soon as he jumps out of the vehicle, says, "Get

17 them ready" -- and Mr. Johnson suggests, "Well, I mean, they

18 could have still arrested him."

19     It would have been a bloody gun bath.  It's what the

20 defendant wanted.

21     As what's talked about in the detention hearing and as he

22 talks about in Facebook, words means something.  He ridicules

23 others that just talk hard.  I suggest that he's done

24 everything to show this Court that he's not just talking hard.

25 He means what he says.

U.S. v. Ledbetter  *  20-CR-168-G                         57
December 17, 2020

1      His mother testified at detention hearing that he is a

2    truthful person.  Judge Mitchell locked on to that too.  Aren't

3    we supposed to believe this truthful person?  He has gone out

4    of his way over and over to make sure that everyone believes

5    him.  To stand back now and say, "Well, that's just talk.  It's

6    just First Amendment.  He was afraid by the McLoud Police

7    Department," is just completely unrepresented by what he does.

8      Did his actions in Guthrie and misrepresenting himself as

9    Duncan Lemp, this right wing martyr who was killed, by the way,

10   while they were attempting to execute a firearms violations

11   warrant -- what did Guthrie have to do with McLoud?  Nothing.

12     What did him going to Kansas and saying, "I've got illegal

13   weapons on me right now" -- what did that have to do with

14   McLoud?

15     His speech at the capitol -- and that's why we wanted that

16   last part included in the PSR, because it was so important.

17   His words, how he chose to end his speech -- "I will use all

18   the weapons" -- and he pauses -- "all the illegal weapons to

19   fight terrorists, foreign and domestic."

20     And while we did misstate the portion where his stepdad

21   had, in fact, not said that he referred to police as

22   "terrorists," he referred to "terrorist laws."  Such as a seat

23   belt?  This is what this man's willing to spill blood for.  A

24   seat belt.  As little as that.

25     I don't see how anything, other than incapacitation and

U.S. v. Ledbetter  *  20-CR-168-G                               58
December 17, 2020

1  deterrence -- not just specific to him but a general deterrence

2  to his audience that he preaches to about this open defiance

3  and the willingness to be pipe hitters.  "Are you willing to

4  kill or be killed for this?"

5       This is definitely not a tax case, and it stretches far

6  past possession, and that is why the government says that he

7  deserves a "top of the guideline" sentence.

8              THE COURT:  Thank you.

9              MR. JOHNSON:  May I address from the podium, Your

10  Honor?

11             THE COURT:  Yes.

12             MR. JOHNSON:  May I keep my mask on?  I speak loud.

13             THE COURT:  Yes.  If we have a problem, we'll let you

14  know.

15             MR. JOHNSON:  Thank you, Your Honor.

16       May it please the Court, Counsel, Mr. Ledbetter:  Judge,

17  we don't punish people in the United States of America for

18  ideology regardless of what Mr. Dillon wants to believe.

19       I specifically agreed with him and asked for him to show

20  those videos, and the two specific ones are his speech about

21  his life on the Oklahoma state capitol and also the interview

22  that was, maybe, 10 seconds' worth at the Kansas state capitol.

23  They were talking about closing down businesses and mask

24  mandates.

25       Are we going to arrest the tens of thousands of people in

1  Kansas that were protesting that day because they didn't

2  believe in the government's right to enforce mask mandates and

3  close down business, because that's what that was:  a protest.

4       And his response on the state capitol of Oklahoma, when he

5  goes through his career as a Marine, as a boxer, fighting ISIS,

6  was, "I will defend myself from violence by using violence.  If

7  they use violence upon me, I will use violence."

8       He didn't advocate using violence.

9       He didn't say, "Overthrow the government."

10      He didn't tell people to get out and do a boogaloo as the

11 government would suggest in some of their sentencing

12 memorandums or in the PSR.

13      He just told people, "If people are violent against you,

14 you don't have to take it.  You can be violent back," because

15 he talked about his experiences -- and I wanted you to watch

16 that video -- of how much he was bullied as a child, okay, and

17 that's all that speech was about.

18      This is an open-carry state.  He is allowed to carry a

19 weapon.

20      And, Mr. Dillon, you are 100 percent wrong.  That weapon

21 that you keep talking about was manufactured in 1976.  It

22 hasn't been put in any of your reports.  It was manufactured in

23 West Virginia.

24      And, if he wanted to modify it, all he had to do was apply

25 for a Class III license, get a tax stamp, and modify it.

U.S. v. Ledbetter  *  20-CR-168-G                                    60
December 17, 2020

1    I have plenty of friends that have Class III licenses, and

2    we go out, and we shoot select fire weapons all the time.  Why?

3    They have a license to do it, they've paid the appropriate fee

4    to do it, and they have the appropriate safe in which the ATF

5    can come to their house and look to make sure that weapon is

6    stored properly.

7        So that is a right as an American.  It is not a prohibited

8    weapon.  It's prohibited from certain people from having it.

9    But you can have that weapon as long as you go through a series

10   of steps, which he did not do.

11       The Facebook posts, which they've given you slight

12   snippets of and which I made such a big deal in my objection

13   about, does not show his ideology.  It shows unknown Facebook

14   users talking to him about certain things after he made his

15   speeches on this.

16       This is a dispute with the McLoud Police Department.  He

17   left his house and moved into a little trailer -- almost a

18   shipping container -- on the front of his parents' property to

19   make sure that that officer who had threatened to kill them

20   would not do it again.  He was protecting his parents.  I don't

21   have an issue with that, Judge.  I think it's very admirable.

22       I think it's very admirable that this young man served his

23   country in the Marine Corps.  You know, they made a big deal

24   about going and finding one officer, one major, from the U.S.S.

25   *San Antonio* that had some negative comments about him, but at

U.S. v. Ledbetter   *   20-CR-168-G                                    61
December 17, 2020

1    least the PSR got it right and went through every single

2    ribbon, award, and medal that he received and all the areas he

3    was deployed to in defense of our country.

4         And it didn't stop there.  If we can remember back to

5    2016, our enemy was ISIS.  Our president, President Trump --

6    still our president right now -- advocated fighting ISIS.

7         What did he do?  He went overseas, and he fought ISIS as a

8    medical technician, as an American.  He did what everybody

9    wanted him to do, and they're going to criticize him for doing

10   that?  Absolutely not, Judge.

11        He has earned the right through his service to this

12   country and his patriotism to have his ideology.  That's what

13   it means to be an American.

14        If you act on certain ideologies; if you threaten to blow

15   up government buildings; if you threaten to go around killing

16   police officers; if you threaten to wreck, mayhem, and rob

17   banks and do certain things with these weapons, then you are a

18   criminal.  You crossed that line from being a patriot to being

19   a criminal.  He didn't cross that line.  What he did was

20   modify -- not one -- two weapons.  Okay?

21        Much was made -- and you have the transcript from the

22   detention hearing in front of Judge Mitchell -- about the Close

23   Quarter training center that they set up that he's teaching his

24   friends, and it's actually not him shooting the video.  He's on

25   the video.  That's somebody else's GoPro that -- he's on the

U.S. v. Ledbetter   *   20-CR-168-G                                    62
December 17, 2020

1    video, but somebody else's -- that, on the silhouettes, it said

2    "police."

3        The reason I wanted that video for you to watch, Judge --

4    not one of those silhouettes that they are shooting has the

5    word "police" on it.  So where they came up with that, I don't

6    know, but it did not say "police" on that.

7        And you have the video.  I think it's Exhibit Number 1.

8    It's a minute and 24 seconds, I believe.  Watch it.  See if it

9    says "police" on it, because, Judge, for them to sit there and

10   say that he is fighting all of law enforcement -- he went and

11   made complaints to -- about the McLoud Police Department to

12   other law enforcement agencies.  This officer was found to have

13   been in the wrong and ultimately was fired.

14       There were other complaints that were made that, quite

15   frankly, I -- I mean, led to some anger, led to some meetings

16   at the McLoud Police Department.  Nothing was done on it, but,

17   you know, that's for the McLoud Police Department.  If the FBI

18   decides they want to investigate that, by all means, knock

19   themselves out.

20       Looking at certain Facebook posts that have been happening

21   in this country over the last seven months and social

22   injustice -- you know, you hear the word "racial injustice,"

23   but it's social injustice.  It's not just certain groups that

24   are being discriminated against.  It's a lot of groups that

25   have been discriminated against.

U.S. v. Ledbetter  *  20-CR-168-G                                    63
December 17, 2020

1    And what I hear today is the United States government

2    attempting to punish him for a certain ideology that -- quite

3    frankly, every weekend I go out prior to the election, and I'd

4    see 5,000 trucks driving up and down with signs and flags on

5    the back of them.  They might disagree with other ideologies,

6    but they have the absolute right to have that ideology.  They

7    have their guns around their necks -- most of them assault-type

8    weapons -- they have their guns on their hips, and all that

9    means is they're Americans, Judge, because they have that

10   right.

11       And so I would hope that we are not going to punish this

12   gentleman because his ideology might differ from the U.S.

13   attorney that is prosecuting him.

14       The action that he did, other than making those select

15   fire weapons that he's being held accountable for, are the

16   explosive devices.  Were those in his vehicle?  No.  They were

17   at his home.  They were meant to protect his home, his parents'

18   home, if somebody ever came there and tried to use violence

19   against him unlawfully.  If legally they were there, he doesn't

20   have an issue with it.

21       He, as you've looked in his presentence report, is a very

22   law-abiding citizen.  He was hoping to become an officer in the

23   military, but the DUI that was reduced to reckless driving

24   derailed that.  Okay?  He understood that.

25       But, that being said, Judge, there is nothing in his

U.S. v. Ledbetter  *  20-CR-168-G                             64
December 17, 2020

1  criminal history that would show that he is a criminal -- not

2  one bit.  The fact that he is very proficient with firearms

3  because of his training in the military and because he went

4  over there and did things that, quite frankly, none of us

5  did -- fighting ISIS, who our president said was the number one

6  enemy of this country -- I find offensive now that they are

7  saying, "We don't like that ideology."

8       His ideology isn't against all law enforcement.  It is

9  against the McLoud Police Department because they didn't take

10  action against a certain one of their officers that threatened

11  the lives of his family over a trash can and property dispute.

12  That's how petty it was.  And it escalated and escalated and

13  escalated.  Okay?

14       The fact that McLoud Police Department would come and try

15  to enforce laws way outside their jurisdiction on his family's

16  property, which is even in a separate county, is what escalated

17  this; and, ultimately, that officer was fired, and the other

18  officer they complained about has been relieved as well.

19       Obviously, they still have a beef, for lack of a better

20  expression, with the police chief, and I'm sure he has his own

21  issues.

22       Judge, when the government asks you to sentence him to the

23  upper end of the guideline range -- even the probation officer

24  thought that an advisory -- or a sentence below the advisory

25  guideline range was -- was agreeable in this.  In Part F, they

U.S. v. Ledbetter  *  20-CR-168-G                          65
December 17, 2020

1  put -- and they even put the factors for the Court to consider,

2  and a lot of times they don't do this, but even they

3  recommended a sentence below the guideline range.  Why?

4  Because he's not a criminal, Judge.

5       When you look at the one -- what I consider to be the most

6  egregious thing that he did -- not pulling over for the

7  police -- I understand why he didn't.  I don't agree with it,

8  and he and I have talked about it many times, but even that,

9  Judge, is a misdemeanor.  That was a misdemeanor that he was

10  committing.

11       Now, they added the pointing a firearm to make it a felony

12  to get a sealed warrant so the FBI could swoop in with their

13  tactical teams and arrest him.

14       He had the weapon with him right then.  Did he assault

15  them?  Did he fight to the death?  Did he throw grenades?  No.

16  It was a lawful arrest.

17       They didn't use violence against him.  Why would he use

18  violence back?

19       And, if you can look at the videos, Judge, he's not going

20  around, trying to intimidate people with this firearm.  He's

21  not pointing it.  He's very well trained in it because of his

22  Marine Corps training.  He has very good trigger discipline,

23  and he holds it the way it's supposed to be held.  He clears it

24  the way it's supposed to be cleared.  It's never pointed at a

25  person and never held in a dangerous manner.

U.S. v. Ledbetter   *   20-CR-168-G                                66
December 17, 2020

1     If we're going to say that, "You have a weapon, and,

2  therefore, you are a danger to society," that is against what

3  the state has passed in the legislature, and it's against what

4  the Second Amendment holds, Judge.

5     What my client did wrong was he took a weapon and made it

6  into a select fire twice -- for him and one of his buddies --

7  and he should not have done that.

8     What my client did wrong was he bought a prop or a

9  paperweight hand grenade and filled it with tannenite

10  (verbatim) to make it into an explosive device.  He should not

11  have done that.

12     What my client did wrong was he took two quart bottles,

13  filled them with diesel gasoline, and wrapped them with a rag

14  and kept them inside his storage container in case somebody

15  unlawfully ever came there and tried to attack his family like

16  they said they were going to.  That was wrong.

17     But that's it, Judge.  Everything else he did was

18  protected under our Constitution and under rights, quite

19  frankly, that he was willing to die for in service of our

20  country to get there.

21     He has no criminal history.  He has no criminal conduct.

22     If the government thought and the state thought what he

23  did was so egregious, he'd have pending state charges, but you

24  yourself have watched that video, and I hope -- he didn't point

25  that weapon at anybody.

U.S. v. Ledbetter  *  20-CR-168-G                           67
December 17, 2020

1        Mr. Dillon made a big point of reading all the things that
2    have to go along with pointing a firearm:  malicious manner and
3    a manner in which to attempt to intimidate somebody with
4    threatening behavior.  He did none of that.  He looked down to
5    make sure it was clear in the proper way.  The helmet cam
6    looked down at the weapon because the helmet follows the
7    weapon.  If the weapon's sitting right there, the head's
8    sitting right there.  That is not pointed at the officer.

9        And, even the officer on his video -- all he said was,
10   "Hey, he got out with an AR," not that, "He's pointing it at
11   me," or anything else.

12       And, in the paragraph that I pointed you to, Judge, even
13   the officer said they were aware that this compound -- because
14   they knew this was an ongoing dispute with this family.  They
15   knew this family had weapons.  They decided to back off not
16   because he pointed a gun at them.  They decided to back off and
17   just come back at a later date with an arrest warrant, which is
18   what they did, but they gave it to the federal government.

19       Judge, I don't believe in punishing people that aren't
20   criminals.  I don't believe in punishing people that have
21   different ideologies.  There's a lot of people in this state
22   that I disagree vehemently with what they think and believe,
23   but I don't hold it against them, because that's their right.
24   Okay?

25       I'd ask the Court to consider his lack of criminal

U.S. v. Ledbetter   *   20-CR-168-G                              68
December 17, 2020

1  history, his service to this country, his service after he

2  served his country, all the great things that he did prior to

3  this year, okay, in determining an appropriate sentence.

4      The fact that, when the rest of us are sitting on TV and

5  watching people protest what they believe is wrong, because

6  a lot of us did; the fact that he actually, out there, is

7  protesting what he believes in -- we can't hold that against

8  him.  We shouldn't hold that against him, and I believe that's

9  what the government is attempting to do.  That is not fair,

10  Judge.

11      I believe an appropriate sentence in this -- and I've

12  talked to him.  I believe that a message has to be sent not

13  because of his ideology, but we have laws regarding firearms

14  for certain reasons.  He knows he's a convicted felon and will

15  never have a firearm again.

16      I believe an appropriate sentence is 12 months and a day.

17  It serves as a deterrent, it serves as punishment, and, quite

18  frankly, it rewards him for the mitigation that he's done for

19  this country.  As a Marine, he wrote a blank check up to and

20  payable by his life for all of us in this courtroom today, and

21  that's something that can't be disregarded, Judge.

22      He continued by fighting ISIS on his own as a -- as a

23  combat medic, okay, until they were defeated.  These are things

24  that I don't think should be discounted, Judge.

25      And the fact that he has a dispute with the police -- not

U.S. v. Ledbetter  *  20-CR-168-G                                69
December 17, 2020

1  one bullet was fired.  Not one bomb was thrown.  Not any

2  arrests were ever made.  No punches were ever thrown.  Words

3  were exchanged.  That's it.  Words.  We don't punish people for

4  words in this country, Judge, unless it's an absolute threat of

5  violence, such as, "I'm going to blow up a bank," "I'm going to

6  blow up a building," or "I'm going to kill every one of you."

7  That's not what was said, Judge.

8       Thank you.

9            THE COURT:  Thank you.

10           MR. JOHNSON:  I do believe my client does have some

11  allocution.  He'd like to talk to the Court.

12           THE COURT:  All right.  I'll hear that now.

13      And then, Mr. Dillon, I saw you stand up, and so I'll let

14  you conclude in a moment.

15      But, Mr. Ledbetter, if there's something that you'd like

16  to say, then I'd be pleased to hear it.

17           THE DEFENDANT:  Is it okay if I take my mask off,

18  sir?

19           THE COURT:  Yes.

20           THE DEFENDANT:  I -- I have a statement arranged up,

21  but, as -- as my lawyer said, sir, the weapon I did purchase --

22  it was a 1976.

23      I told them the truth on everything.  I wasn't trying to

24  escape out of it.  I was -- I obviously posted all those videos

25  on purpose to show what was happening, you know, and a lot of

U.S. v. Ledbetter   *   20-CR-168-G                        70
December 17, 2020

1  the stuff they said, yes, is happening.  They're just leaving

2  out half of the story, saying all of the -- you know, coming in

3  at the end, after I'm reacting, and telling nothing what

4  happened beforehand and saying this is just my ideology, that

5  nothing happened from anyone else, just me.

6       Starting with the -- the night that I was -- I've never

7  pulled -- the DUI?  I slept in my car.  That's the only other

8  time I've been arrested in the United States here at all.  I

9  slept in my vehicle to not drive anywhere.  So that's the only

10 other thing that kept me out of getting back in the military

11 and everything.  So I -- trying to do the right thing on that

12 too.  I was arrested for sleeping.

13      According -- I'm sorry.

14           THE COURT:  Take your time.

15           THE DEFENDANT:  The night that -- that I was

16 pulled -- they were trying to pull me over, that -- if -- if

17 causation -- if the causation is looked at as, hey, this is --

18 this is endangering someone because the causation was breaking

19 the law, the videos themselves prove that it was an illegal

20 stop, which would be the first breaking of the law, which, yes,

21 I admit.  It's not good to not pull over for a police officer.

22 I -- I'm a normal person like everybody else.  I have fear and

23 everything.  I was horrified.

24      Of course, I want to pull over.  The only -- that's the

25 only time in my life I haven't pulled over -- I've hardly ever

U.S. v. Ledbetter  *  20-CR-168-G                                71
December 17, 2020

1  been pulled over -- because I thought they were actually going

2  to kill me from everything that they -- I said it in the

3  videos.  Like, I'm going -- yeah, I said a lot of -- I was

4  angry and everything, but I said, "I'm going to die if you

5  don't come here and see this.  They're trying to get me on

6  the" -- so they were following me at the gas station, watching

7  me, pulled out not using their blinkers at all, and just

8  following me for miles, riding on my bumper, and the video

9  itself proves it.

10     Also, when I'm on the phone in that video, they called me.

11  The police called me.

12     I mean, all of these videos prove that I was trying to

13  cooperate with any police that I could to tell them about all

14  these things that were happening, what -- with the -- the

15  videos that they showed at the pretrial that were presented by

16  the chief of police themself that they purposefully cut out

17  parts of it.

18     They admitted to pedophile sexual charges by their

19  officers, felonies, all of -- all of that, you know.  All of

20  this is proven beforehand that just -- more stuff kept coming

21  out.

22     So they called me as soon as I was up there.  In the

23  video, it says, "Yeah, I'm -- I'm in pursuit of Christopher

24  Ledbetter."  They knew who I was.  They were following me.

25  They weren't trying to just pull over a person that they saw on

U.S. v. Ledbetter  *  20-CR-168-G                           72
December 17, 2020

1   the road.  It -- it proves that in the video as well.

2         Then Officer Caskey, who I'd talked to before off duty --

3   obviously, I know his name.  He's in my phone.  He called me

4   and said, "Hey, what's happening?"

5         And I said, "It's McLoud again, and I didn't do anything,

6   and they're" -- and he's like, "What did they try to" -- and

7   he's like, "I'm down here talking to them right now," and you

8   can see it in the whole video, because I have him on

9   speakerphone, talking to the police, because I've contacted so

10  many of them trying to get something done -- Mike Boof

11  (phonetic) as well, the -- the sheriffs, all of them.

12        And he said, "Oh, they're here trying to" -- I -- I said,

13  "What's the problem, and we can talk."

14        He said, "They're trying to pull you over for a taillight

15  out."

16        And I said, "Okay.  Well, I didn't" -- I still thought

17  they were trying to kill me, you know, because of everything

18  that they've done so far, you know.

19        This was after -- this was the second time they'd tried to

20  raid my family's place after the first, you know.  They -- they

21  circled it, and they had people walking through the woods, cut

22  the back of our fence, threatening other neighbors, all -- all

23  kinds of stuff.  They -- just like they threatened the other

24  ladies with the children to not talk about the officers', you

25  know -- inappropriate with their children in the middle of

U.S. v. Ledbetter   *   20-CR-168-G                             73
December 17, 2020

1    town.

2         But he said, "Yes," he said, "it's for your taillight

3    out."

4         And I said, "Okay.  Well, let me test it right here where

5    you can see it down the road."  I tested it, showed him both

6    the blinkers, everything.

7         And I said, "Hey, they -- he's lying.  The only one

8    committed a crime here is him.  You see that I'm actually

9    trying to get away.  I'm actually in fear for my life now.  I'm

10   not making this up."

11        And that's when they left in the video -- is right after I

12   proved that it was a lie anyways, and then it's proven yet

13   again -- not by my opinion -- on the paperwork presented later

14   saying that it was for swerving, changing the story yet again.

15        And it's not just that.  This happened many, many times,

16   you know.

17        So, with all that -- and the FBI, after they came

18   through -- I mean, just like all of this shouldn't matter to my

19   case because I just -- I did -- I did it on purpose.  I put --

20   I put the videos of the gun online on purpose because I'd went

21   to so many police officers and talked with them and sat with

22   them and tried to get something done.  I had -- I have

23   police -- I had sheriffs' cards in my wallet when they got me.

24   You know, 30 minutes before, I was stopped at a car wreck

25   trying to help somebody out, you know.

U.S. v. Ledbetter   *   20-CR-168-G
December 17, 2020                                                    74

1        All of this stuff -- they're only presenting half of it

2    and not what happened before.

3        But the FBI, when they came through -- they told me -- I

4    would love for that whole video where they're interviewing me

5    to be shown here because it shows -- we -- we go over

6    everything that happened, but they told me, "When we come out

7    to your family's place, everything's going to be okay.  We're

8    not like that."

9        I told them, you know, "Thank you.  Just don't hurt

10   anybody," you know.  I'm -- I'm like, "I'm here.  I admit

11   everything of what I done.  I'm not trying to lie about it.  I

12   was doing this to try to get somebody in here," because I knew

13   that having a machine gun is going to attract federal

14   attention.

15       I'd went to -- and you'll see more in my statement that

16   I've had lots of dealings with the FBI before in debriefings

17   from overseas and everything, so they had -- they'd been

18   watching me a long time before now.

19        But, yeah, they said -- they -- they went through -- they

20   didn't present my family any warrant, kicked them off their own

21   property, you know, with armored vehicles.  I mean, I'm sure

22   you've seen some of the videos on the news.

23       They went through and, with five different houses,

24   presented no warrant, cut open our renter's daughter's feeding

25   tube with a razor blade.  She's special needs.  She needs a

 1  feeding tube.  They cut that open, cut open her food bags,

 2  threw -- threw out oil everywhere, you know, stuff like that,

 3  stuff that is just really sad.

 4      But I'll get started with my statement now.

 5      I would like to start by thanking my family and friends

 6  whom I love very much.

 7      My mother and father have both turned 67 years old.

 8      My grandfather was put into hospice care.  He -- he died

 9  in October now.

10      My mother passed out from heat exhaustion while doing the

11  construction work I normally do with medics called there.

12      But I've admitted to my charge of possessing a select fire

13  weapon without the tax stamp from the beginning.  Obviously, I

14  know the numbers for it and everything.  I admitted to

15  everything to them, you know.  1976.  Serial Number GV2300.

16      Furthermore, I haven't lied about anything, and that's --

17  that's proven with all of my videos, that I'm the only one

18  that -- every single other of these statements has been

19  proven -- not opinion but proven fact -- to have changed

20  stories or straight-out proven lies.

21      Why would I -- why would you have to lie if -- if you're

22  not hiding something, that a lot more has been happening.

23  Like, just the videos even on the pretrial cut out pedophile

24  charges.  They had to cut it in half and then use my own videos

25  to show them for evidence because they couldn't continue the

U.S. v. Ledbetter   *   20-CR-168-G                              76
December 17, 2020

1  body cam without showing stuff like that.  They -- and that's

2  the one video they used.

3      If I -- I know that, if I'm released, I will not be

4  allowed to touch any firearm, and I will abide by that, so...

5      I don't want to be taken away from my family again, you

6  know.  If -- if -- if they come and kill me or -- and I'm not

7  able to defend myself, then I've done everything I can do to

8  try to show everybody that I'm doing the right thing, and I'm

9  not out to hurt everybody, especially in all those videos as

10  well.

11      They say, oh, I want to do violence.  Almost every single

12  one -- and every -- every contact I've had with a police

13  officer, I said, "Please do not pull a weapon me."  This is

14  just because I've had so many weapons pulled on me here without

15  doing anything when I was unarmed, and then that was the only

16  thing that got them to leave me alone.

17      I've committed no violence.  I've never pointed a weapon

18  at anyone in this entire country in my whole life.

19      I have saved lives here on multiple occasions, so -- so

20  my -- my victim number is -- is zero for any of this.  I

21  haven't...

22      As far as being a flight risk, I have very little money

23  saved up, may lose my vehicle if I'm not allowed to go back to

24  work.  I have no desire to leave my family for any amount of

25  money.

1        And I'm not even eligible to obtain a U.S. passport

2   because I am still making monthly payments to the Department of

3   State due to the emergency passport they issued me in Iraq.

4   This was due to being held for questioning in the U.S. allied

5   facility after we aided the Kurdish allies and U.S. Special

6   Operations Forces in ground fighting against ISIS.

7        And, inside of this facility, I was questioned by the

8   FBI -- this is my first contact with the FBI -- and they

9   debriefed us there inside of the -- the prison where they held,

10  you know, children -- children.  The people there were being

11  subsidized by U.S. tax dollars torturing children, political

12  prisoners as well.  And we were also thrown in with ISIS

13  fighters who tried to kill us, and, afterwards, I came back

14  here.

15       I was also questioned by the FBI and Department of

16  Homeland Security in Canada, actually, before crossing into the

17  U.S.

18       I volunteered completely unpaid and in good faith any

19  information related to U.S. national security, international

20  security of U.S. allies, U.S. foreign aids and weapon security,

21  sex slavery or so-called "human trafficking," and other crimes

22  against humanity.

23       After all this, despite any personal disagreements I may

24  have with the FBI's actions or inactions, I will still risk my

25  life to protect any of their innocent families, as I have done

U.S. v. Ledbetter   *   20-CR-168-G                                78
December 17, 2020

1    and would do for anyone.

2        I believe in treating other human beings the way that I

3    would like to be treated.  That's my only ideology.

4        I -- I'm -- everything is so complicated, and I've seen

5    it -- seen it everywhere -- people fighting over everything --

6    and it's not that complicated.  It's -- if no one's hurting

7    you -- I believe that you shouldn't hurt someone that's not

8    hurting you, hurting someone that is a peaceful person, and

9    that's the only ideology I have.

10       So I -- I'd like to apologize to the Court for wasting

11   your time and the F -- FBI's joint terrorism task force for

12   wasting millions on the investigation as I'm clearly not a

13   terrorist.  On the contrary, I'm an antiterrorist.  The act of

14   using violence or the threat of on peaceful people to induce

15   fear and compliance, especially for religious or political

16   goals -- I find that to be devoid of any honor or decency.

17       I do uphold and defend the Constitution of the United

18   States of America, and it is beyond any reason -- question of

19   reasonable doubt that I love this country, and I love freedom.

20   So, therefore, it is my honest hope that in the future this

21   time and money may be used more effectively to combat actual

22   terrorism, crimes against children, and crimes against

23   humanity.

24       And, as for me, I'd just like -- I'd just like to go back

25   to work and get to spend time with my family that I haven't had

U.S. v. Ledbetter  *  20-CR-168-G                               79
December 17, 2020

1   much time with and try to have a peaceful life.

2        And I thank you.

3            THE COURT:  Thank you.  I appreciate all of the

4   information that you've shared.  Thank you.

5        Mr. Dillon, I promised you a chance to respond to, I

6   think, some points that were brought up by Mr. Johnson.

7            MR. DILLON:  Yes.

8        First, Your Honor, Mr. Johnson is right about one thing.

9   Exhibit 1 is the CQB video.  The government takes offense at

10  his besmirchment of our character and representation to the

11  Court.  Unfortunately, I'm technologically inept, I guess, but,

12  on 19 seconds, you can clearly see the silhouette that's being

13  shot at --

14           THE COURT:  You should talk to me.

15           MR. DILLON:  -- that is saying -- it says "police"

16  and has a badge.  It's in his discovery.

17       Also in his discovery is the photographs of the two

18  silhouettes laying on the ground, having been shot, that are

19  these silhouettes that say "police" with a badge on it.

20       I don't know where he gets this idea that we have simply

21  made this up.  He has the same videos that we had, that

22  probation has, that we showed at the detention hearing.

23  Nowhere, in fact, is his claim that we've just made this up.

24       Mr. Johnson is right, that there is a marking of 1976 on

25  the firearm.  Unfortunately, for that argument, is the

U.S. v. Ledbetter  *  20-CR-168-G                                    80
December 17, 2020

1  firearms -- the firearm itself was assembled by Two Rivers.

2  It -- the frame was manufactured by Childers.  Childers opened

3  in 2012.  The 1976 marking is simply a stamped reference to

4  Soviets.  It's a gimmick for people that like AK-47s.  It's not

5  a manufactured date.  The gun itself was shipped in 2017.  It

6  was purchased by the defendant February 15th of this year,

7  2020.  So this idea that it's simply a tax stamp and that he

8  could have done it is just flat wrong.  It's nowhere in the

9  evidence.

10      The defendant -- let's be clear about the ideology that

11  we're talking about attributing to him -- is we're talking

12  about the same person who, on January 14th, 2020, says, "The

13  only good cop is a dead one."

14      When he goes to the BLM protests in Tulsa, I believe, May

15  31st -- it was a Saturday.  As he's kitting up, a female -- and

16  this is on his public YouTube page.  As he's recording, a

17  female asks, "What are you going to do if the military comes?"

18      He responds, "I was part of the military," and, Your --

19  again, Your Honor, I can only quote him to get the full effect.

20  He says, "I will fucking kill all those motherfuckers."  This

21  is the respect for the government, for law enforcement.

22      I appreciate that he wants to protect -- but I thought it

23  was interesting -- their families.  He even gave that caveat as

24  he was talking to you.  "I'd protect their peaceful families."

25      We're not asking the Court to punish him for not liking

U.S. v. Ledbetter  *  20-CR-168-G                              81
December 17, 2020

1   the government.  We're asking the Court to punish him for what
2   he wanted to use his illegal firearm for, what he said he would
3   use it for, what he almost used it for.  It goes to his respect
4   for the law, which is absolutely a factor to be considered for
5   the Court.
6        And I think the Court heard today he still blames
7   everybody but himself.  There's always a reason.
8        He says things are proven by fact.  They should be, but
9   they're not in his case.  He says people have said things that
10  they haven't.  He says things are documented that aren't.  The
11  only evidence that has been documented -- we've brought it.
12  We've brought it to you.
13       The only cop -- good cop's a dead cop, and he's shooting
14  at police silhouettes with the gun that is the offense conduct,
15  the one he's convicted for.
16       I -- I don't know how else to get around -- he says, "I
17  won't possess guns when I get out."  He knowingly said all over
18  Facebook, all over his videos, he knew he wasn't supposed to
19  possess that one.  What good is that promise to be made?
20       He also wants to point to his FBI interview and say, "Look
21  how truthful I was."
22       When he's talking about his friends, his followers -- he
23  also tells in that interview towards the end that, basically,
24  "If you don't return my property, there will be violence.  My
25  friends, my followers -- they will react violently if you don't

U.S. v. Ledbetter  *  20-CR-168-G                                    82
December 17, 2020

1   return my property," talking about his machine gun that he

2   cannot legally possess.

3       It -- a lot of times we have to speculate based on

4   history, based on little nuances, about what a defendant

5   actually intended.  This is one of the few cases we don't.  He

6   put it on -- in writing and on video exactly what he wanted his

7   actions to be viewed as.

8       So we're not talking about somebody who's being punished

9   for not liking the government.  We're talking about somebody

10  who possessed a machine gun and what he said he would use that

11  machine gun for, the lengths that he would go to, to defy the

12  government because he believes that the laws aren't just, that

13  they're not as they should be; and, instead of going to his

14  legislator, his congressman, he goes to his ammunition.  He

15  goes to his guns.  That's how he gets his point across.

16           THE COURT:  All right.  It's 12:30 -- or just about

17  12:30 now.  I know everybody's been here without a break for

18  lunch.

19      Given where we are, let's have everybody come back at

20  1:30, and I'm going it take the time between now and 1:30 to go

21  back through all of the material that was presented.  I take

22  these decisions very seriously.  I want to consider the

23  information presented.  I want to consider all of the evidence

24  and the statement of the defendant and the arguments of

25  counsel.  So let's be back at, as I said, 1:30 p.m.

1      We're adjourned.

2      (A recess is taken from 12:27 p.m. to 2:06 p.m.)

3           THE COURT:  All right.  We got everybody here?

4      We're back on the record in *United States v. Christopher*

5  *Ledbetter*.  It's Case No. CR-20-168.

6      Before proceeding with the pronouncement of sentence, I

7  want to mention one procedural matter.

8      After the date of the defendant's guilty plea, a new

9  federal law became effective requiring the Court to issue a

10  written and oral reminder to the parties that the government is

11  obligated under *Brady v. Maryland* and its progeny to disclose

12  to the defendant all material evidence in its possession or

13  knowledge.

14      To the extent that such requirement -- requirement might

15  still apply in this case, I am reminding the parties now of

16  that obligation, and I will enter a written order as part of

17  today's proceeding.

18      I assume that none of that matters given the procedural

19  stance in the case, but, nevertheless, I wanted to at least

20  comply and mention the order -- mention the requirement under

21  the law.

22      Proceeding, then, to the sentence in the case, the Court

23  is required to impose a sentence that is sufficient but not

24  greater than necessary to comply with the purposes of

25  sentencing identified at 18 U.S.C. Section 3553.

U.S. v. Ledbetter  *  20-CR-168-G                           84
December 17, 2020

1        In determining the sentence to be imposed in this case,

2    I have considered the statutory factors.  I've considered the

3    information presented in the presentence investigation report

4    as addressed this morning, the arguments of counsel, and the

5    statement of Mr. Ledbetter.  In particular, I focused on the

6    nature and circumstances of the offense and the history and

7    characteristics of Mr. Ledbetter -- good and bad.  I have

8    tried to understand the full picture of who he is.

9        I've also considered the guideline range for

10   imprisonment as calculated under the United States sentencing

11   guidelines, which, in this case, recommend a sentence of 57

12   to 71 months.

13       As far as Mr. Ledbetter's personal history, there is

14   much good to be recognized.  He has served in the military

15   and has no history of violent crime.  All of that's to be

16   commended.

17       He's maintained steady employment and has the support of

18   his family.

19       In evaluating the nature of the offense, I focused on

20   what Mr. Ledbetter has actually done, not what he thinks or

21   what he said.  The criminal conduct at issue here, though, is

22   very serious, and it warrants a substantial punishment.

23   Mr. Ledbetter had an illegal machine gun.  He also

24   manufactured and possessed two grenades and two incendiary

25   devices.

U.S. v. Ledbetter   *   20-CR-168-G                                    85
December 17, 2020

1       Then there is the pursuit incident.  When a police

2   officer attempted to pull Mr. Ledbetter over, he refused to

3   yield, and he led the police on a chase back to his family

4   property.  He was carrying his machine gun during the chase,

5   and he called home to ask his stepfather to get guns ready

6   for a confrontation with the police.  When Mr. Ledbetter

7   exited the vehicle, he was carrying the machine gun, and he

8   shouted at the police officer.

9       Then there are the threats of violence.  This is an

10  unusual case in that, while the criminal conduct at issue

11  here is very serious, it is the fear of what else the

12  defendant might do that -- I think it's safe to say -- drives

13  the government's request for a "top of the guideline"

14  sentence.

15      The government looks to the statements that

16  Mr. Ledbetter has made about his willingness to commit

17  violence against law enforcement officers, statements made in

18  speeches and in videos and in Internet posts; and the

19  government is afraid that Mr. Ledbetter will actually carry

20  through on what he said he's going to do.

21      In considering whether that fear is justified, I do not

22  concern myself with Mr. Ledbetter's political ideology or his

23  lawful exercise of First Amendment or Second Amendment

24  rights, but I am concerned when someone's ideology leads him

25  over a cliff to land where they act in open defiance of the

U.S. v. Ledbetter   *   20-CR-168-G                          86
December 17, 2020

1    law.  Mr. Ledbetter is free to protest improper or illegal

2    conduct by the police, but, as citizens of this state and

3    this country, we are all obligated to obey the law and to

4    respect the officers charged with enforcing the law.

5        Mr. Ledbetter's repeated statements about using weapons,

6    including illegal firearms, against police officers indicate

7    at least some likelihood that, if not severely punished now,

8    he would commit crimes in the future similar to the one at

9    issue today.

10       Ultimately, as I say, I've tried to see the full picture

11   of what happened here and who the defendant really is, and

12   there is good, but there's a lot of bad mistakes here.

13       When applying the factors set forth in 18 U.S.C. Section

14   3553, I conclude that the sentencing guidelines give an

15   appropriate range of punishment for this case.  In light of

16   Mr. Ledbetter's complete lack of prior violent crimes, I

17   believe a sentence at the bottom of the guideline range is

18   appropriate.

19       Therefore, I will sentence Mr. Ledbetter to 57 months'

20   imprisonment to be followed by three years of supervised

21   release.  I believe that sentence is sufficient but not

22   greater than necessary to reflect the seriousness of the

23   offense, to afford adequate deterrence to criminal conduct of

24   Mr. Ledbetter and other similarly situated persons, and to

25   achieve punishment in the most effective means possible.

U.S. v. Ledbetter  *  20-CR-168-G                                87
December 17, 2020

1        I'll have the defendant stand, at this time.

2        Sir, it is the judgment of the Court that you,

3   Christopher Steven Ledbetter, are hereby committed to the

4   custody of the Bureau of Prisons for a term of 57 months.

5        Due to your inability to pay a fine, a fine is waived.

6        It's recommended that the defendant participate in the

7   federal Bureau of Prisons' Inmate Financial Responsibility

8   Program at a rate determined by BOP staff in accordance with

9   that program.

10       Upon release from imprisonment, the defendant shall be

11  placed on supervised release for a term of three years.

12       Within 72 hours of release from custody, the defendant

13  is obligated to report in person to the Probation Office in

14  the district to which he is released.

15       The defendant shall comply with the standard conditions

16  of supervision adopted by this Court while on release and

17  shall not possess a firearm or other destructive device and

18  shall cooperate in the collection of DNA as directed by law.

19       Further, while on release, the defendant shall comply

20  with the special conditions listed in Part D of the

21  presentence investigation report.  The Court specifically

22  adopts the report's justification for each of those

23  conditions as detailed in the Recommended Conditions of

24  Supervision section of that report.

25       It's further ordered that the defendant pay a special

U.S. v. Ledbetter   *   20-CR-168-G                              88
December 17, 2020

1   assessment to the United States of $100, which shall be due

2   immediately.

3        Finally the defendant is advised that, pursuant to the

4   plea agreement, he has waived the right to appeal or

5   collaterally challenge the sentence imposed by the Court

6   except under limited circumstances.

7        To the extent that a right of appeal survives that

8   waiver, the defendant is advised that he would appeal to the

9   United States Court of Appeals for the Tenth Circuit; and, if

10  he cannot pay the cost of appeal, he may apply for leave to

11  appeal *in forma pauperis* -- that is, without prepayment of

12  the cost -- and to have a government-appointed attorney and a

13  transcript provided without expense to himself.

14       Notice of appeal must be filed with the clerk of this

15  Court within 14 calendar days, or the defendant may announce

16  his intent to appeal on the record here today.

17       Let me ask counsel for the government:  Do we need to do

18  anything today insofar as the property that's at issue?

19            MR. DILLON:  Your Honor, I believe there was a

20  motion filed yesterday for the forfeiture of property, which

21  was part of this plea agreement.  We would ask the Court to

22  go ahead and announce that preliminary order of forfeiture.

23            THE COURT:  All right.  I believe the preliminary

24  order of forfeiture has been entered, and I'll take up any

25  final request that the government makes, whenever you make

U.S. v. Ledbetter   *   20-CR-168-G                                    89
December 17, 2020

 1   it.

 2          MR. DILLON:  Thank you, Your Honor.

 3          THE COURT:  All right.  Let me ask the Probation

 4   Office, then:  Did we cover everything we need to cover?

 5          THE PROBATION OFFICER:  Yes, Your Honor.

 6          THE COURT:  All right.  Anything further from the

 7   government?

 8          MR. DILLON:  No, Your Honor.

 9          THE COURT:  Anything further from the defendant?

10          MR. JOHNSON:  Judge, we would ask that you

11   recommend a placement within BOP at FCI El Reno.

12          THE COURT:  All right.  I'll make that

13   recommendation.  As counsel knows, my recommendation to the

14   Bureau of Prisons as far as a facility is only a

15   recommendation.  They have the discretion to assign

16   facilities based on their own judgment.

17       Beyond that, anything further from the defendant?

18          MR. JOHNSON:  No, Your Honor.

19          THE COURT:  All right.  Sir, you're remanded to the

20   custody of the United States Marshal to begin immediate

21   service of the term of imprisonment imposed by the Court.

22       We are adjourned.

23

24       (The hearing is adjourned at 2:15 p.m.)

25

U.S. v. Ledbetter  *  20-CR-168-G                                    90
December 17, 2020

1                          REPORTER'S CERTIFICATE

2          I, CASSY KERR, Federal Official Court Reporter in

3     and for the United States District Court for the Western

4     District of Oklahoma, do hereby certify that, pursuant to 28

5     U.S. Code 753, the foregoing is a true and correct transcript

6     of the stenographically reported proceedings held in the

7     above-entitled matter and the transcript page format is in

8     conformance with the regulations of the Judicial Conference

9     of the United States.

10         DATED THIS 26th day of April, 2023.

11

12         _____

13         /s/Cassy Kerr
           Cassy Kerr, CSR, CCR, RPR, CRR, CRC, NP-OK
           Oklahoma CSR License No. 1367
14         Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25